# EXHIBIT 1

## Spruill's Habeas Petition

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District **E.D.N.Y.** |
|---|---|

| Name (under which you were convicted):<br>Tasker Spruill | Docket or Case No.:<br>13008/95 |
|---|---|

| Place of Confinement:<br>Otisville Correctional Facility, PO Box 8, Otisville, NY 10963 | Prisoner No.:<br>98A5959 |
|---|---|

| Petitioner (include the name under which you were convicted)<br>Tasker Spruill | Respondent (authorized person having custody of petitioner)<br>v. Kathleen Gerbing |
|---|---|

The Attorney General of the State of **New York**

### PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging: _____
    Supreme Court, Kings County, 320 Jay Street, Brooklyn, New York 11201

    (b) Criminal docket or case number (if you know): Ind. No. 13008/95

2.  (a) Date of the judgment of conviction (if you know): 09/16/1998

    (b) Date of sentencing: September 16, 1998

3.  Length of sentence: 25 years to life

4.  In this case, were you convicted on more than one count or of more than one crime?  Yes X        No

5.  Identify all crimes of which you were convicted and sentenced in this case: _____
    Murder in the second degree

6.  (a) What was your plea? (Check one)

    (1)    Not guilty ✔            (3)    Nolo contendere (no contest) ☐

    (2)    Guilty ☐                (4)    Insanity plea ☐

    (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge,
    what did you plead guilty to and what did you plead not guilty to? N/A

_____
_____
_____
_____
_____

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury ☑    Judge only ☐

7.   Did you testify at either a pretrial hearing, trial or a post-trial hearing?

Yes ☐  No ☑

8.   Did you appeal from the judgment of conviction?

Yes ☑  No ☐

9.   If you did appeal, answer the following:

(a) Name of court: Supreme Court, Appellate Division - Second Department

(b) Docket or case number (if you know): _____

(c) Result: Conviction affirmed

(d) Date of result (if you know): 11/04/2002

(e) Citation to the case (if you know): 299 A.D.2d 374 (2d Dep't 2002)

(f) Grounds raised: _____

_____

See Addendum identifying the issues raised in prior state court and federal

litigation, p. 1

_____
_____

(g) Did you seek further review by a higher state court?   Yes ☑ No ☐

If yes, answer the following:

(1) Name of court: New York Court of Appeals

(2) Docket or case number (if you know): _____

(3) Result: Leave to appeal denied

_____

(4) Date of result (if you know): 01/13/2003

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

See Addendum to the habeas petition of Tasker Spruill identifying the issues raised

in prior state court and federal litigation, p. 1

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☐ No ☑

If yes, answer the following:

(1) Docket or case number (if you know): N/A

**ADDENDUM TO THE HABEAS PETITION OF TASKER SPRUILL
IDENTIFYING THE ISSUES RAISED IN PRIOR STATE COURT
AND FEDERAL LITIGATION**

**A.**   **Issues Raised On State Direct Appeal**
(Affirmed November 4, 2002)

1.   Spruill was deprived of a fair trial by (a) the prosecutor's mischaracterization of the defense, and (b) testimony that a fellow inmate called an eyewitness a 'snitch' while showing him his grand jury testimony against Spruill, and the court's ruling admitting photographs showing Spruill with a nickname tattoo.

2.   The prosecutor's improper and prejudicial comments during summation (a) comparing the police's inability to locate Spruill with Moses and King Edward VIII, and (b) referring to Spruill's brothers' presence at the scene of the crime as a suggestion that they should have been called as witnesses by the defense, deprived Spruill of a fair trial and shifted the burden of proof to the defense.

**B.**   **Issues Raised In Spruill's Application For Leave To
Appeal To The New York Court of Appeals  (Direct Appeal)**
(Leave denied January 13, 2003)

1.   Spruill was deprived of a fair trial by the admission of testimony that a fellow inmate called an eyewitness a 'snitch' while showing him his grand jury testimony against Spruill, and the court's ruling admitting photographs showing Spruill with a nickname tattoo.

**C.**   **Issue Raised On Prior Federal Habeas Corpus Petition**
(Denied July 25, 2005)

1.   Spruill was deprived of a fair trial by the admission of testimony that a fellow inmate called an eyewitness a 'snitch' while showing him his grand jury testimony against Spruill, and the court's ruling admitting photographs showing Spruill with a nickname tattoo.

**D. Issue Raised On Motion For A Certificate Of Appealability
Concerning Spruill's Prior Habeas Petition**
(Denied January 6, 2006)

1. Spruill was deprived of a fair trial by the admission of testimony that a fellow inmate called an eyewitness a 'snitch' while showing him his grand jury testimony against Spruill, and the court's ruling admitting photographs showing Spruill with a nickname tattoo.

**E. Issues Raised In CPL § 440.10 Motion To Vacate Judgment**
(Filed March 14, 2016; granted March 23, 2017; revered September 12, 2018; New York Court of Appeals leave to appeal denied March 5, 2019)

1. Spruill's conviction may be vacated on *Brady* grounds, based on the prosecution's suppression of numerous items of *Brady* material;

2. Spruill's conviction may be vacated pursuant to CPL § 440.10 (1) (b), as the prosecutor obtained the conviction through duress misrepresentation, and fraud;

3. Spruill's conviction may be vacated on State and Federal constitutional due process grounds based on the prosecutor's knowing use of, and failure to correct, false or misleading evidence and arguments;

4. Spruill's conviction may be vacated based on newly discovered evidence; and

5. Spruill's conviction may be vacated based on the prosecutor's use of Newton's legally coerced testimony at trial.

**F. Issues Raised in New York Court of Appeals Leave Application**
(Pertaining to the CPL § 440.10 Motion Leave denied March 5, 2019)

1. The prosecution's suppression of numerous items of *Brady* material and knowing use of, and failure to correct, false or misleading evidence and argument violated Spruill's right to due process.

(2) Result: __N/A__

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): __N/A__

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

     Yes X   No

11. If your answer to Question 10 was "Yes," give the following information:

   (a)  (1) Name of court: __Supreme Court, Kings County__

        (2) Docket or case number (if you know): __13008/95__

        (3) Date of filing (if you know): __March 14, 2016__

        (4) Nature of the proceeding: __CPL § 440.10 motion to vacate conviction__

        (5) Grounds raised: _____

__See Addendum identifying the issues raised in prior state court and federal litigation, p. 2__

        (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

          Yes ✔ No ☐

        (7) Result: __Motion granted, conviction vacated, and a new trial ordered__

        (8) Date of result (if you know): __03/23/2017__

   (b) If you filed any second petition, application, or motion, give the same information:

        (1) Name of court: __N/A__

        (2) Docket or case number (if you know): __N/A__

        (3) Date of filing (if you know): _____

        (4) Nature of the proceeding: __N/A__

        (5) Grounds raised: _____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?
Yes ☐ No ☐

(7) Result: __N/A_____

(8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: __N/A_____

(2) Docket or case number (if you know): __N/A_____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: __N/A_____

(5) Grounds raised: __N/A_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?
Yes ☐ No ☐

(7) Result: __N/A_____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition: Yes ☑ No ☐

(2) Second petition: Yes ☐ No ☐

(3) Third petition: Yes ☐ No ☐

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not: __N/A_____

_____

_____

_____

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:** the State suppressed crucial Brady material witness, including its knowing use of false or misleading evidence argument.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

See Addendum to the petition of Tasker Spruill stating the factual grounds for the petition

(b) If you did not exhaust your state remedies on Ground One, explain why: N/A (The issue presented in this petition was fully exhausted).

(c) **Direct Appeal of Ground One:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

    Yes ☐ No ☑

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: This issue was discovered after the direct appeal and raised in Spruill's CPL § 440.10 motion.

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

    Yes ☑ No ☐

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: CPL § 440.10 motion to vacate conviction

    Name and location of the court where the motion or petition was filed: Supreme Court, Kings County, 320 Jay Street, Brooklyn, New York 11201

    Docket or case number (if you know): 13008/95

    Date of the court's decision: 03/23/2017

Result (attach a copy of the court's opinion or order, if available): _____

_____ Addendum of court decisions in Spruill's case _____

_____

(3) Did you receive a hearing on your motion or petition?
Yes ✔ No ☐

(4) Did you appeal from the denial of your motion or petition?
Yes ✔ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
Yes ✔ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: New York Court of Appeals, 20 Eagle Street, Albany, New York 12207

Docket or case number (if you know): 13008/95

Date of the court's decision: 03/05/2019

Result (attach a copy of the court's opinion or order, if available): _____

_____ See Addendum of court decisions in Spruill's case _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:
N/A
_____
_____
_____
_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: N/A _____

_____
_____

**GROUND TWO:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____
_____
_____
_____
_____
_____
_____
_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes [ ] No [ ]

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes [ ] No [ ]

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

Yes [ ] No [ ]

(4) Did you appeal from the denial of your motion or petition?

Yes [ ] No [ ]

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes [ ] No [ ]

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

_____

_____

_____


**GROUND THREE:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?
Yes☐ No☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
Yes☐ No☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

_____

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☐ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?   Yes ✔   No ☐

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: N/A _____

_____

_____

_____

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: No _____

_____

_____

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? Yes ✔ No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinions or orders, if available. **United States District Court, Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York 11201; Spruill v. Phillips, 04 CV 1382 (NG) (MDG), habeas denied corpus denied July 25, 2005, 05-6184-pr (2d Cir. June 6, 2006), Certificate of appealability denied; See Addendum of court decisions in Spruill's case; See Addendum identifying the issues raised in prior state court and federal litigation, pp. 1-2.**

_____

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?     Yes ☐ No ✔

   If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. N/A

_____

_____

_____

_____

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

   (a) At preliminary hearing: Barry Krinsky, Esq., 26 Court Street, Brooklyn, New York 11242

_____

   (b) At arraignment and plea: Same

_____

   (c) At trial: Same

_____

   (d) At sentencing: Same

_____

   (e) On appeal: Richard Ware Levitt, Esq., 40 Fulton Street, 23rd Floor, New York, New York 10038

   (f) In any post-conviction proceeding: Rita Dave, Esq., 26 Court Street, Suite 1212, Brooklyn, New York 11242

   (g) On appeal from any ruling against you in a post-conviction proceeding: Rita Dave, Esq., 26 Court Street, Suite 1212, Brooklyn, New York 11242

_____

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?     Yes ☐ No ✔

   (a) If so, give name and location of court that imposed the other sentence you will serve in the future:
N/A

_____

   (b) Give the date the other sentence was imposed: _____

   (c) Give the length of the other sentence: N/A

   (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?     Yes ☐ No ✔

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

_____

_____

_____

**See Addendum explaining the timeliness of the petition**_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of —
   (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
   (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
   (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
   (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: **issuance of a writ of habeas corpus, including an unconditional writ barring retrial, ordering Spruill's release, and such further relief as may be appropriate,**

or any other relief to which petitioner may be entitled.

_____ - RITA DAVE, ESQ.

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____

_____ (month, date, year).

Executed (signed) on _April 24, 2019_ (date).

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition. _____

_____

_____

# ADDENDUM TO THE PETITION OF TASKER SPRUILL STATING THE FACTUAL GROUNDS FOR THE PETITION

# ADDENDUM TO THE PETITION OF TASKER SPRUILL
## STATING THE FACTUAL GROUNDS FOR THE PETITION

## INTRODUCTION

1.      Spruill seeks habeas relief based on the State's suppression of crucial *Brady* material, *Brady v. Maryland*, 373 U.S. 83 (1963), including its knowing use of false or misleading evidence argument.[1]

2.      In September 1998 Spruill was tried before the Honorable Ariel Belen (now retired) and convicted of the 1993 murder of Tracy Thomas, a local drug dealer killed as he sat in his car with drugs and loaded gun in East New York, Brooklyn.

3.      Before Spruill's trial the prosecutor, Irvin,  promised the defense he would disclose all *Brady* material in the case and in open court, assured the judge and defense that he had done so.  Irvin then presented Newton —a state inmate at the time he testified at Spruill's trial— to the jury as scared but Good Samaritan

---

[1]The now-retired prosecutor who committed this misconduct, Assistant District Attorney Stan Irvin, has been cited for misconduct in at least four other cases.  *See People v. Bond*, 95 N.Y.2d 840 (2000) (reversing murder conviction due to Irvin's suppression of his star witness' prior statement indicating she had not witnessed the crime); *People v. Boone*, 287 A.D.2d 461 (2d Dep't 2001) (noting the trial court's declaration of mistrial due to Irvin's elicitation of irrelevant and prejudicial testimony); *People v. Jenkins*, 284 A.D.2d 550 (2d Dep't 2001), *aff'd*, 98 N.Y.2d 280 (2002) (Appellate Division Justice Gloria Goldstein and Court of Appeals Justice Judith Kaye criticizing Irvin for his late disclosure of a ballistics report that blindsided the defense); *People v. Spruill*, 299 A.D.2d 374 (2d Dep't 2002) (majority holding Irvin "improperly implied during summation that" Spruill should have called witnesses, and dissent holding Irvin knowingly made a false summation argument and intentionally attempted "to insert facts not in evidence[.]")

who always met with the State voluntarily, and whose only reason for testifying was to see that justice was done.

4.  Yet at the same time Irvin was advancing this narrative, he was suppressing a host of facts that rendered his portrayal of Newton deeply misleading if not outright false, including:

(a) Newton had actually refused to meet with the prosecutor and *tried to kill himself* in his prison cell to avoid being brought to meet with Irvin,

(b) Newton, after being brought from State prison to Rikers Island, refused on multiple occasions, to meet with Irvin, and

(c) When detective-investigators from State's Office attempted to bring Newton to the State's Office *on the first day of trial*, he "refused" to accompany them,

5.  Irvin also used affirmatively false documentary evidence and made affirmative misrepresentations to the court, including:

(a) 15 counterfeit affirmations, bearing phony signatures, and falsely affirming to the court that Newton was needed in court to testify on dates Spruill's case was not being heard, and that Newton had asked to be produced to the State's Office, when he had, in truth, refused to be produced there, and

(b) Irvin knowingly allowed Newton to testify falsely regarding the number of pretrial meetings he had with Irvin —bolstering the impression that their interactions were always voluntary— argued that false testimony in summation, and deceived the trial judge into allowing Irvin to ambush the defense with a surprise witness —Connor— who Irvin had represented was dead.

6.      Spruill was convicted and sentenced to life in prison.  For the next 18-years, the State covered-up Irvin's misconduct, repeatedly lying to court after court that the *Brady* material didn't exist, and delaying and ultimately defeating Spruill's New York Freedom of Information Law lawsuit for key records.

7.      Irvin's conduct violated Spruill's right to due process and a fair trial, and the state court's rejection of Spruill's claims was contrary to, and constituted an unreasonable application of, clearly established Supreme Court precedent.

8.      A prosecutor's belief that a witness is scared of testifying does not give him a license to present the jury with an entirely false narrative concerning the events leading up to the witness' cooperation.   To the contrary, a prosecutor is constitutionally obligated to immediately correct any false impression he or the witness creates.

9.      Similarly, regardless of whether that witness ultimately "agrees" to testify, the defense is entitled to know what tactics the State employed to get that witness to the point that he "agreed," and to argue to the jury those tactics rendered the witness' testimony unworthy of belief.

## THE TRIAL

### A.      The State Casts Newton As An Always Voluntary Witness

10.      On October 18, 1997, Irvin provided Spruill's trial attorney with a Voluntary Disclosure Form representing the State was unaware of any *Brady*

material in the case but if they discovered any, they would provide it to the defense.  (Exhibit A.)

11.    On July 23, 1998, before Newton testified as a witness, the trial court directed Irvin to make a record of all *Brady* material pertaining to Newton, at the time a state prisoner at Coxsackie Correctional Facility.  Irvin then revealed the following:

    (a)    Newton received an infraction on Rikers Island for masturbating in front of a female correction officer, and cursing out another officer who ordered him to stop, and was going to be placed in solitary confinement for 120 days, but Irvin contacted corrections and arranged for them to waive the infraction;

    (b)    Irvin wrote to the State Department of Corrections attempting to secure work release and parole for Newton, and to have him moved to a non-maximum facility;

    (c)    Irvin promised Newton that after Newton testified, the State's Office would drive him back to his upstate prison; and

    (d)    Irvin agreed to attempt to relocate Newton's wife if the State determined she had been threatened.

(Exhibit B, Excerpt of Spruill's Trial Transcripts, pp. 433-438.)

12.    Irvin emphasized that despite his promises, he had explicitly informed Newton there was no guarantee Newton would benefit by testifying.  *Id.* (Irvin stating work release officials told him to tell Newton that despite the State's letter, they could not make any promises, and that Irvin conveyed that to Newton; same regarding parole and transferring Newton to a non-maximum facility).

13.    The import of Irvin's disclosures was thus that Newton, while initially reluctant to testify at trial, had always voluntarily met with Irvin and appeared at the State's Office, and that he decided to testify simply because it was the right thing to do.  Newton would later swear that he was testifying simply because he "want[ed] to be here" and Irvin would argue in summation that the *only* reason Newton was testifying was because of what had happened to his friend.

**B.    The State's Case**

**After The Decedent Is Murdered In His Car,
An Eyewitness Sees Newton Climbing Out Of The
Passenger Window**

14.    Around midnight on October 22, 1993, Morris Rogers ("Rogers"), a union carpenter with no criminal convictions, was buying beer at a 24-hour bodega on the corner of Hopkinson Avenue and McDonough Street in East New York, Brooklyn.   There were around 25 to 30 people hanging out at a nearby game room that Spruill owned.  Rogers did not see Spruill there, but saw one of his brothers.

15.    As Rogers waited on line at the bodega, he saw the decedent drive up in black Saab.   Newton and a man named Gregory Pearson were in the car with

the decedent.[2]  Rogers knew all three men from the neighborhood and knew that the decedent was a drug dealer.

16.     The decedent got out the car and purchased beer for Newton and Pearson, both of whom got out of the car as well.  The decedent and Rogers then began to talk about Rogers working on a barber shop that the decedent planned to open.  Newton and Pearson returned to the car, leaving him alone to converse with Rogers.  The decedent and Rogers talked for about five minutes, and he then returned to the car.

17.     When Rogers began to walk away he saw the decedent back his car up toward Hopkinson Avenue, toward the game room.  Suddenly, the decedent's car sped down the block at full speed and cut the corner.  Rogers heard the car crash and ran toward it.

18.     When he reached the car, he saw Newton and Pearson climbing out of the rear passenger windows, and the decedent slumped over the steering wheel.  There was money scattered everywhere in the car.  Rogers tried to speak to the decedent but he was unresponsive.  Rogers asked a woman standing nearby to call

_____

[2]Pearson was a drug dealer who worked with Newton.  He was killed before trial in an unrelated homicide by a man named Gerald Neal, who pled guilty to the murder.   Spruill was never charged with that crime, yet the State attempted to smear Pearson's murder on Spruill based on a triple hearsay statement of an unidentified jailhouse snitch, likely seeking to curry favor with authorities, recounting a rumor he heard on the street from unidentified people.  None of those rumors were before the jury, and under basic evidentiary rules and *Brady* jurisprudence, they may not be considered in reviewing the *Brady* issue.

911 and then began gathering the money scattered around the inside of the car for safe keeping.

19.     Meanwhile, Transit Police Officer Sharon Cole and her partner were driving on Broadway when they were flagged down by a group of people to what appeared to be an automobile accident. They observed the decedent's car crashed into another vehicle, and when Cole and her partner approached the car, they observed the decedent in the driver's seat slumped over the steering wheel. They saw Rogers crouching down outside of the driver's side door taking money out of the car.

20.     Cole and her partner handcuffed Rogers[3] and called the NYPD and EMS, assuming the decedent had been in a car accident. However, when EMS arrived and removed the decedent from the car, they informed Cole that he had been shot. An EMS worker also gave Cole drugs and money recovered from the decedent' car. Cole and her partner then went back to inspect the car and recovered a .38 caliber pistol between the gas and brake pedal.

### The Medical Examiner's Testimony Establishes Newton Could Have Been The Killer

21.     Frede Federic was a medical examiner with the New York City Medical Examiner's Office and an expert in forensic pathology. Frederic determined that the fatal shot could have been fired by someone sitting in the front

---

[3]The NYPD would later release him. Rogers stayed at the scene for two hours before he went with the police to the precinct to tell them what happened.

passenger seat of the decedent's car, exactly where Newton admitted he was sitting.

22.     Frederic explained that the decedent's bullet wound was consistent with someone shooting him from outside of the car as he sat in the driver's seat, and lacerations on the decedent's face from contact with the steering wheel.

23.     Critically, however, Frederic testified the decedent could have been shot by someone who sitting in the front passenger seat, exactly where Newton was sitting:

> Q.     Within a reasonable degree of scientific certainty, if two people are involved in a struggle in the front seat of the car and during the course of that struggle the body of the deceased is turned in the direction of the person he is struggling with, is that consistent with the course of the bullet in this particular case?
>
> A.     The muzzle of the gun has to be in a higher position —
>
> Q.     As long as the muzzle of the gun is in a higher position —
>
> A.     — than the deceased; *that could be.*
>
> Q.     So —
>
> THE COURT: *As long as the muzzle is higher than the deceased, than the dead person?*
>
> THE WITNESS:  *Yes, than the dead person.*

Exhibit B, p. 930.

**Police Identify Newton As The Prime Suspect In The Murder And Newton Initially Lies To The Police About His Knowledge Of The Crime, But When They Continue To Focus On Him, He Implicates Spruill, Who Owned The Game Room Near Where The Murder Took Place**

24.     Within days of the crime, Detective Willis Crossland, the lead detective in the investigation, received information that Newton may have been involved in the murder.  Detective Crossland considered Newton a suspect.

25.     Newton heard police were looking for him, and went to the precinct and lied to them, claiming he had nothing to do with the murder.  He did not identify Spruill as the shooter.  However, when the police continued to focus on Newton, and interviewed him a second time, he admitted he had been in the car when the decedent was killed, and then blamed Spruill for the murder.

26.     Detective Crossland acknowledged, however, that the fact that Newton was the prime suspect in the murder may have been what motivated him to come forward, and he thought Newton might be trying to clear himself by providing information to the police.

27.     It was not until two weeks later, on July 23, 1998, that Irvin was finally able to get Newton to testify.  Newton, who used the alias Derrick Wright, was a career criminal, and sexual deviant.  He began using marijuana when he was five years old, an admission that made jurors gasp.  He was selling drugs by the time he was 13, and sold them for the next 10 years.  He also sold drugs with the decedent.

28.     Newton had an extensive criminal history.  In March and June of 1992 he was convicted on attempted robbery charges and sentenced to respective terms of one year and nine months in prison.  During the robbery, Newton beat his victim.  Exhibit B, pp. 582-586.  In June 1995 he was convicted of criminal possession of a controlled substance and sentenced to 5 and 1/2 to 11 years in prison.  He was serving that sentence when he testified at Spruill's trial.

29.     After being sentenced on the drug case and sent upstate to prison, Newton was returned to Rikers Island in connection with Spruill's case.  On July 9, 1998, Newton was given 120 days in punitive segregation for publicly masturbating in the telephone area of his Rikers Island housing unit and cursing out a correction officer who told him to stop.

30.     Newton's account of the crime shifted responsibility for the murder to Spruill.  According to Newton, on the night of the shooting, the decedent, Newton, and Pearson were driving around in the decedent's car.  Newton had been released from prison less than three weeks before the murder and had smoked nearly one hundred dollars worth of marijuana that day.

31.     The decedent was mad because one of his girlfriends was involved with a minister of a church, and he had planned to burn the church down.  The men stopped at McDonough Street and Hopkinson Avenue where a crowd of around 50 to 70 people were gathered on the street socializing.

32.     In contrast to the disinterested testimony of Rogers —which had the decedent freely getting out of his car, casually speaking with Rogers, and even standing there by himself after Newton and Pearson returned to the car— Newton's testimony cast him as supposedly being nervous about getting out of the car and sending Newton and Pearson to scout out the area because Spruill was there. (As previously stated, Rogers testified that he did *not* see Spruill in the area.)

33.     Specifically, Newton claimed that when the decedent stopped his car near the bodega, the decedent didn't get out because he did not trust Spruill.   He supposedly told Newton and Pearson "to go see what's up with" Spruill and his friends" because he felt bad vibes.  Newton and Pearson then supposedly walked over to the game room and spoke with Spruill's brother and two other men standing there, and then returned to the car.[4]

34.     Newton said Spruill's brother Marty, who was standing in front of the game room, motioned for the decedent to come over and talk to him.  The decedent retrieved a gun hidden in his car, put it on his lap, drove over to where Marty was standing, and stopped his car.  Newton was in the front passenger seat at the time.

35.     Marty approached the car and shook the decedent's hand through the driver's side window, never letting go of it.  Newton claimed Marty held the

_____

[4]Rogers testified that he did not see Newton and Pearson walk over to the game room and talk to anyone.

decedent's hand for "thirty minutes" and Spruill then supposedly came out of the game room with a gun, approached the car, and reaching around Marty who was still holding the decedent's hand through the window, shot him in the chest at point blank range. (Irvin never attempted to reconcile Newton's account of the shooting with and Connor's, who omitted Marty from the scene, had the decedent getting out his car, and Spruill shooting him from five feet away.)

36.     The decedent immediately put the car in drive and drove around the  corner where he lost control and crashed into a parked car.  Newton and Pearson then climbed out the back window and fled.  Newton never mentioned the cash and drugs that were strewn about the inside of the car, or explained how it got there.

37.     Newton, despite claiming that the decedent was like a "brother" to him, and the decedent's mother like "a mother" to him, *never called an ambulance or attempted to help him.*   This was so despite Newton having multiple opportunities to call for help: he said after leaving his "brother" in the car, he *walked* to one of the decedent's drug stash spots to retrieve a gun, and that it took him 20 minutes to get there and another 20 minutes to return to the scene.[5]

---

[5]Notwithstanding that by the time he arrived the crime scene was flooded with police, Newton claimed he and Pearson fired several gun shots toward the game room.  Outside of Newton, there was no evidence this ever took place.

38.    The next day Newton heard police were looking for him and spoke with them about the crime.  Critically, Newton admitted that during his second interview by police, when he blamed Spruill for the murder, he had prior "disagreements or misunderstandings, anger" or somewhat of a bad relationship with Spruill.

39.    As to how Newton's trial testimony came about, Irvin led Newton to create the impression that Newton decided to testify after voluntarily meeting with Irvin around 20 times:

> Q.    Now, you're here today - - have you and I spoken since October of 1995, between that time and today?
>
> A.    Yeah.
>
> Q.    And do you recall — how many times would you say you and I have spoken between that time and today?  Just a rough estimate.
>
> A.    A good — about 20 times.
>
> Q.    How many?
>
> A.    About 20 times.
>
> Q.    Okay.  And that was where at?
>
> A.    In your office.
>
> Q.    And, during those times, were there times that you expressed other things that you would like for me to do?

> A.    Yes.

Exhibit B, p. 450.

41.    Irvin thus created the impression that Newton was always a willing participant in the meetings, presenting them as arms length negotiations where Newton simply asked Irvin for several favors in light of his testimony.

40.    Irvin reinforced Newton's testimony that there were 20 meetings between them by asking him on redirect, "you said before that you and I met and had spoke about twenty times, is that correct?," to which Newton replied, "Yes." Exhibit B, p. 692.

42.    The defense tried in vain to establish Newton had some incentive for testifying, but Irvin blunted the attack by having Newton testify to his pure motives.  Thus, even though Irvin contacted Corrections to ensure Newton would not be placed in punitive segregation for masturbating in front of a Corrections Officer, Newton claimed Corrections could still place him in segregation even after he cooperated with the State.

43.    Even when the trial judge questioned Newton about any incentive for cooperating, Newton swore there was no guarantee he would benefit by doing so, and that he was testifying simply because he wanted to:

> THE COURT:  [Irvin] told you he was going to do certain things, is that right?
>
> THE WITNESS:  He told me it's not definite it's going to happen. *I'm here because I want to be here.*

THE COURT: He's trying to find out what the
D.A. would do for you, but the D.A. said these things
wouldn't necessarily happen because Corrections doesn't
have to honor what [the] D.A. asks, is that right?

THE WITNESS: Yes.

Exhibit B, p. 651.

## The Only Other Identifying Witness Is A Heroin Addicted Prostitute

44.    Marilyn Connor was a heroin addicted prostitute with a lengthy

criminal record who, like Newton, sold drugs for the decedent.  Judge Ariel Belen,

who presided over Spruill's trial, declared she was "streetwise" "all over the map

… with her testimony" and that her credibility was a "real issue" Exhibit B, pp.

366-359.

45.    At the time of trial, she was a shoplifter for 12 years and a heroin

addict for six years.  She did not implicate Spruill in the crime until November 4,

1993, when she was arrested on larceny charges, and after she implicated Spruill,

her arrest was dismissed.

46.     In 1981 Connor was arrested for assault.  That same year she was

arrested for loitering for the purpose of prostitution, and in 1983, 1986, and 1993,

arrested for petit larceny.   After the October 1993 murder in Spruill's case, Connor

was arrested yet again for petit larceny (November 1993) and criminal possession

of stolen property (December 1993).  Connor claimed she stopped using heroin

about a month before the murder, but admitted she was still addicted to it.

47.      At the time of Connor's testimony there were several outstanding bench warrants for her arrest.  Following the first day of her testimony, detective-investigators from the State's Office escorted her to Queens Criminal Court to appear on some of those warrants, after which she was released on her own recognizance.

48.      Connor claimed that on the night of the crime she was in a cab going somewhere she couldn't remember and had the cab stop at a bodega so she could buy cigarettes.[6]  After getting out of the cab, she saw the decedent, who she knew for about two years, and who had paid her sister to store drugs in Connor's apartment.

49.      Connor claimed she wanted to pay the decedent the money back — because her sister had supposedly failed to carry through on her part of the deal— and was crossing the street to talk to him as he stood near a car talking to someone.

50.      Someone stopped her —she could not recall who— and told her to walk with them, or asked her for a cigarette (she claimed both) and as she walked away she looked back and heard a gunshot.  She saw a spark come from Spruill, who she claimed was standing by a tree about *five feet from the decedent, who looked as if he was getting out of a car*.  No one was standing between the two men.   Connor never mentioned that her co-workers, Newton and Pearson were

---

[6]She later claimed she had the cab stop because she saw the decedent.

sitting in the front and rear passenger seats, respectively. After supposedly hearing several more shots, Connor left the area.

51.　　　Connor said she did not want to be in court and that detectives had to threaten her to get her to come there. She said the day of her testimony —July 13, 1998— was the first time she met or spoke to Irvin, and Irvin told the court that Connor had been at the State's office for most of the day.

52.　　　There were substantial issues with Connor's credibility. *While she claimed she knew Spruill prior to the incident, she was unable to identify him from a photo array just a month after the incident.*

53.　　　Connor lied under oath. It was undisputed that two weeks after the murder, she was interviewed by the State's office and admitted under oath that she sold drugs for the decedent, and that when she exited the cab on the night of the crime, she met one of the decedent's uncles and one of his other dealers. Yet at trial Connor said that her claim about selling drugs for the decedent was concocted to protect her sister, and when questioned about meeting the decedent' uncle and her fellow dealer near the crime scene, Connor pled the Fifth Amendment.[7]

54.　　　During the second day of cross-examination, Connor retained counsel who advised her to plead the Fifth Amendment to avoid possible perjury charges, after Connor informed her attorney that she might give testimony *exculpating Spruill as the shooter.* Exhibit B, pp. 359-360.

---

[7]Even after the State gave Connor immunity for any drug-related crimes, she claimed she could not remember meeting any of the decedent's other dealers that night.

55.     While Connor ultimately reaffirmed her testimony that Spruill was the shooter, her attorney informed Judge Belen that Connor's testimony might have contradicted exculpatory statements she made to him but which the attorney-client privilege barred him from revealing.  Exhibit B, pp. 431-432A.

## The Evidence Introduced To Show Consciousness Of Guilt

56.     The only other evidence against Spruill was evidence introduced to supposedly show his consciousness of guilt.

57.     Over the defense's objection, Irvin introduced evidence regarding Newton supposedly being threatened when he was on Rikers Island.   Newton claimed that about three months before Spruill's trial, in March or April 1998, he was confronted by another inmate on Rikers who called him a snitch and showed him a transcript of his grand jury testimony against Spruill.  The State contended Spruill had to have orchestrated this because the State provided Spruill's attorney with a copy of Newton's grand jury testimony when trial began.[8]

---

[8]On direct appeal, Appellate Division Justice Gloria Goldstein concluded this testimony was improperly admitted and that compounded its prejudicial impact in summation. *People v. Spruill*, 299 A.D.2d 374, 376 (2d Dep't 2002) (Goldstein, J. dissenting).  Justice Goldstein reasoned that it was "undisputed that [Irvin] only released a copy of the Grand Jury minutes to … defense counsel at the commencement of the trial" and that these "undisputed facts indicated that the documents shown to [Newton] could not have been documents released by the [Irvin] to the defendant."  Irvin, Justice Goldstein found, "compounded the error when he argued that the witness was shown his 'very own sworn testimony to the Grand Jury,' knowing full well that such could not have been the case." *Id.*

58.     The parties stipulated that at one time Spruill had a small tattoo on the outside bicep area of his left arm that said, 'Pike.'" After the stipulation was read into the record, Spruill showed the jury his arm, which had a tattoo of a panther surrounded by moneybags.  It did not contain any lettering.[9]

59.     The remaining evidence established that despite extensive search efforts, the police were unable to locate Spruill for four years after the shooting. When Spruill was arrested in Baltimore, Maryland, he told police his name was Kevin Michael Mulberry.

60.     Outside of Newton and Connor, no other State witness identified Spruill as the shooter.[10]

## B.     The Defense's Case

61.     After Connor testified, Irvin belatedly disclosed *Brady* material establishing that shortly after the murder, detectives Henry Mulzac and Donna Wright showed Connor a photo array containing Spruill and Morris Rogers'

---

[9]Justice Goldstein held this evidence was improperly admitted as well: "[Irvin] could not establish when the defendant changed the tattoo, and therefore could not establish consciousness of guilt based upon the defendant's alteration of" it.  *People v. Spruill*, 299 A.D.2d at 377.

[10]Bobby Thomas, the decedent's uncle, identified the decedent's body; Detective Michael Sheptuk, a Crime Scene Unit team member responded to the scene; Detective Henry Mulzac, interviewed Connor, showed her a photo- array, and brought her to the State's office for further interrogation; Detective George Lapine, examined the ballistics evidence in the case; and Detectives Robert Schulman, Robert Sielaw, and Steven Feely, recounted their unsuccessful efforts to locate Spruill until he was arrested in Baltimore in 1997.

photographs, and a handwritten notation on the back of Morris Rogers' photograph indicated Connor positively identified Rogers as "Pike" and as "the shooter[.]"[11]

62. Based on these revelations, the defense called Mulzac and Wright as defense witnesses. Mulzac reiterated his testimony that he had no recollection of making the notation on back of Rogers' photograph. Wright, however, contrary to her hearing testimony that she was positive Mulzac made the notation, claimed the handwriting merely "looks like" and "appears to be" Mulzac's.[12]

## C.    <u>Summation</u>

63. Irvin's summation emphasized the voluntary nature of Newton's cooperation and his utter lack of incentive for providing it.

64. He argued the *only* reason Newton was testifying was because for once in his life he was doing the right thing, because of what happened to his friend: "Do you think that [Newton] … wanted to be here, other than the fact that he wanted to tell you what happened to his friend," he asked. Exhibit B, p. 1138.

65. Irvin then argued the very fact that Newton was testifying without any assurance that he would benefit by doing so made his testimony more believable:

---

[11]Judge Belen excoriated Irvin for his delay in disclosing this evidence and conducted a hearing at which Mulzac denied any recollection of showing Connor Rogers' photograph or making the handwritten notation on back of it. Judge Belen concluded Mullzac was "stonewalling" and "not telling the truth." Wright, in contrast, testified she was *positive* that it was Mulzac's handwriting on the back of the photograph.

[12]The State called Connor in rebuttal, who testified she never identified Rogers' photograph as that of the shooter.

> [Newton says] … despite the fact that [Irvin] said he'll
> write the letters [to parole and provide other
> consideration] and it might not happen, I'm still willing
> to tell you what happened.  The street smart person
> knows he may not get these things, but he's willing for
> once in his life, when he knows it's a risk and it may not
> happen, a person that's been using drugs since five,
> selling them from thirteen, sold drugs for a long time,
> goes to trial, for once in his life is willing to say that even
> though I know it may not happen, I'm willing to sit up
> here and tell you what I told the police the next day, what
> I told the ADA the next day, what I told the Grand Jury[.]

Exhibit B, pp. 1119-1120, 1129.

66.    Irvin also reiterated Newton's testimony that he and Irvin met 20

times: "He said we talked about this for days.  We met about twenty times"

Exhibit B, p. 1121.

## THE *BRADY*/DUE PROCESS VIOLATIONS

67.    For nearly two decades following Spruill's conviction, the State

covered-up Irvin's *Brady* and due process violations in Spruill's case.  Beginning

in 2015 and up until 2016, Spruill uncovered that evidence, discussed below, and

then used it to challenge his conviction.  *See* Addendum To The Petition Of Tasker

Spruill Explaining The Timeliness Of His Petition.

**A.     The Prosecutor's Deception Of The State Court With 15
        Counterfeit And Substantively False 'Affirmations'**

68.    Unbeknownst to the defense, in the months leading up to Spruill's trial

Irvin secretly used 15 literally counterfeit affirmations to deceive several judges

into issuing orders to produce and *Damiani* orders[13] that he then used to confine

Newton on Rikers and the State's office, confinements that were illegal as a matter

of law.  The counterfeit affirmations, court orders Irvin obtained with them,

consisted of:

(1)    Irvin's January 22, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(2)    Irvin's March 2, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(3)    Irvin's April 30, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(4)    Irvin's June 23, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(5)    Irvin's June 29, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

---

[13]A *Damiani* order is a New York court order allowing the District Attorney, upon an inmate's consent, to take custody of the inmate from jail or prison and bring him or her to the District Attorney's Office for questioning.  *See People v. Jackson*, 65 N.Y.2d 265, 267 n.1 (1985).  The orders are explicitly contingent on the inmate providing his written consent.  Exhibit C  (*Damiani* orders stating they were effective "provided the … inmate signs the written consent included in this order, thereby agreeing to be released into detective-investigators").  An order to produce is a court order directing a correctional facility to produce an incarcerated individual to court to provide testimony or appear in court.  *See* CPL § 630.10.

(6)     Irvin's July 13, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(7)     Irvin's July 17, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(8)     Irvin's July 7, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(9)     Irvin's July 10, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order dated July 6, 1998 (sic);

(10)    Irvin's July 16, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(11)    Irvin's July 21, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(12)    Irvin's July 27, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(13)    Irvin's July 28, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(14)    Irvin's July 28, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date; and

(15)    Irvin's July 28, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date.

*See* Exhibit C, Irvin's counterfeit affirmations and the court orders he obtained with them.

69.	Although the "affirmations" purported to have been affirmed by Irvin and bore what purported to be his signature, in truth, Irvin never affirmed them or signed them, and Irvin's name was signed by some unknown paralegal in the State's Office.

70.	These counterfeit affirmations, containing phony signatures, were *legal nullities*. *See e.g. Luscier v. Risinger Bros. Transfer, Inc*., 2015 WL 5638063, at *1 (S.D.N.Y. Sept. 17, 2015) (Castel, J. ) (affidavit upon which attorney falsely signed and notarized his client's name was a "sham filing of no evidentiary worth"); *Reboul, MacMurray, Hewitt, Maynard & Kristol v. Quasha*, 90 A.D.2d 466 (1st Dep't 1982) ("An affidavit purported to be that of one person, but signed and sworn to by another, is a nullity") (citation omitted); NY CPLR § 2106 (an affirmation is a statement "*of an attorney* admitted to practice in the courts of the state," "*subscribed and affirmed by him*" to be true under the penalties of perjury) (emphasis added).[14]

71.	Irvin's counterfeit affirmations had staggering consequences in the context of Spruill's case: Newton's confinements pursuant to the orders to produce and *Damiani* orders based on the counterfeit affirmations were, as a matter of law, unlawful. PL § 135.00 (1) (a person is confined "without consent" when that

_____

[14]Irvin's creation and use of these "affirmations" was, of course, fraudulent. *See e.g.  In re Moroff*, 55 A.D.3d 200 (2d Dep't 2008) (attorney's submission to court of two reply affirmations requiring his attestation, which, pursuant to his instructions, were signed by someone else constituted conduct involving "*dishonesty, fraud, deceit, or misrepresentation*") (emphasis added).

confinement is accomplished by "deception"); *Shaw v. Shaw*, 97 A.D.2d 403, 404

(2d Dep't 1983) (a judgment obtained through fraud "is considered a nullity" and a

"court will have no part in enforcing" it); *cf. Simon v. City of New York*, 893 F.3d

83, 93 (2d Cir. 2018) (seizure of material witness is analyzed under Fourth

Amendment principles and a seizure is reasonable only to the extent that it is

consistent with the legal authority authorizing it).

72.     Moreover, Irvin's staggering deception of the state court provided the

defense with powerful grounds to argue the State's case was corrupted, unworthy

of belief, and to bar Newton's trial testimony, which followed his unlawful

confinement, from being heard by the jury.  *Kyles v. Whitley*, 514 U.S. 419, 446 n.

15 (1995) (evidence establishing the government committed fraud in the course of

assembling its case against the defendant constitutes favorable evidence for *Brady*

purposes), *citing Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (overturning

conviction because the withheld *Brady* material "carried with it the potential … for

… discrediting … the police methods employed in assembling the case").

73.     The State explicitly conceded during Spruill's CPL § 440.10  that

Irvin created these counterfeit affirmations:

>           THE COURT [Judge Gerstein]: I think we have
> fully established from the papers -- Mr. Dennehy will
> correct me that the People do not dispute that the relevant
> affirmations were as Mr. Irvin testified were signed by a
> paralegal at the direction of Mr. Irvin.  Have I got that
> right, Mr. Irvin?

THE WITNESS:  Yes.

THE COURT:  Mr. [ADA] Dennehy?

DENNEHY:  Correct, Judge.

Exhibit D, CPL § 440.10 Hearing Transcript, August 17, 2016, p. 14; Exhibit E, State Appellant's Brief, pp. 24, 26-27 ("The practice in the [State's] Office at the time was for the paralegal to sign the ADA's name on the paperwork")

74.     In addition to being counterfeits, Irvin's "affirmations" were *substantively* false.  All of them falsely represented the court was being presented with an affirmation, that Irvin was the affiant, and that the affiant was a licensed attorney who had affirmed the contents of the document under the penalty of perjury.

75.     The *Damiani* affirmations falsely informed the court that Newton had "communicated to representatives of the State's Office" that he "wishe[d] to provide information" regarding Spruill's case when, in truth, Newton had informed Irvin that he would not testify, and had initially refused to consent to even meeting with Irvin.  Exhibit D, pp. 20-21 (Irvin admitting that when he applied for the *Damiani* order, Newton had not asked to be produced but Irvin simply wanted to interview him).  They also lacked Newton's written consent, a prerequisite to the effectiveness of the orders.  *See* n. 13, *supra*.

76.     Likewise, the order to produce affirmations falsely represented Newton was needed in court to testify on dates Spruill's case wasn't even on the

court calendar.  *See* Exhibit E, pp. 26-27 (State conceding that "[a]t the hearing, Irvin was shown several orders to produce Newton to court …. On those dates, Newton was not needed as a witness in a court proceeding. Indeed, on three of those … dates, defendant's case was not calendared.")

**B.    The Prosecutor's Suppression Of Newton's Attempt To Kill Himself To Avoid Meeting With The Prosecutor, And Newton's Repeated <u>Refusals To Be Transferred To The State's Office For Those Meetings</u>**

77.    Pursuant to a defense subpoena issued during Spruill's CPL § 440.10 hearing, the NYS Department of Corrections disclosed Newton's Chronological History record.  An entry in that record establishes that when Irvin sought to have Newton produced to court on May 13, 1998, Newton refused to go, attempted to kill himself, but was forced to go anyway:

> At request of [Senior Corrections Counselor], went to inmate's cell. *[Inmate] refusing to move to reception in order to prep for court trip.* Once I arrived at division, Officer went to release inmate out of cell in order to speak to me. *Inmate was in process of tying bed sheet around radiator pipe in what seemed to be an attempt at suicide.* [Inmate] seen at officer's office. *[Inmate] stated that he is stressed and does not want to go to court in fear of safety of himself and family. Explained that he will have to go and he would have to handle matter while in court.* [Inmate] stated he fears Spruill, Clayton (defendant) in case.  Assured that this will be noted and there should be no contact between him and enemy as well as enemy's family.  [Inmate] said he will pack up and move to reception w/o further incident. [Office of Mental Health] staff spoke to [Inmate] afterwards.

Exhibit F (emphasis added) ("Newton's suicide report").

78.     Newton's New York City correction records, also disclosed pursuant to a defense subpoena issued during the hearing, establish that prior to Spruill's trial, Newton refused to be transferred from Rikers to meet with Irvin on five occasions.   Exhibit C, pp. 31-32 (summarizing correction officer's testimony regarding Newton's City jail records).

79.     Indeed, Newton even refused to be produced to court *on the first day of Spruill's trial*, July 13, 1998.  The *Damiani* order authorizing Newton's production that day bears a handwritten notation by a correction officer indicating Newton "refused" to go.  Exhibit G, p. 2; Decision & Order Vacating Spruill's Conviction, March 23, 2017, p. 25 (" Irvin offered no explanation as to why he would not have investigated the non-production of his main witness on the first day of trial.")

80.     Thus, Newton refused to meet with Irvin at least *seven times*, including once when Newton tried to kill himself to avoid being brought to that meeting.   This directly contradicted Irvin's trial presentation of Newton as a witness who had always voluntarily met with him but who was simply scared to testify *in open court.*  The undisclosed evidence showed that in truth, Newton, who should have had absolutely no reason to fear meeting Irvin in the safety of the State's Office,  repeatedly refused to do so and tried to kill himself to avoid being brought there, evidence the defense could have used to argue to the jury that Newton had been coerced by his multiple involuntary productions.

81.     Since State and City corrections were acting on Irvin's behalf in executing the illegal transfers he orchestrated, Irvin is directly chargeable with knowledge of Newton's correction records. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case[.]")

82.     As previously stated, Irvin deceived the court into issuing orders to produce Newton by lying to the court that Newton was needed in court to testify when Spruill's case was not even on the calendar.  Irvin caused those fraudulently obtained court orders to be filed with corrections, and when prison officials executed them and witnessed Newton's refusal and attempted suicide, they were unwittingly carrying out *Irvin's* illegal scheme to get Newton to his office. Corrections was thus acting on Irvin's behalf and as such, Irvin is chargeable with their knowledge. *See Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir.1997) (government obligated to turn over witness' prison records inasmuch as such material bore on the witness' credibility).

83.     Critically, Newton's State correction records establish that on March 29, 1999, just a few months after Newton testified at Spruill's trial, Newton complained to the New York Attorney General that Irvin was failing to honor his promises to Newton, and warned that Irvin was prompting him to reveal that Irvin had "push[ed]" him "to testify after" Newton recanted prior to trial, and to "tell the court they got the wrong person in jail[.]"  Exhibit H.

**C. The Prosecutor's Elicitation Of Newton's False Testimony Regarding The Number Of Meetings He Had With the State's Office, And The Prosecutor's Lies Regarding Connor**

84.     As previously stated, during trial Newton testified, and Irvin argued in summation, that he and Irvin met at the DA's Office around 20 times, bolstering the impression that Newton was always a voluntary participant in those meetings.  Yet in truth, as Irvin admitted during Spruill's CPL § 440.10 evidentiary hearing, Newton and Irvin actually met only seven or eight times (Newton refused to attend the other seven times).  *People v. Spruill,* 164 A.D.3d 1270, 1277 (2d Dep't 2018) ("the prosecutor should have corrected Newton's testimony and should not have referenced such testimony during summation[.]")

85.     Irvin also deceived the court and defense regarding Connor.   For weeks before trial Irvin represented that Connor was dead and would not be called as a witness.  Irvin then obtained a secret material warrant from a miscellaneous part judge, Exhibit I, took Connor into custody on it, and ambushed the defense with Connor as a surprise witness on the first day of trial.

86.     When the defense objected to this ambush, Irvin, without ever informing Spruill's trial judge that Connor was already in the DA's custody on the secret material witness warrant obtained from another judge, falsely argued that Connor had to be called out of turn because she "*would not return to court and might disappear if her testimony was adjourned*[.]"  Exhibit E, p. 7 (emphasis added).

87.     The trial court overruled the defense objection and allowed Irvin to call Connor.  Neither the defense or court ever learned of Irvin's deception, and that it was impossible for Connor to "disappear" since she was already in the DA's custody on the secret material witness warrant.[15]

### SPRUILL'S CPL § 440.10 MOTION RAISING THE INSTANT CLAIMS

88.     On March 14, 2016, Spruill brought a State CPL § 440.10 motion to vacate his conviction, based on, as relevant here, the State's *Brady* violations and knowing use of false or misleading evidence and argument.

89.     On March 24, 2017, following a four-day evidentiary hearing, Acting Supreme Court Judge Michael Gerstein granted Spruill's motion on *Brady* and knowing use of false testimony grounds, vacated Spruill's conviction, and ordered a new trial.

90.     Judge Gerstein held Irvin violated Spruill's rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by *deliberately* suppressing (1) that Newton repeatedly refused to meet with Irvin, tried to kill himself to avoid being brought to one of those meetings, and was repeatedly produced to meet with Irvin after that suicide attempt, (2) several court orders evidencing Newton's lack of consent to

---

[15]Irvin also deceived the trial judge regarding the material witness warrant on two additional occasions.  After Connor testified, Irvin stood by silently as the trial judge warned Connor that if she did not return to court for cross-examination she might "be considered a material witness" and be "arrested."  Later, when Connor failed to appear in court, the trial judge instructed Irvin to prepare a material witness warrant should she fail to return and Irvin said that he would.

meet with Irvin, (3) Irvin's repeated and consistent breaches of his promise to the court, under the penalty of perjury, that Newton would not be produced to the State's Office unless he provided his written consent, and (4) the secret material witness warrant regarding Connor.[16]

91.     Newton's May 13, 1998, suicide attempt, explicit refusal to meet with Irvin on the first day of trial, and the lack of written consent on even a single date, Judge Gerstein held, could have supported the defense argument that Newton's testimony was coerced and not credible.  *Id.* 17.

92.     Likewise, Irvin's breach of his representations may have undercut *his own* credibility and Newton's as well.  *Id.* p. 18.

## THE APPELLATE DIVISION'S DECISION REVERSING THE VACATUR

93.     On September 18, 2018, the Appellate Division, Second Department reversed the decision vacating Spruill's conviction, reinstated the judgment, and ordered Spruill's re-incarceration.  (Spruill had been freed on bail following the vacatur of his conviction and surrendered after the Appellate Division's decision.)

---

[16]Judge Gerstein also vacated Spruill's conviction on knowing use of false testimony grounds, based on Irvin's failure to correct Newton's false trial testimony that he and Newton had 20 meetings.  Judge Gerstein declined to vacate Spruill's conviction based on Irvin's use of the counterfeit affirmations, concluding it did not provide a basis for vacatur under CPL § 440.10.  Spruill motioned the Appellate Division, Second Department for leave to cross-appeal that aspect of Judge Gerstein's decision, but on June 23, 2017, his request was denied.  Decision and Order on Application, *People v. Spruill*, 2017-04490 (M-233441) (Cohen, J.).

94. The Appellate Division's decision was constitutionally flawed in at least five key respects.

95. First, notwithstanding that Newton's suicide attempt and refusal to be brought to Irvin's office directly contradicted Irvin's trial narrative that Newton had always voluntarily met with him prior to trial, the Appellate Division held Newton's suicide report was not favorable to the defense under *Brady* because it indicated Newton's suicide stemmed from his fear of Spruill. But Supreme Court precedent hold that "if the withheld evidence contains material for impeachment, it falls within the *Brad*y principles *even if it may also be inculpatory*[.]" *Fuentes v. Griffin*, 829 F.3d 233, 246 (2d Cir. 2016)(emphasis added), citing *Strickler v. Greene*, 527 U.S. 263, 282 n. 21 (1999). The Appellate Division's conclusion is thus contrary to Supreme Court precedent.

96. Second, the Appellate Division held that, based on a state law rule, *People v. Howard*, 87 N.Y.2d 940 (1996), Irvin was not chargeable with knowledge of Newton's suicide report because it was in corrections', rather than Irvin's, control. But *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) holds a prosecutor is responsible for other acting on his behalf, and the Appellate Division ignored that corrections learned of Newton's refusal and attempted suicide while they were acting on behalf of Irvin, who had personally orchestrated Newton's illegal productions. Irvin was thus chargeable with suppressing the documents for *Brady* purposes. *Accord Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir.1997)

(government obligated to turn over witness' prison records inasmuch as such material bore on the witness' credibility).

97.     Third, in assessing the materiality of the suppressed evidence, the Appellate Division impermissibly relied on evidence that was never introduced at Spruill's 1998 trial, but rather, adduced 18 years after Spruill was convicted, at the 2016 hearing on his CPL § 440.10 motion.  This violated Supreme Court precedent holding that materiality of suppressed evidence must be assessed only against evidence the State actually introduced at trial, and not on *de hors* the trial record evidence and arguments the jury never heard.  *See Turner v. United States,* 137 S.Ct. 1885, 1893 (2017) ("We must examine *the trial record* [and] evaluate the withheld evidence *in the context of the entire record"*) (emphasis added) (citations and alternations omitted); *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (*Brady* materiality "is assessed in light of the evidence adduced against the defendant *at trial"*) (emphasis added).[17]

98.     Fourth, the Appellate Division concluded that the unsigned *Damiani* orders and the one explicitly indicating Newton refused to be produced to meet with Irvin on the first day of trial were not material, focusing solely on the

_____

[17]*Accord United States v. Gallego*, 191 F.3d 156, 164-65 (2d Cir. 1999) (analyzing reasonable probability in the ineffective assistance of counsel context and holding "[i]t is inconsistent with [that] standard for the government to evaluate [materiality] with hypothetical testimony that was not delivered to the jury.  Such a practice would raise serious concerns under the Confrontation Clause[.]"), abrogated on other grounds by *Crawford v. Washington*, 541 U.S. 36 (2004).

purported strength of the State's case. But the Second Circuit recently held that analyzing materiality in this manner violates clearly established federal law because it fails to consider how the undisclosed evidence *might have been used by the defense*. *See Fuentes v. Griffin*, 829 F.3d 233, 249 (2d Cir. 2016) ("materiality analysis requires a careful, balanced examination of the nature and strength of the evidence presented, *as well as an evaluation of the potential impact of the evidence on the witness's credibility*") (emphasis added); *Kyles v. Whitley*, 514 U.S. at 441-454 (conducting a thorough examination of suppressed *Brady* material, what purpose it would have served, and how it might have affected the jury's view of the evidence introduced at trial).

99.     Finally, because the Appellate Division erroneously deemed Newton's suicide report unfavorable to the defense, and failed to take in account Irvin's repeated breeches of his sworn promises to the court, it never considered that evidence was assessing the materiality of *Brady* materiality suppressed in Spruill's case. This violated Supreme Court precedent as well, as when the State suppresses several items of *Brady* material, a reviewing court must consider the *cumulative prejudice* resulting from that suppression. *See Kyles*, 514 U.S. at 437 n. 10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately.")

## **CONCLUSION**

100.   The Appellate Division's decision was contrary to, and constituted an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.  28 U.S.C. § 2254 (d).

# ADDENDUM TO THE PETITION OF TASKER SPRUILL EXPLAINING THE TIMELINESS OF HIS PETITION

**ADDENDUM TO THE PETITION OF TASKER SPRUILL
EXPLAINING THE TIMELINESS OF HIS PETITION**

1.      Spruill's present petition is based on the fruits of his years-long struggle, in the face of the State's continuing misrepresentations, to amass evidence proving he was deprived of a fair trial.

2.      Because his petition relies on new evidence, the basis for its timeliness is 28 U.S.C. § 2244 (d) (l) (D), under which a habeas petitioner has one year in which to file his petition from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

3.      Alternatively, because Spruill's case involves affirmative State misconduct —an 18-year cover-up of the *Brady* material in his case— 28 U.S.C. § 2244 (d) (l) (B) governs the timeliness of Spruill's claims. *Id.* (designating the trigger date as the date an unconstitutional State created impediment to filing a habeas petition is removed).

4.      Finally, the doctrines of equitable estoppel and equitable tolling apply to moot any argument the State might make concerning the purported untimeliness of Spruill's claims.

5.      As demonstrated below and in the attached Time Line, Spruill's one-year limitation to file his habeas petition began to run, *at the earliest*, on May 11, 2015, when he learned Irvin created and used eight counterfeit affirmations in his

case. Subtracting from that date the time during which Spruill's CPL § 440.10 motion and resultant appeals were pending —March 14, 2016 to March 5, 2019— Spruill had until April 30, 2019, to file this petition. *See* Time Line attached to this addendum. (The pendency of Spruill's CPL § 440.10 tolled the one-year limitation period.)

6. As will be discussed in Spruill's Memorandum of Law, which we will file shortly, a habeas petitioner is deemed to have discovered the "factual predicate" for a claim, not at the point he begins to harbor some suspicion of unfairness, but only once he knows the "important" facts that form the bases for each element of his claim.

7. Thus, in a *Brady* case such as this one, the "factual predicate" must consist of concrete facts sufficient to show both that the State withheld exculpatory or impeachment evidence, and that this lack of disclosure was material.

## A. The Timeliness Of The *Brady* Claim Based On The Prosecutor's Creation And Use Of The 15 Counterfeit Affirmations

### Factual Predicate

8. Spruill's *Brady* claim based on Irvin's false affirmations is based on two groups of documents: (1) the false affirmations the State disclosed pursuant to Spruill's New York Freedom of Information Law lawsuit, and (2) the false affirmations the State disclosed during Spruill's 2016 CPL § 440.10 hearing.

9.      The State did not disclose the first group of documents —six orders to produce affirmations and two *Damiani* affirmations— until 2010,  following Spruill's successful Freedom of Information Law lawsuit.  However, when the State provided Spruill with them, it never disclosed the latent *Brady* material contained in the documents, indiscernible to the naked eye: that Irvin's signatures on the affirmations were false and had been signed by a paralegal, and that the factual representations in them were false.

10.     When Spruill initially received the eight affirmations in 2010, he was indigent, incarcerated, and more importantly, there was nothing in the documents to alert Spruill that they were counterfeits.  Moreover, the State had by that point represented for 12 years that it had already disclosed all *Brady* material in Spruill's case.  *See* Addendum Stating Factual Grounds For Spruill's Habeas Petition, ¶¶ 8-10, 60-63; Time Line, *infra* October 18, 1997 and July 13, 1998, entries.   Spruill was legally entitled to rely on the State's representations and cannot be faulted for having been deceived by them.  *See e.g. Banks v. Dretke*, 540 U.S. 668 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."); *Su v. Filion*, 335 F.3d 119, 128 (2d Cir. 2003) ("it would be an unreasonable application of federal law, as determined by the Supreme Court, to fault the defendant for not proceeding in his cross-examination on the assumption that the prosecutor is a liar.")

11.     It was not until May 11, 2015, after the undersigned took on Spruill's case and, aware of the revelations in the high-profile Jabbar Collins wrongful conviction case, had Irvin's affirmations analyzed by a handwriting expert and discovered they were fraudulent.  Exhibit J (Handwriting Expert Report dated May 11, 2015).

12.     The second group of Irvin's counterfeit affirmations —six *Damiani* affirmations— weren't disclosed by the State until August 15, 2016, during Spruill's CPL § 440.10 hearing.  *See* Decision & Order Vacating Spruill's Conviction, March 23, 2017, p. 11, n. 6 ("Just prior to Irvin testifying [at the 440 hearing], the People disclosed, *inter alia*, seven (sic) additional *Damiani* orders, an Order to Produce … and their supporting affirmations … that the District Attorney's Office located while searching their file in lieu of a defense subpoena.") Prior to that, the State had falsely represented that all *Damiani* orders in the case had been disclosed.  *Id.* p. 30 ("The People's response to Spruill's FOIL request following the Article 78 proceeding "was clearly incomplete, as many additional documents were produced only during the pendency of this motion[.]")

### Due Diligence

13.     Assessing due diligence for § 2244 (d) (1) purposes requires the court to consider the petitioner's unique circumstances, particularly his lack of resources due to his incarceration and indigence.  *See e.g. Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000) ("The proper task in a case such as this one is to determine

when a duly diligent person in petitioner's circumstances would have discovered"
the factual predicate for the claim, and the mere fact that it was possible to
discover evidence earlier is not dispositive.  "The statute does not require the
maximum feasible diligence, only "due," or reasonable, diligence."), citing
*Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir. 2000) (assessment of due
diligence must take into account the limitations imposed by petitioner's
incarceration).

14.    As discussed above, it was impossible for anyone, much less an
incarcerated, indigent, prisoner to discover with the naked eye that Irvin's
affirmations were counterfeit.  It was only when analyzed by a Handwriting Expert
that the fraudulent nature of the affirmations came to light.  Not only could Spruill
not afford a handwriting expert on his own, but there was nothing to alert him that
there was any need to have the affirmations in his case analyzed, particularly
considering the State's repeated representations that it had already disclosed all
*Brady* material.

15.    Likewise, Spruill had no basis to suspect Irvin's factual
representations in the affirmations were false, that Irvin had lied to several judges
regarding his need for Newton in court, and that Irvin had lied to those judges
about Newton's purported offer to share information with the State and willingness
to be produced to its office.

**B.** **The Timeliness Of The *Brady* Claim Based On The Prosecutor's Suppression Of Newton's Suicide Attempt And His Repeated Refusals To Meet With The Prosecutor**

## Factual Predicate

16.    It is undisputed that it was not until August 15, 2016, that the State turned over six *Damiani* orders, lacking Newton's written consent, and one indicating he "refused" to be produced to meet with Irvin.

17.    It is also undisputed that it was not until September 2016, that New York State and City Corrections provided the defense with Newton's suicide report, and records of his refusals to be produced to meet with Irvin.  Until that point, Spruill simply had no way of knowing this evidence existed.

18.    While the State, in 2010, provided Spruill with two *Damiani* orders that lacked Newton's signature indicating he consented to production on two specific occasions, this was obviously insufficient to establish Newton had affirmatively refused to be produced on those dates.  Indeed, the State made this very argument in opposition to Spruill's CPL § 440.10 motion, contending any such a claim was "unsupported," "speculative,"  and "belied by the record." Exhibit K, ADA Morgan J. Dennehy's Memorandum of Law Opposing Spruill's CPL § 440.10 Motion, May 26, 2016, pp. 13-15.  In any event, establishing Newton refused to meet with Irvin on these two occasions was insufficient, in and of itself, to satisfy the *Brady* materiality standard, and it was only when Newton's

lack of signatures is considered with the other affirmative evidence of misconduct in the case that it met *Brady*'s materiality standard.

### Due Diligence

19.     The State took the position in the lower court that Irvin had no knowledge of Newton's suicide attempt, or that Newton refused to be produced to any of their meeting.  If Irvin had no knowledge of this, Spruill obviously didn't either, much less any way to uncover it from his prison cell.

**C.     The Timeliness Of The *Brady* Claim Based On Newton's False Testimony Regarding The Number Of Meetings He Had With The Prosecutor, And The Prosecutor's Lies Regarding Connor**

### Factual Predicate & Due Diligence

20.     The State conceded that during trial Irvin allowed Newton to give false testimony that the two met on 20 occasions before trial.  The State also conceded that Irvin argued that false testimony in his summation.  Irvin did not reveal the truth about the number of meetings he had with Newton —only seven eight— until August 15, 2016, when he testified at Spruill's CPL § 440.10 hearing.

21.     Spruill was entitled to assume Irvin was not a liar and would not use false evidence, and Spruill cannot be faulted for doing so.  *Su v. Filion*, 335 F.3d at 128 (it would be an unreasonable application of federal law to fault the defendant for not proceeding on the assumption that the prosecutor is a liar.)

22.     Likewise, Spruill did not uncover Irvin's deception of the trial court regarding the secret material witness order and his lies regarding Connor's

unavailability until after his current counsel took on and independently

investigated the case in May 2015.

**D.    The State's 18-Year Cover-Up Of The *Brady* Material In Spruill's Case Was A State Created Impediment To Filing Under 28 U.S.C. § 2244 (d) (l) (B).  Moreover, Equitable Estoppel Precludes The State From Raising Timeliness As A Defense To Spruill's Petition**

23.    For nearly 18 years following Spruill's conviction —from July 1998

to August 2016— the State covered-up the *Brady* material in this case.

24.    Eight years after Spruill was convicted, he made a Freedom of

Information Law ("FOIL") request to the State for all records in its possession

relating to his case.  The State delayed resolving Spruill's request for four years,

and in 2010, he commenced a CPLR Article 78 proceeding challenging the State's

denial.  *Spruill v. Hynes*, Kings County Index Number 11036/10.

25.    In response to Spruill's Article 78 petition, the State disclosed two

*Damiani* orders and five orders to produce.  The Office then swore to the court

that it had fully complied with Spruill's FOIL request.  In July 2010, the court

credited the State's representations and dismissed Spruill's petition.  Exhibit L,

State's Opposition To Spruill's Article 78 Petition & Court Information Sheet.

26.    Six years later, Spruill filed his CPL § 440.10 motion arguing, among

other things, that Newton had repeatedly refused to meet with Irvin.  The State

opposed the motion, arguing Spruill's claim were "unsupported" and

"speculative." Exhibit K, p. 13.  When the parties appeared for oral argument on

the motion, the State represented that the two *Damiani* orders it disclosed pursuant to Spruill's FOIL request were "the only orders in the[ir] file." Exhibit M, p. 27.

27.     Yet, at the same time the State was making this representation, it was suppressing six additional *Damiani* orders lacking Newton's written consent, including one memorializing his explicit refusal to meet with Irvin, and Newton's suicide report. Exhibits C, F, and G.

28.     It was not until August 2016, when the State, faced with a defense subpoena in connection with Spruill's 440 motion, finally disclosed the additional *Damiani* orders, each of which was *Brady* material and responsive to Spruill's FOIL request.

29.     As we will argue in our upcoming memorandum of law, this series of false official denials should equitably estop the State from asserting the statute of limitation defense and, at the very least, equitably toll the statute of limitations with regard to the claims in Spruill's petition.

# TIME LINE

| | |
|---|---|
| **1997**<br><br>October 18 | **The State provides Spruill's trial attorney with a Voluntary Disclosure Form representing the State was unaware of any _Brady_ material in the case** but if they discovered any, they would provide it to the defense (Exhibit A). |
| **1998**<br><br>July 13 | **The State falsely represents it had disclosed all _Brady_ material in the case.** Supreme Court, Kings County Judge Ariel Belen, who handled Spruill's trial, directed the State to make a record of all _Brady_ material pertaining to its star witness Shawn Newton ("Newton"). Irvin then reveals the following:<br><br>(1) Newton received an infraction on Rikers Island for masturbating in front of a female correction officer, and cursing out another officer who ordered him to stop, and was going to be placed in solitary confinement for 120 days, but Irvin contacted corrections and arranged for them to waive the infraction;<br><br>(2) Irvin wrote to the State Department of Corrections attempting to secure work release and parole for Newton, and to have him moved to a non-maximum facility; |

| | |
|---|---|
| **1998** | |
| | (3)     Irvin promised Newton that after Newton testified, the DA's Office would drive him back to his upstate prison; and |
| | (4)     Irvin agreed to attempt to relocate Newton's wife if the DA's Office determined she had been threatened. |
| | The prosecutor emphasized that despite these promises, he had explicitly informed Newton there was no guarantee Newton would benefit by testifying. |
| | At trial Irvin presents Newton as a witness with no undisclosed motive for testifying, whose sole reason for doing so was to see that justice was done for his friend's murder. Newton, the narrative continued, was a Good, albeit reluctant, Samaritan who engaged in consensual talks with the DA's office and decided to testify only because it was the right thing to do. *See* Spruill's Habeas Petition, Factual Addendum ¶¶ 11-13. |
| September 16 | Spruill is convicted and sentenced to 25-years to life |
| **2002** | |
| November 4 | The Appellate Division, Second Department affirms Spruill's conviction, *People v. Spruill*, 299 A.D.2d 374 (2d Dep't 2002) |
| | |

| | |
|---|---|
| **2003** | |
| January 13 | The Appellate Division (Goldstein, J.) denies Spruill's application for leave to appeal to the New York Court of Appeals |
| **2005** | |
| July 25 | The United States District Court, Eastern District of New York (Gershon, D.J.), denies Spruill's first habeas corpus petition, *Spruill v. Phillips*, 2005 WL 1743828 (E.D.N.Y. July 25, 2005) |
| **2006** | |
| August 1 | Spruill makes a Freedom of Information Law ("FOIL") request to the DA's Office for all records in the DA's possession relating to his case.  The DA's Office delays resolving Spruill's request for four years, and in 2010, he commences a CPLR Article 78 proceeding challenging the DA's denial.  *Spruill v. Hynes*, Kings County Index Number 11036/10.  In 2010, in response to Spruill's Article 78 petition, the State discloses two *Damiani* orders and six orders to produce.  The State then swears to the court that it had fully complied with Spruill's FOIL request (Exhibit L).  In July 2010, the court credited the State's representations and dismisses Spruill's petition.  *Id.* |

| | |
|---|---|
| **2006**<br><br>January 6 | The Second Circuit denies Spruill's motion for certificate of appealability, *Spruill v. Phillips*, 05-6184-pr (2d Cir. 2006) |
| **2015**<br><br>May 11 | **Spruill uncovers the first batch of undisclosed *Brady* material: the State's fraud on the court by its deception of several judges with eight counterfeit and substantively false affirmations.**  Spruill, indigent and only through the assistance of a third-party, retains an expensive handwriting expert who, after comparing Irvin's true signature to the signatures on eight affirmations in Spruill's case, determines the affirmations are phony and someone other than Irvin signed them.  Those phony affirmations were used to deceive at least five state judges in Spruill's case, by, among other things, falsely informing the judges that they were being presented with affirmations, that Irvin was the affiant, and that an attorney had affirmed the factual representations in them.  (Exhibit C).<br><br>Pursuant to 28 U.S.C. § 2244 (d) (1) (B) and (D), the one-year time limitation for bringing a habeas petition *on this issue* began to run on this date.  *Id.* (providing the one-year period shall run "from the latest" of "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action," or "the |

| | |
|---|---|
| **2015** | date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."); *Zack v. Tucker*, 704 F.3d 917 (11th Cir. 2013) (one-year statute of limitations applies to each claim in a habeas application by a state prisoner on an individual basis, rather than application as a whole); *Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000) (holding "[t]he proper task in a case such as this one is to determine when a duly diligent person in petitioner's circumstances would have discovered" the factual predicate for the claim, and that the mere fact that it was possible to discover evidence earlier is not dispositive. "The statute does not require the maximum feasible diligence, only 'due,' or reasonable, diligence."), citing *Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir. 2000) (assessment of due diligence must take into account the limitations imposed by petitioner's incarceration). <br><br>(At this point, Spruill has 365 days to file his habeas petition.) |
| **2016**<br><br>March 14 | Spruill's files his CPL § 440.10 motion arguing the State committed a *Brady* violation by failing to disclose the eight counterfeit affirmations, its fraud on the court, and its knowing use of false evidence and argument. Under 28 U.S.C. § 2244 (d) (2), Spruill's filing of this motion tolled the running of the one-year statute of limitation. *Id.* ("The time during which a properly filed application for State post-conviction or other collateral |

| | |
|---|---|
| **2016** | |
| | review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.") *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999) (filing of CPL § 440.10 motion tolls the one year limitation period from the date the motion is filed until it is finally disposed of and further appellate review is unavailable). |
| | (At this point, Spruill still has 56 days remaining to file his habeas petition.) |
| July 13 | The State misleads the judge handling Spruill's CPL § 440.10 motion by informing the judge that the two *Damiani* orders it disclosed pursuant to Spruill's FOIL request were the only ones "in the file." (Exhibit M, p. 27). |
| July 27 | **Spruill uncovers a second batch of undisclosed *Brady* material**: the prosecutor testifies at Spruill's CPL § 440.10 hearing that his representations in the *Damiani* affirmations that Newton had asked to be produced were not true. Instead, the prosecutor admitted, he simply wanted to speak with Newton. The prosecutor also admits that he allowed Newton to testify falsely that he met with the prosecutor 20 times. (Exhibit E, p. 25 n. 3) |
| | Pursuant to 28 U.S.C. § 2244 (d) (1) (B) and (D), the one-year time limitation for bringing a habeas petition *on this issue began to run*. *Zack v. Tucker*, 704 F.3d 917 (one-year time limitation applies to each individual claim) |

| | |
|---|---|
| **2016** | |
| August 15 | **Faced with a defense subpoena, the State discloses a third batch of *Brady* material**: six additional phony *Damiani* affirmations that the prosecutor submitted during trial, including a *Damiani* order bearing a handwritten notation that Newton "refused" to be produced to meet with the Irvin. (Exhibit C). |
| | Pursuant to 28 U.S.C. § 2244 (d) (1) (B) and (D), the one-year time limitation for bringing a federal habeas corpus *on this issue began to run*. |
| September 23 | **Pursuant to a defense subpoena, the New York State and City Departments of Correction disclose the last batch of *Brady* material**: Newton's Chronological History record showing that when Irvin sought to have Newton produced from his upstate prison to Rikers, Newton refused to go and attempted to commit suicide, but was forced to go anyway, and other records showing Newton refused to go meet with Irvin on at least six other occasions. (Exhibit F, May 13, 1998, entry). |
| | Pursuant to 28 U.S.C. § 2244 (d) (1) (B) and (D), the one-year time limitation for bringing a habeas petition *on this issue* began to run. |
| **2017** | |
| March 23 | The Supreme Court, Kings County (Gerstein, J.) grants Spruill's CPL § 440.10 motion and vacates his conviction. |

| | |
|---|---|
| **2017** | At this point, Spruill's is barred from bringing a habeas petition, and the one-year time limitation is moot, because there was no existing conviction or judgment for him to challenge. *See e.g. McFarland v. Kirkpatrick*, 2017 WL 3981179, at *2 (W.D.N.Y. Aug. 16, 2017) ("Under 28 U.S.C. § 2254 (a), a federal court 'shall entertain an application for a writ of habeas corpus in behalf of a person *in custody pursuant to the judgment of a State court* only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.' Here, petitioner is no longer in custody pursuant to the judgment of a State court because the Appellate Division vacated his judgment of conviction. The Court cannot grant petitioner any relief at this juncture because the Appellate Division has already granted him the relief he seeks herein. Therefore, the petition is moot and should be dismissed"), *report and recommendation adopted,* 2017 WL 3971294 (W.D.N.Y. Sept. 7, 2017); *Fisher v. Superintendent*, 2014 WL 128015, at *7 & n.7, *23 (S.D.N.Y. Jan. 14, 2014) (claims in habeas petition mooted by Appellate Division order reversing conviction); *Rodriguez v. LeFevre*, 1990 WL 33564, at *1 (S.D.N.Y. Mar. 23, 1990) (habeas petition mooted by Appellate Division order vacating state court conviction); *Dominguez v. Kernan*, 906 F.3d 1127, 1132 (9th Cir. 2018) ("To the extent Dominguez's petition challenges those convictions, the petition is indeed moot, because those convictions have been vacated, and no collateral consequences flow from them[.]")<br><br>Alternatively, the prosecution's appeal of the decision vacating Spruill's conviction rendered his CPL § 440.10 motion still pending under 28 U.S.C. § 2244 (d) (2), and |

| | |
|---|---|
| **2016** | |
| | it thus continued to toll the one-year time limitation. *See e.g. Carey v. Saffold*, 536 U.S. 214, 219–20 (2002) ("[A]n application is pending as long as the ordinary state collateral review process is 'in continuance' - *i.e.,* 'until the completion of' that process. In other words, until the application has achieved final resolution through the State's post-conviction procedures, by definition it remains 'pending.'") |
| April 21 | The State files its notice to appeal the decision vacating Spruill's conviction. |
| July 28 | Spruill is released on bail. |
| **2018** | |
| September 12 | The Appellate Division, Second Department reverses the vacatur of Spruill's conviction, denies his motion to vacate, and reinstates his conviction, *People v. Spruill*, 164 A.D.3d 1270 (2d Dep't 2018). |
| September 14 | Spruill surrenders and is re-incarcerated. |
| **2019** | |
| March 5 | The New York Court of Appeals denies Spruill's application for leave to appeal the Appellate Division's decision reversing the vacatur of his conviction, retriggering the running of AEDPA's one year statute of limitation. *See e.g. Taylor v. Lee,* 186 F.3d 557, 561 (4th Cir.1999) ("[U]nder § 2244(d)(2) the entire period of state post-conviction proceedings, from initial filing |

| | |
|---|---|
| **<u>2019</u>** | to final disposition by the highest state court ... is tolled from the limitations period") |
| | (At this point, Spruill still has 56 days remaining to file his federal habeas petition, *i.e.,* until **April 30, 2019**.) |
| April 26 | Spruill files his habeas petition, with four days left to do so. |

# COURT DECISIONS IN
# SPRUILL'S CASE

# State of New York
# Court of Appeals

BEFORE: HON. JENNY RIVERA, Associate Judge

---

THE PEOPLE OF THE STATE OF NEW YORK,

                                     Respondent,

-against-

TASKER SPRUILL,

                                 Appellant.

**ORDER
DENYING
LEAVE**

---

       Appellant having applied for leave to appeal to this Court pursuant to Criminal Procedure

Law § 460.20 from an order in the above-captioned case;*

       UPON the papers filed and due deliberation, it is

       ORDERED that the application is denied.

Dated: March 5, 2019

Associate Judge

*Description of Order: Order of the Appellate Division, Second Department, entered September 12, 2018, reversing an order of the Supreme Court, Kings County, entered March 27, 2017.

164 A.D.3d 1270
Supreme Court, Appellate Division,
Second Department, New York.

The PEOPLE, etc., appellant,
v.
Tasker SPRUILL, respondent.

2017–04490
|
(Ind. No. 13008/95)
|
Argued-April 18, 2018
|
September 12, 2018

**Synopsis**
**Background:** Defendant sought to vacate a judgment, after his conviction for second-degree murder was affirmed on appeal, 299 A.D.2d 374, 750 N.Y.S.2d 312. The Supreme Court, Kings County, Michael Gerstein, J., vacated the judgment. People appealed.

**Holdings:** The Supreme Court, Appellate Division, Second Department, held that:

[1] alleged withholding of information regarding eyewitness's suicide attempt in prison cell was not a *Brady* violation;

[2] alleged withholding of fact that prosecutor obtained a material witness order was not a *Brady* violation;

[3] alleged withholding of orders providing for incarcerated eyewitness to be delivered for interview was not a *Brady* violation;

[4] eyewitness's testimony was not a product of duress; and

[5] eyewitness's incorrect trial testimony regarding how frequently he had met with prosecutor did not support vacatur of conviction.

Reversed.

**West Headnotes (15)**

**[1]** **Constitutional Law**
⟜ Evidence
**Constitutional Law**
⟜ Notice;disclosure and discovery
A defendant has a right, guaranteed by the Due Process Clauses of the federal and state constitutions, to discover favorable evidence, known as *Brady* material, in the People's possession which is material to either guilt or punishment. U.S. Const. Amend. 14; N.Y. Const. art. 1, § 6.

1 Cases that cite this headnote

**[2]** **Criminal Law**
⟜ Impeaching evidence
The prosecutor's duty to exchange *Brady* material extends to the disclosure of evidence that can be used to impeach the credibility of

a witness for the People whose testimony may be determinative of the defendant's guilt.

Cases that cite this headnote

**[3]    Criminal Law**
  👉 Constitutional obligations regarding disclosure
  **Criminal Law**
  👉 Impeaching evidence

To establish a *Brady* violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature, (2) the evidence was suppressed by the prosecution, and (3) prejudice arose because the suppressed evidence was material.

1 Cases that cite this headnote

**[4]    Criminal Law**
  👉 Materiality and probable effect of information in general

Where a defendant makes a specific request for a document, the materiality element required for a *Brady* violation is established, provided there exists a reasonable possibility that it would have changed the result of the proceedings.

Cases that cite this headnote

**[5]    Criminal Law**

  👉 Materiality and probable effect of information in general

Absent a specific request by defendant for a document, the materiality element required for a *Brady* violation can only be demonstrated by a showing that there is a reasonable probability that it would have changed the outcome of the proceedings.

Cases that cite this headnote

**[6]    Criminal Law**
  👉 Materiality and probable effect of information in general

The mere possibility that undisclosed evidence, which was not requested, might have helped the defense or affected the outcome of the trial does not establish materiality in the constitutional sense, as required to establish a *Brady* violation. U.S. Const. Amend. 14; N.Y. Const. art. 1, § 6.

Cases that cite this headnote

**[7]    Criminal Law**
  👉 Test results;demonstrative and documentary evidence

Record regarding eyewitness's suicide attempt in prison cell at or around the time period that he was supposed to be produced to meet with prosecutor was not favorable to defense in murder trial, and thus alleged withholding of record was not a *Brady* violation; record

indicated that eyewitness did not want to go to court out of fear of defendant, and eyewitness was assured that there would be no contact between him and defendant or defendant's family.

Cases that cite this headnote

[8] **Criminal Law**
    ⟜ Information Within Knowledge of Prosecution
    Department of Corrections and Community Supervision (DOCCS) record regarding eyewitness's suicide attempt while in prison cell was not imputable to the People, as required to support *Brady* violation for alleged withholding of record from defense in murder trial; DOCCS record was not within control of prosecutor, who was not aware that eyewitness had attempted to commit suicide, but rather record was in possession of DOCCS, which was in most respects an administrative rather than a law enforcement agency.

Cases that cite this headnote

[9] **Criminal Law**
    ⟜ Test results;demonstrative and documentary evidence
    Fact that prosecutor had obtained a material witness order to secure eyewitness's testimony at murder trial was not exculpatory,

and thus alleged withholding of evidence was not a *Brady* violation; eyewitness's absence was due to her fear of testifying against defendant, and during trial, prosecutor informed court, among other things, that one day after shooting, an individual told eyewitness's sister that eyewitness would be killed if she returned to the area.

Cases that cite this headnote

[10] **Criminal Law**
    ⟜ Test results;demonstrative and documentary evidence
    Defendant was not prejudiced by failure of prosecutor to disclose that he had obtained a material witness order for eyewitness, and thus failure to disclose was not a *Brady* violation; even if the order was exculpatory, jury was aware that eyewitness did not want to testify, because she testified that she "didn't want to be here," that "detectives had to threaten" her to get her to court, and that she "didn't want to come."

Cases that cite this headnote

[11] **Criminal Law**
    ⟜ Test results;demonstrative and documentary evidence
    Orders providing for incarcerated eyewitness to be delivered to police department to be interviewed by

District Attorney's Office were not material to defendant's murder trial, and thus alleged failure to disclose orders was not a *Brady* violation; even though eyewitness did not sign consent portions of orders, failure to sign did not mean eyewitness was brought to District Attorney without consent or that testimony was coerced, and evidence of defendant's guilt was strong, as it included two eyewitnesses familiar with defendant and defendant evading arrest for approximately four years.

Cases that cite this headnote

**[12]** **Criminal Law**
 ⌦ Conduct and argument of prosecutor
**Criminal Law**
 ⌦ Calling witnesses;compelling assertion of privilege
Eyewitness's testimony in defendant's murder trial was not product of duress, and thus did not support defendant's request to vacate conviction; even though eyewitness had attempted suicide in his prison cell, prosecutor did not threaten or tell eyewitness that he was required to testify, eyewitness was reluctant to testify because he was scared defendant would harm him or his family, and defense counsel explored in cross-examination benefits eyewitness

received in exchange for testimony. N.Y. CPL § 440.10(1)(b).

Cases that cite this headnote

**[13]** **Criminal Law**
 ⌦ Conduct and argument of prosecutor
Eyewitness's trial testimony that he had met with prosecutor approximately 20 times prior to trial, and prosecutor's reference to such testimony during summation, were not material, and thus did not support vacatur of defendant's murder conviction; even though prosecutor should have corrected testimony and not referenced it in summation, as prosecutor only recalled meeting with eyewitness seven or eight times, the inaccurate testimony did not contribute to defendant's conviction. N.Y. CPL § 440.10(1).

Cases that cite this headnote

**[14]** **Criminal Law**
 ⌦ Use of False or Perjured Testimony
**Criminal Law**
 ⌦ Duty to correct false or perjured testimony
Prosecutors, in their role as public officers, are required to correct the knowingly false or mistaken material testimony of a prosecution witness.

Cases that cite this headnote

**[15]  Criminal Law**
    ↪ Presentation of Evidence
    Where a prosecutor elicits or fails to correct inaccurate testimony, reversal and a new trial are necessary unless there is no reasonable possibility that the error contributed to the conviction.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*522** Eric Gonzalez, District Attorney, Brooklyn, N.Y. (Leonard Joblove, Victor Barall, and Morgan J. Dennehy of counsel, Brooklyn), for appellant.

Rita Dave, Brooklyn, NY, for respondent.

JOHN M. LEVENTHAL, J.P., SHERI S. ROMAN, FRANCESCA E. CONNOLLY, LINDA CHRISTOPHER, JJ.

**DECISION & ORDER**

**\*1270** Appeal by the People from an order of the Supreme Court, Kings County (Michael Gerstein, J.), entered March 27, 2017, which, after a hearing, granted those branches of the defendant's motion which were pursuant to CPL 440.10(1)(b), (f), and (h) to vacate a judgment of the same court (Ariel E. Belen, J.) rendered September 16, 1998, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence.

ORDERED that the order is reversed, on the law, and those branches of the defendant's motion which were pursuant to CPL 440.10(1)(b), (f), and (h) to vacate the judgment rendered September 16, 1998, are denied, the judgment is reinstated, and the matter is remitted to the Supreme Court, Kings County, which, upon at least two days' notice to the defendant and his attorney, shall promptly direct the defendant to surrender himself to the court in order that execution of the judgment may resume.

The defendant was charged with murder in the second degree, among other crimes, in connection with the shooting death of Tracey Thomas on October 22, 1993. Thomas was shot and killed as he sat in his car outside a game room operated by the defendant, who was known as "Pike."

The evidence at trial, which was conducted in 1998, included the testimony of two eyewitnesses who identified the defendant **\*\*523** as the shooter. One eyewitness to the shooting, Marilyn Connor, testified that she heard a gunshot and saw a spark coming from the defendant, who was standing in front of Thomas. **\*1271** Connor stated that she had seen the defendant "[o]nce or twice" before. The other eyewitness, Shawn Newton, testified that the defendant exited the game room, approached Thomas's car, and shot Thomas in the chest. Newton stated that he had known the defendant "all [his]

life." Newton was incarcerated at the time of trial on charges unrelated to those against the defendant. He also testified regarding an implied threat that was made to him by a fellow inmate concerning Newton's testimony in this case. Several police officers testified concerning the efforts that were made to locate the defendant following the shooting, and that the police were unable to find him until August 1997, when he was apprehended in Baltimore. After he was apprehended, the defendant told a detective assigned to the fugitive task force that his name was Kevin Michael Mulberry. The People and the defendant also entered into a stipulation at trial that the defendant "at one time had a small tattoo on ... his left arm," which said "Pike." At the time of trial, however, the tattoo, which was shown to the jury, depicted a panther.

At the conclusion of the trial, the jury convicted the defendant of murder in the second degree. The judgment of conviction was affirmed on direct appeal by decision and order of this Court dated November 4, 2002 (see People v. Spruill, 299 A.D.2d 374, 750 N.Y.S.2d 312).

In March 2016, the defendant moved to vacate the judgment, inter alia, pursuant to CPL 440.10(1)(b) on the ground that the judgment was procured by duress, misrepresentation, or fraud on the part of the prosecutor, and pursuant to CPL 440.10(1)(f) and (h) on the ground that the prosecution violated its duty to disclose certain material favorable to the defense. Specifically, the defendant argued that the prosecution had violated *Brady v.*

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to disclose certain pretrial orders pursuant to which Newton was produced from prison to meet with the prosecutor to discuss his testimony. The defendant argued that these "Damiani orders" (*see generally People v. Jackson,* 65 N.Y.2d 265, 267 n. 1, 491 N.Y.S.2d 138, 480 N.E.2d 727), were explicitly contingent on Newton providing his written consent to being taken into temporary custody by detective investigators representing the District Attorney's Office; however, Newton's signature was absent from the consent sections of those orders. Additionally, the defendant argued, among other things, that the prosecutor had "abused a secret material witness" order to obtain Connor's testimony, and that Newton's testimony at trial was coerced.

The Supreme Court directed that a hearing be held on the **\*1272** defendant's motion with respect to the issues of whether Newton had consented to meet with the prosecutor approximately 20 times prior to trial, as Newton had testified at trial, or whether his testimony was coerced, and whether the prosecutor engaged in a deliberate pattern of deception upon the court. At the hearing, testimony was elicited from, among other witnesses, the Assistant District Attorney who prosecuted the case against the defendant (hereinafter the prosecutor). The record indicates that due to an apparent medical condition, Newton was not called as a witness at the hearing, which commenced in August 2016.

Following the hearing, the Supreme Court determined, among other things, that the People had committed a *Brady* violation by failing to disclose the Damiani orders that the prosecutor had used to **\*\*524** secure Newton's presence, one of which contained the notation "refused," as well as evidence that Newton had refused to be produced to meet with the prosecutor. Additionally, the court found that the People had violated *Brady* by failing to disclose a record from the Department of Corrections and Community Supervision (hereinafter DOCCS) evidencing that Newton had attempted suicide in his cell at or around the time period that he was supposed to be produced to meet with the prosecutor. The court determined that Newton's lack of written consent to the meetings with the prosecutor constituted material which could have been used to further impeach Newton, and that Newton's suicide attempt, explicit refusal to be produced, and lack of written consent to production could have supported the defense argument that Newton's testimony was coerced and not credible. The court also determined that the prosecutor had improperly failed to disclose that he had obtained a material witness order to secure Connor's testimony. While the court concluded that application of the "reasonable possibility" standard was appropriate in evaluating the subject *Brady* violations, the court found that it was both "reasonably probable" and "reasonably possible" that the undisclosed items would have changed the outcome of the proceedings.

The Supreme Court further determined that the prosecutor had engaged in prosecutorial misconduct by failing to correct Newton's testimony concerning the number of times that he had met with the prosecutor prior to trial, and by referring to that testimony during his summation. The court also determined that the defendant was entitled to relief pursuant to CPL 440.10(1)(b) inasmuch as "there was evidence that Newton was subject to duress by being repeatedly produced to **\*1273** meet with [the prosecutor] after his suicide attempt and refusals [to be produced]." Accordingly, the court granted those branches of the defendant's motion which were pursuant to CPL 440.10(1)(b), (f), and (h) to vacate the judgment, and directed a new trial. The People appeal.

**[1]** **[2]** A defendant has a right, guaranteed by the Due Process Clauses of the federal and state constitutions, to discover favorable evidence, known as *Brady* material, in the People's possession which is material to either guilt or punishment (*see Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. 1194; *People v. Bryce*, 88 N.Y.2d 124, 128, 643 N.Y.S.2d 516, 666 N.E.2d 221; *People v. Wagstaffe*, 120 A.D.3d 1361, 1363, 992 N.Y.S.2d 340). "The prosecutor's duty to exchange *Brady* material extends to the disclosure of evidence that can be used to impeach the credibility of a witness for the People whose testimony may be determinative of the defendant's guilt" (*People v. Wagstaffe*, 120 A.D.3d at 1363, 992 N.Y.S.2d 340; *see Giglio v. United States*, 405 U.S. 150, 154–155, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *People v. Baxley,*

84 N.Y.2d 208, 213, 616 N.Y.S.2d 7, 639 N.E.2d 746).

**[3] [4] [5] [6]** "To establish a *Brady/Salton* violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (*People v. Fuentes*, 12 N.Y.3d 259, 263, 879 N.Y.S.2d 373, 907 N.E.2d 286; *see People v. Salton*, 74 A.D.3d 997, 999, 905 N.Y.S.2d 199). "In New York, where a defendant makes a specific request for a document, the materiality element is established provided there exists a 'reasonable possibility' that it would have changed the result of the proceedings" (*People v. Fuentes*, 12 N.Y.3d at 263, 879 N.Y.S.2d 373, 907 N.E.2d 286, quoting **\*\*525** *People v. Vilardi*, 76 N.Y.2d 67, 77, 556 N.Y.S.2d 518, 555 N.E.2d 915). "Absent a specific request by defendant for the document, materiality can only be demonstrated by a showing that there is a 'reasonable probability' that it would have changed the outcome of the proceedings" (*People v. Fuentes*, 12 N.Y.3d at 263, 879 N.Y.S.2d 373, 907 N.E.2d 286, quoting *People v. Bryce*, 88 N.Y.2d at 128, 643 N.Y.S.2d 516, 666 N.E.2d 221; *see People v. Vilardi*, 76 N.Y.2d at 73, 556 N.Y.S.2d 518, 555 N.E.2d 915; *People v. Salton*, 74 A.D.3d at 998–999, 905 N.Y.S.2d 199; *People v. Bryant*, 247 A.D.2d 400, 401, 668 N.Y.S.2d 646). "The mere possibility that undisclosed evidence, which was not requested, might have helped the defense or affected the outcome of the trial does not establish materiality in the constitutional sense" (*People v. Figueroa*, 213 A.D.2d 669, 669–670, 625 N.Y.S.2d 49; *see People v. Salton*, 74 A.D.3d at 999, 905 N.Y.S.2d 199; *People v. Alongi*, 131 A.D.2d 767, 768, 516 N.Y.S.2d 794).

**[7]** Here, the Supreme Court should have denied that branch of the defendant's motion which was to vacate the judgment of conviction on the ground that the prosecution committed *Brady* violations. The nondisclosure of the DOCCS record reflecting **\*1274** Newton's apparent suicide attempt did not constitute a *Brady* violation, inasmuch as the information contained in that record was not favorable to the defense. As set forth in the DOCCS record, Newton, who was observed in the process of tying a bed sheet around a radiator pipe, reported that he was "stressed and [did] not want to go to court in fear of [the] safety of himself and family," and that he "fears [the defendant]." The DOCCS record further indicated that Newton was "[a]ssured that this [would] be noted and that there should be no contact between him and enemy as well as enemy's family." Thus, the DOCCS record attributed the apparent suicide attempt to Newton's fear of the defendant and was therefore not favorable to the defense.

**[8]** In any event, the DOCCS record was not within the control of the prosecutor, who testified at the CPL article 440 hearing that he was not aware that Newton had attempted to commit suicide. Rather, the record was in the possession of DOCCS, which is "in most respects, an administrative rather than a law

enforcement agency" (*People v. Howard*, 87 N.Y.2d 940, 941, 641 N.Y.S.2d 222, 663 N.E.2d 1252; *see People v. Lanfranco*, 124 A.D.3d 1144, 1145, 1 N.Y.S.3d 576). Thus, the record is not imputable to the People, and the prosecutor had no obligation to locate and produce the record to the defense (*see People v. Howard*, 87 N.Y.2d at 941, 641 N.Y.S.2d 222, 663 N.E.2d 1252; *People v. Lanfranco*, 124 A.D.3d at 1145–1146; *People v. Smith*, 89 A.D.3d 1148, 1150, 931 N.Y.S.2d 803).

**[9]** **[10]** Furthermore, that the prosecutor had obtained a material witness order to secure Connor's testimony did not constitute *Brady* material because that information was not exculpatory (*see People v. Lundy*, 48 A.D.3d 1046, 1047, 850 N.Y.S.2d 755). To the contrary, the record indicates that Connor's absence was due to her fear of testifying against the defendant. During the trial, the prosecutor had informed the court, among other things, that one day after the shooting, an individual told Connor's sister that Connor would be killed if she returned to the area. In any event, the defendant was not prejudiced by the failure of the prosecutor to disclose that he had obtained a material witness order for Connor, as the jury was aware that Connor did not want to testify. At trial, Connor testified that she "didn't want to be here. The detectives had to threaten **\*\*526** me to bring me here. I didn't want to come."

**[11]** We next turn to the nondisclosure of the Damiani orders, which are orders of the Supreme Court, Kings County, pursuant to which custody of an inmate, with the inmate's consent, is delivered to the police department to be interviewed by the District Attorney's Office (*see* **\*1275** *People v. Jackson*, 65 N.Y.2d at 267 n. 1, 491 N.Y.S.2d 138, 480 N.E.2d 727). The defendant did not make a specific request for the production of such orders. Therefore, the orders would be material only if there is a reasonable probability that, had they been disclosed, the outcome of the proceedings would have been different (*see People v. Fuentes*, 12 N.Y.3d at 263, 879 N.Y.S.2d 373, 907 N.E.2d 286; *People v. Wagstaffe*, 120 A.D.3d at 1364, 992 N.Y.S.2d 340). However, contrary to the Supreme Court's determination, the orders did not satisfy the materiality standard. That Newton did not sign the consent portions of the orders did not establish that he was brought to the District Attorney's Office to meet with the prosecutor without his consent, or that his testimony was coerced. At the CPL 440 hearing, the prosecutor testified that Newton never told him that he did not want to meet, nor did Newton direct the prosecutor to stop bringing him to court. Moreover, a New York City Correction Officer, who worked as a court productions staff member at Rikers Island, testified at the hearing that if an inmate refused to go to court or to be taken by an outside agency, the inmate could not be forced to leave the facility unless the court issued a force order. The prosecutor testified that he did not attempt to obtain a force order to compel Newton to appear in court.

Furthermore, the evidence of the defendant's guilt was strong (*see Spruill v. Phillips*, No. 04 CV 1382(NG)(MDG), 2005 WL 1743828, \*6, 2005 U.S. Dist LEXIS 14869,

*17–18 (E.D.N.Y. July 25, 2005). The defendant was identified as the shooter by two eyewitnesses who were familiar with the defendant. Additionally, the shooting occurred on the street outside the defendant's game room. There was also substantial evidence demonstrating the defendant's consciousness of guilt. The police witnesses testified concerning their extensive efforts to locate the defendant after the shooting, and that they were unable to locate him until approximately four years later when he was apprehended in Baltimore. At that time, the defendant provided the detective with a false name. Further, Newton testified about an implied threat he received from a fellow inmate concerning his testimony in this case, and there was evidence that the defendant, who was known as Pike, once had a Pike tattoo on his arm that had been altered by the time of trial. Given the strong evidence of the defendant's guilt, there is no reasonable probability that the disclosure of the Damiani orders and the fact that one of those orders indicated that Newton had refused to be produced would have affected the outcome of the trial (see *People v. Moore*, 43 A.D.3d 1085, 1086, 843 N.Y.S.2d 102; *People v. Figueroa*, 213 A.D.2d at 670, 625 N.Y.S.2d 49).

[12] The Supreme Court also should have denied that branch of the defendant's motion which was to vacate the judgment pursuant *1276 to CPL 440.10(1)(b). Initially, contrary to the defendant's contention, the People did not abandon their challenge to the court's determination that Newton was subject to duress by the prosecutor.

Turning to the merits, pursuant to CPL 440.10(1)(b), a judgment may be vacated upon the ground that it "was procured by duress, misrepresentation or fraud on the part of the court or a prosecutor or a person acting for or in behalf of a court or **527 a prosecutor." Here, the defendant failed to show that Newton's testimony was the product of duress based on his postsuicide attempt productions to meet with the prosecutor.

At the hearing, the prosecutor testified that he did not threaten Newton or tell Newton that he was required to testify. Additionally, as noted above, the prosecutor testified that Newton never said that he did not want to meet with the prosecutor, nor did Newton tell the prosecutor to stop bringing him to court. While Newton was reluctant to testify at the defendant's trial, the prosecutor's hearing testimony revealed that Newton told the prosecutor that he was aware that a third eyewitness to the shooting, his friend Greg Pearson, had been shot and killed in 1994 prior to the defendant's trial in 1998. The prosecutor explained that Newton's reluctance to testify against the defendant was out of concern for the safety of himself and his wife. The Assistant District Attorney who served as coprosecutor on the defendant's case also testified at the hearing that Newton was reluctant to testify because he was afraid of the defendant and the defendant's family and friends, who Newton "felt would cause harm to his family."

The record also reflects that Newton requested and was to receive significant

benefits in exchange for his testimony against the defendant. Those benefits included the prosecutor writing a letter to the parole board on Newton's behalf in support of his release, assisting Newton in seeking a transfer to a different correctional facility, and ensuring that he was not placed in punitive segregation. The promises that were made to Newton were set forth on the record before the jury during his direct testimony at trial, and were explored by defense counsel during cross-examination so as to enable the jury to assess the witness's credibility. Notably, when the defendant's trial counsel cross-examined Newton about the promises that had been made to him in exchange for testifying against the defendant, Newton twice confirmed, "I'm here because I want to be here." Thus, the defendant failed to establish that Newton's testimony was procured by duress on the part of the prosecutor.

*1277 [13] [14] [15] Lastly, vacatur of the judgment was not warranted based on the prosecutor's failure to correct Newton's trial testimony that he had met with the prosecutor approximately 20 times prior to trial, and the prosecutor's reference to such testimony during summation. Prosecutors, in their role as public officers, are required to correct the knowingly false or mistaken material testimony of a prosecution witness (*see People v. Colon*, 13 N.Y.3d 343, 349, 890 N.Y.S.2d 424, 918 N.E.2d 936; *People v. Steadman*, 82 N.Y.2d 1, 7, 603 N.Y.S.2d 382, 623 N.E.2d 509). "Where a prosecutor elicits

or fails to correct such inaccurate testimony, reversal and a new trial are necessary unless there is no 'reasonable possibility' that the error contributed to the conviction" (*People v. Colon*, 13 N.Y.3d at 349, 890 N.Y.S.2d 424, 918 N.E.2d 936, quoting *People v. Pressley*, 91 N.Y.2d 825, 827, 666 N.Y.S.2d 555, 689 N.E.2d 525). In the present case, the prosecutor testified at the CPL 440 hearing that he had met with Newton "maybe seven or eight times," not 20 times as Newton testified at trial. However, while the prosecutor should have corrected Newton's testimony and should not have referenced such testimony during summation, the subject testimony was not material. In any event, there is no reasonable possibility that the failure to correct Newton's inaccurate testimony concerning the number of times he met with the prosecutor contributed to the defendant's conviction.

**528 Accordingly, those branches of the defendant's motion which were pursuant to CPL 440.10(1)(b), (f), and (h) to vacate the judgment should have been denied.

LEVENTHAL, J.P., ROMAN, CONNOLLY and CHRISTOPHER, JJ., concur.

**All Citations**

164 A.D.3d 1270, 82 N.Y.S.3d 520, 2018 N.Y. Slip Op. 06041

---

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: PART 38

-------------------------------------------------------------------------x

PEOPLE OF THE STATE OF NEW YORK,

                                                 DECISION AND ORDER

        -against-                             Indictment No.: 13008/95
                                                 Date: March 23, 2017

TASKER SPRUILL,

                             Defendant

-------------------------------------------------------------------------x

Eric Gonzalez, Esq., Acting District Attorney Kings County (Leonard Joblove, Esq., Morgan Dennehy, Esq., Olatakunbo Olaniyan, Esq., Assistant District Attorneys of Counsel), for the People
Rita Dave, Esq., Cuomo, LLC (Oscar Michelen, Esq., of counsel) for Defendant.


      By Notice of Motion and supporting Affirmation of Rita Dave, Esq., dated March 14, 2016, with a separate Appendix of Exhibits and Memorandum of Law, Defendant has moved, pursuant to CPL § 440.10(1)(b), (c), (f), (g) and (h), and the Due Process clauses of the New York State and Federal Constitutions, for an order vacating Defendant's September 16, 1998 conviction, after a jury trial, for Murder in the Second Degree (PL § 125.25[1]), for which the court sentenced Defendant to twenty-five years to life. (Belen, J. at trial and sentence). The motion is also supported by an Affirmation of Defendant's trial counsel, Barry Krinsky, Esq., and eight court orders – two *Damiani*[1] orders and six orders to produce Shaun Newton ("Newton"), an eyewitness to the shooting who was incarcerated on a felony drug conviction at the time of Defendant's trial – and their supporting affirmations, that Spruill obtained from the District Attorney's Office in July 2010, after four years of litigating that Office's denial of his Freedom of Information Law ("FOIL") request for records regarding his case.

---

[1] *People v. Jackson*, 65 NY2d 265, fn 1 (1985) ("The reference is to an order of Supreme Court, Kings County, issued March 10, 1972, establishing the procedure whereby, on the basis of a letter written by the District Attorney to the Warden of the Rikers Island House of Detention and consented to by the inmate, custody of the inmate is delivered to the police department for the purpose of interview by the District Attorney and return the same day to Rikers Island.")

Spruill raised five claims in his motion: *Brady* violations; misrepresentation, fraud and duress under CPL § 440.10(1)(b); Irvin's knowing use of, and failure to correct, false and/or misleading evidence and arguments; the prosecution's legal coercion of Newton; and newly discovered evidence pursuant to CPL § 440.10(1)(g). He does not assert actual innocence.

The People opposed the application in an Affirmation of Morgan Dennehy, Esq., dated May 26, 2016, and a Memorandum of Law.

Following oral argument, this court issued an Interim Order dated July 15, 2016[2] which ordered an evidentiary hearing as to the following factual issues:

a) The circumstances surrounding the testimony of Shawn Newton, and particularly whether he consented to meet with ADA Irvin[3] about twenty times prior to trial, as he testified, or whether his testimony was coerced.

b) Whether Irvin engaged in a deliberate pattern of deception upon the court.

During the course of the hearing, Defendant moved to add additional grounds and submit additional exhibits for his motion. Those grounds will be considered and dealt with in this decision.

On July 27, 2016, August 17, 2016, October 5, 2016, and November 2, 2016, this court conducted the hearing, including testimony by both former Assistant District Attorneys who tried the underlying case, and a representative of the New York City Department of Corrections ("DOC"), and introduction of dozens of exhibits into evidence, following which the parties submitted extensive post-hearing memoranda of law.[4]

Defendant argues that the following items of favorable evidence were not disclosed to the defense: (1) Newton repeatedly refused to meet with Irvin; (2) Irvin repeatedly lied to judges regarding his need for Newton's productions, court dates in Spruill's case, that Newton had

---

[2] Familiarity with the Interim Order is assumed.

[3] Assistant District Attorney Stan Irvin was the lead prosecutor at Defendant's trial.

[4] The post-hearing memoranda aggregated in excess of 200 pages, not including exhibits.

reached out to the office, and that Newton would not be produced to the office without Newton's written consent; (3) Irvin had Newton repeatedly and involuntarily transferred from state prison to court bullpens on orders to produce when Spruill's case was not on the calendar; (4) Newton attempted to kill himself to avoid being brought to meet Irvin; (5) even after Newton's refusals and suicide attempt, he was repeatedly produced to court and the DA's office; (6) *all* of the *Damiani* orders lack Newton's written consent; (7) Newton, prior to the trial, repeatedly refused to testify; (8) Irvin told Newton he could be compelled to take the stand; and (9) Newton "agreed" to testify only after being subjected to all of the above. (Def Post-Hearing Memorandum "PHM" 56).

> Defendant argues that:
>
> Each of these items, individually and collectively, were favorable to Spruill because they impeached Newton, the false trial narrative that he met with Irvin voluntarily, was on Rikers Island legitimately, and that he had no undisclosed reason for testifying against Spruill. The evidence also impeached the overall integrity of the prosecution's case by demonstrating it was knowingly founded on fraud and coercion.

(Def PHM 56-57).

Defendant argues that the prosecution "deprived the defense of evidence it could have used to make a powerful argument to the jury that Newton was a liar, a mentally fragile pawn who Irvin secretly manipulated to parrot a false trial narrative." (Def PHM 8-9). In essence, the defense argues that by depriving the defense of its absolute right to make informed decisions about trial strategy, and the ability to fully explore the weaknesses in the People's proof, the prosecution denied the defense its opportunity to present a narrative alternative to that presented by the People as to Newton's reasons for testifying.

Moreover, Defendant argues, by failing to disclose any information regarding the 20 meetings which Newton testified he had with prosecutors, Irvin essentially represented to the

defense that there was no *Brady* material pertaining to those meetings. (Def PHM 14). *See, e.g.* *United States v. Bagley.* 473 US 667, 682 (1985) ("the prosecutor's failure to fully respond to a Brady request...has the effect of representing to the defense that the evidence does not exist []").

The prosecution's primary response to this motion is first, that there were no Brady, due process or other violations; second, that even if there were any such violations, there is no reasonable probability or possibility that they affected the jury's verdict; and, third, all the allegations raised by the motion could have been raised at trial, and Defendant's extensive delay in making the motion prejudices the People.

## FACTS AND PROCEDURAL HISTORY

### A. *Statement of Facts*

The undisputed trial testimony evidenced that on October 22, 1993, near MacDougal Street and Hopkinson Avenue in Brooklyn, Tracey Thomas, a reputed drug dealer, was shot by a bullet fired into his chest, and died shortly thereafter. Thomas, who was himself armed, had been sitting in his car, apparently with a quantity of drugs and substantial cash, in front of a video game and pool hall which was owned by Defendant, informally known as "Pike." There was undisputed testimony that, upon being shot, Thomas drove his car around the corner, and then collapsed at the wheel. Shawn Newton, also known as Derrick Wright, testified that he was sitting next to Thomas, in the front passenger seat, and witnessed the shooting, and identified Defendant, whom he knew, as the killer. After the shooting, Newton climbed out of the rear window of the car and left the scene.

At the time he testified. Newton was serving a lengthy prison sentence for Criminal Possession of a Narcotic Drug, specifically crack cocaine, with Intent to Sell (presumably PL §

220.16) (T[5] 447, 607), following prior convictions for violent felonies (Newton: T. 582, 584, 587, 592, 594). A second eyewitness, Marilyn Connor, testified that she observed the shooting from across the street and also identified Defendant. A third person in the car, Greg Pearson, had been shot and killed after the shooting of Thomas but before Defendant's trial.

There was extensive testimony by multiple police witnesses that Defendant fled the area and could not be located for several years, by Newton that he was threatened to dissuade him from testifying, and demonstrative evidence establishing that Defendant had changed his appearance by altering his "Pike" tattoo. After numerous efforts, Defendant was apprehended four years later in Baltimore, Maryland, where he gave the police a false name.

Defendant was charged, by Kings County felony indictment 13008/95, with one count of Murder in the Second Degree (PL § 125.25[1]), one count of Criminal Possession of a Weapon in the Second Degree (PL former § 265.03) and one count of Criminal Possession of a Weapon in the Third Degree (PL former § 265.02).

On July 31, 1998, the jury found Defendant guilty of Murder in the Second Degree. On September 16, 1998, Defendant was sentenced to a prison term of twenty-five years to life (Belen, J., at trial and sentence), and is presently incarcerated.

*B. Post-Conviction Challenges*

Defendant appealed from his judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Department ("Appellate Division").

---

[5] Numbers in parentheses preceded by "T" refer to pages of the trial transcript. Numbers in parentheses preceded by "H", "H1," "H2," and "H3" refer to pages of the transcript on the hearing on the motion to vacate the judgment, dated July 27, 2016, August 17, 2016, October 5, 2016 and November 2, 2016, respectively. Names preceding the numbers refer to witnesses whose testimony is cited.

On November 2, 2002, the Appellate Division, by a three-to-one vote, affirmed Defendant's judgment of conviction. *People v. Spruill*, 299 AD2d 374 (2d Dept. 2002). The majority held that the consciousness-of-guilt evidence was properly admitted, stating:

> Contrary to the defendant's contention, the trial court providently exercised its discretion in permitting the testimony regarding the implied threat. The witness' testimony of his conversation with the fellow inmate circumstantially connected the defendant to the threat. The witness' credibility was a matter for the jury.

> The trial court also providently exercised its discretion in permitting the alteration of the defendant's tattoo to be considered as evidence of consciousness of guilt. While there was no direct evidence as to when the defendant altered his tattoo, there was sufficient evidence from which it could be inferred that the tattoo was altered after the shooting. Further, the trial court gave a comprehensive instruction regarding evidence of consciousness of guilt, advising the jury that such proof has slight value, must be scrutinized carefully, and that there could be innocent explanations for such conduct.

> While the prosecutor improperly implied during his summation that the defendant should have called his brothers, who were present at the crime scene, as witnesses, that error does not warrant reversal.

*Id.* at 375 (internal citations and quotations omitted) The dissent voted to reverse the judgment, on the law, holding that the improper admission of evidence of purported intimidation of a witness and the prosecutor's arguments in summation warranted reversal of Defendant's conviction and a new trial. (Goldstein, J.) *Id.* at 376.

On January 13, 2003, the dissenting justice (Goldstein, J.) denied Defendant's motion for a certificate granting leave to appeal to the Court of Appeals.

By *pro se* application dated April 2, 2004, Defendant petitioned the United States District Court for the Eastern District of New York ("District Court") for a writ of *habeas corpus* pursuant to 28 USC § 2254. In his petition, Defendant claimed that he was deprived of his right to a fair trial by the admission of the consciousness of guilt evidence. On July 25, 2005, the District Court denied Defendant's petition for a writ of habeas corpus and declined to grant a certificate of

appealability. *Spruill v. Phillips*, No. 04 CV 1382, 2005 WL 1743828 (EDNY 2005) (Gershon, J.).

On June 6, 2006, the United States Court of Appeals for the Second Circuit denied Defendant's application for a certificate of appealability. *Spruill v. Phillips*, Docket No. 05-6184-PR.

## DEFENDANT'S MOTION TO VACATE THE CONVICTION

*a.   The Legal Standard*

CPL § 440.10(1)(h) permits a court in which a judgment was entered the power to vacate that judgment upon showing that "the judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States." Post-judgment proceedings under CPL § 440.10 are viewed as an emergency measure, affording a defendant a remedy only where no other judicial relief is, or ever was, available to him. *People v. Donovan*, 107 AD2d 433 (2d Dept 1985). To obtain reversal of a judgment under this provision, the defendant must make a showing that no other remedies or procedures exist that can serve, or might have served this purpose. *See People v. Brown*, 13 NY2d 201, 204 (1963); *People v. Howard*, 12 NY2d 65, 66 (1963); *People v. Sullivan*, 3 NY2d 196, 200 (1957). The standard of proof for resolving factual issues on 440 motions is "preponderance of the evidence." *See* CPL 440.30 (6) ("the defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion").

*b.   Brady*

In *Brady v. Maryland*, 373 US 83 (1963), the Supreme Court held that the prosecution has an affirmative duty to disclose to the defense evidence in its possession that is both favorable to the defense and material to guilt or punishment. This prosecutorial duty is well established in New

7

York (*see e.g. People v. Savvides*, 1 NY2d 554 (1956)), and the prosecution's failure to disclose *Brady* material violates a defendant's constitutional right to due process. *People v. Wright*, 86 NY2d 591, 595 (1995).

Having found that the withheld evidence in *Wright* was manifestly favorable to the defendant, the Court reasoned that the People's failure to disclose this favorable evidence requires reversal only if the evidence is material. *Id.* at 596. Defendant Wright contended that her pretrial request for "any deals, promises or agreements entered into by the People or any agent thereof and any prosecution witness" constituted a specific request for the information in question, "thereby triggering the less stringent 'reasonable possibility' materiality standard articulated in *People v. Vilardi* (76 NY2d 67)." *Id.* at 596-597. The Court held that:

> Even assuming that this is not a "specific request" case, however, the undisclosed evidence must be deemed material because there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. (*People v. Chin*, 67 NY2d 22, 33; *People v. Smith*, 63 NY2d 41, 67 *cert denied* 469 US 1227).

*Id.* at 597.

In *People v. Bond*, 95 NY2d 840 (2000), the Court of Appeals held that reversal of defendant's conviction is required "if there is a reasonable possibility that, had the material been disclosed, the result would have been different." In that case, the key witness, an admitted drug addict, was the only witness who provided direct evidence that defendant shot the victim. The sole eyewitness testified at Bond's CPL § 440 hearing that on the night of the shooting when the detectives came to her house to speak with another witness, "[t]hey asked me did I see anything and I told them no" (*id.* at 842), which was in direct contradiction to her trial testimony. The People conceded that the witness's prior denial of having seen the shooting was *Brady* material and that defendant made a specific request for such material in his omnibus motion. Thus, the

Court held, reversal of defendant's conviction is required if there is a "reasonable possibility" that, had that material been disclosed, the result would have been different. *Id.* at *843,* citing *People v. Vilardi,* 76 NY2d 67, 77. *See also People v. Davis,* 81 NY 2d 281 (1993). The Court held, "while defendant was able to challenge the key witness's credibility based on her drug usage, he was denied the opportunity to challenge the credibility of this witness as a liar." *Bond,* 95 NY2d at 843.

Here, the movant asserts that the Court should apply the "reasonable possibility" standard used in *Bond.* The People assert that because no specific request was made for material now asserted to constitute *Brady* material, the Court should apply the "reasonable probability" standard. In the post-hearing Memorandum of Law, defense counsel argues that that Spruill is only required to establish that the suppressed evidence was not "unimportant and insignificant," *People v. Petros Bedi,* 4107/96, NYLJ 1202592836531 (Sup Ct, March 13, 2013) (Griffin, J.) at *24, and that Spruill is entitled to relief even if the evidence might not have affected the jury's ultimate verdict.

In *Kyles v. Whitley,* 514 US 419 (1995), the Supreme Court held that in determining whether evidence not disclosed by state was "material," in violation of *Brady,* the aggregate effect of all suppressed evidence favorable to the defendant is considered, rather than considering each item of evidence individually.

> [T]he state's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on the evidence considered item by item. Thus, the prosecutor, who alone can know what is undisclosed, must be assigned the responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached.

*Id.* at 420. (internal citations and quotations omitted)

The defense contends that had the alleged *Brady* violations been disclosed, Justice Belen would have suppressed the testimony of both witnesses Newton and Connor. We decline to so

find. "[N]ot every significant misjudgment by the prosecution entitles the defendant to a windfall... [C]ourts are not always required to sacrifice justice in the case before them to the possibility of such deterrence." *People v. Williams*, 7 NY3d 15, 19-20 (2006) citing *Brady*, 373 US at 87 ("The principle ... is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused.")

*c.      The Evidence on this Motion*

While not all of the defense allegations are supported, and some appear to be directly ascertainable from the trial record and thus cannot be considered on this motion, and/or controverted by evidence adduced at the hearing, Defendant has produced credible documentary and testimonial evidence that: a) Irvin had a paralegal sign his name to various affirmations in support of various *Damiani* orders and orders to produce; b) Irvin failed to disclose to the court or defense counsel that witness Marilyn Connor appeared in court pursuant to a material witness order; c) Newton, who testified that he met with ADA Irvin in Irvin's office about 20 times prior to trial, apparently pursuant to *Damiani* orders, did not evidence his consent to these meetings as would be expected by signing the orders, but explicitly refused on several scheduled occasions to meet with Irvin, including one occasion where he tried to commit suicide in his prison cell rather than meet with Irvin; and d) Newton's testimony that he met with Irvin "about 20 times" before trial was false and was known by Irvin at the time of such testimony to be false, the actual number of meetings being far less.

There appeared to be three potential witnesses regarding the issues raised by this motion: Shawn Newton, now at liberty, former Assistant District Attorney Stan Irvin, who was the lead prosecutor at trial, and former ADA Karen Bennett, who second-seated ADA Irvin at trial. (*See* Interim Order at 15). At our hearing, the District Attorney advised the court that Newton, having

completed both his state prison sentence under which he was incarcerated during Defendant's trial, and a subsequent federal sentence for being a felon in possession of a firearm, had recently *sua sponte* contacted the District Attorney's office seeking assistance in obtaining housing, which he asserted had been promised to him by Irvin as an incentive to testify against Defendant. The District Attorney disclosed a letter written by Newton, and subsequently produced Newton voluntarily in court, where he was interviewed by defense counsel. The People also represented that they had ascertained that Newton was currently suffering from mental illness, and proffered medical records to that effect. After interviewing Newton, defense counsel agreed that because of Newton's current mental condition, they would not call him as a witness, as any testimony he might give would not be deemed credible. (H. 2-3)

The People produced former ADA Irvin, who testified that he is no longer practicing law but is engaged as a Minister in Illinois (H2. 8), and who was called as a witness by Defendant. After Irvin's initial testimony, additional documents were produced, in response to defense subpoenas, from the New York City Department of Corrections ("DOC") and New York State Department of Corrections and Community Supervision ("DOCCS").[6] Based on those documents, the court granted Defendant's application to obtain additional testimony from Irvin. Former ADA Bennett, who second-seated the Spruill trial, also testified, as did a representative of the NYC DOC, Corrections Officer Jason Gregory, to explain DOC records regarding Newton.

Irvin testified that while he made many promises to Newton in order to procure his testimony, those promises were all disclosed on the record at trial (Irvin: T. 433-438, Newton: T. 450-59; Irvin: H1. 23-24, 53, 56, 58-60, 62); Newton's testimony was not compelled by any

---

[6] Just prior to Irvin testifying, the People disclosed, *inter alia*, seven additional Damiani orders, an Order to Produce ("OTP"), and their supporting affirmations (Def Exh O and P) that the District Attorney's office located while searching their file in lieu of a defense subpoena. One of those Damiani orders, dated July 6, 1998, and returnable July 13, contained a handwritten note "Refused. DOC CO [illegible] 4854." (Def Ex. O).

improper pressure or tactics; to his knowledge, Newton had never refused to meet with him (Irvin: H1: 31-32, 38, 60, 63-64); and that he was unaware of Newton's suicide attempt. (H4: 110, 111, 112)

Rather, according to Irvin, Newton had been reluctant to testify out of fear for the safety of himself and his family, a fear engendered by threats made while he was incarcerated at Rikers, and the fact that another eyewitness to the murder, Greg Pearson, had himself been murdered between the killing of Thomas and Defendant's trial. Irvin testified that as recently as the day before Newton took the stand at Defendant's trial, Newton was uncertain as to whether he would testify, but finally decided to do so only on the day he took the stand. (H2: 38, 72:11-16, H3: 125: 16-20)

Shawn Newton was the subject of multiple take-out, or so called Damiani orders, pursuant to which he was required to be produced for interviews at the Kings County District Attorney's office by Irvin. Each such order was supported by an affirmation under penalty of perjury, purportedly bearing the signature of then ADA Irvin, albeit signed by Irvin's paralegal, but with Irvin's consent. Each of those affirmations represented that Newton would be produced only upon his written consent endorsed on the order, and that Newton would not be taken out and brought to the District Attorney's office without his written consent thereto.[7] (H2: 22)

Defendant's moving papers included only two such Damiani orders, both of which lacked Newton's signature which should have been endorsed on the orders to evidence his consent to appearing at the District Attorney's office in advance of trial, those two orders having been obtained by Defendant in 2010 following a FOIL request. (Ex 7 to Def Moving Papers). A

---

[7] It is undisputed that other than the orders served with Defendant's initial motion here, none of these applications or orders were turned over to the defense during or prior to service of the motion, and none were turned over at or prior to trial. Except for the allegations disclosed herein as to lack of consent, they would not be deemed *Brady* material.

12

subsequent search, during the pendency of this motion, revealed additional such orders. (Hearing Ex O). None of those orders contained Newton's signature in the space provided to evidence consent.

One of the orders produced during the pendency of this motion, issued July 6, 1998, requiring production July 13, contained the notation "refused"" in that space. (*see* Def Ex O). It was also revealed, as the result of a defense subpoena served on DOCCS, that on May 13, 1998, a date when Newton was to appear at the District Attorney's office pursuant to a Damiani order, Newton was found in his upstate prison cell attempting to hang himself. (Hearing Def Ex T, report by prison counselor [DOCCS records]) [8]. Thus, Spruill has established, by documentary evidence, that on those two occasions, when Newton was scheduled to be produced, he refused. It is uncontroverted that the People did not make any disclosure before or at trial as to those two refusals.

The parties dispute the number of other times Newton was scheduled for production and refused to be produced. Defendant asserts that in addition to the above two dates, Newton refused production to meet with Irvin on February 27, March 16, May 22, July 10 and July 23, 1998 (Def PHM 35). While disputing those dates, the People concede that there are "at most" four such occasions, "spread out over the course of several months" when Newton was in DOC custody, not counting May 13 when he was in DOCCS custody (People PHM 67-68).

Irvin testified at the hearing that he had no knowledge that Newton did not sign any of the Damiani orders to indicate his consent to meeting with Irvin, and, to his knowledge, *never* refused

---

[8] The DOCCS records further indicate that when Correction Officers discovered the attempted suicide, Newton was told that he must nevertheless go to court and "handle the matter in court." (Hearing Def Ex T, report by prison counselor [DOCCS records]). But there was no "court" to which Newton might have complained or objected in May; the purpose of his production was to meet with Irvin, not to appear in court, which was just a way station between the upstate prison and the District Attorney's Office.

13

to meet with him. He stated that once the Damiani orders were signed by a judge, he did not see them, and asserted that it was not his function to obtain Newton's signature thereon. He testified that rather than ascertaining whether Newton signed the order to indicate his consent, he simply assumed from the fact of Newton's appearance at the District Attorney's office that Newton consented to the meeting. (Irvin: H3. 136-138).

Irvin further testified that Newton never expressed any hostility towards him, but only fear of Spruill and the consequences of testifying at trial. Irvin stated that he never threatened Newton, did not yell at him or even raise his voice to him, and that during these meetings, he allowed Newton to make private telephone calls to his wife, and offered him food and water. (Irvin: H2. 67).

When confronted with documents that indicated that on several occasions Newton was not produced at the District Attorney's office as scheduled by Damiani orders, and that on May 13, 1998, per DOCCS records, Newton tried to hang himself in his cell rather than appear, Irvin professed total ignorance. He testified that he did not keep a calendar of when Newton was scheduled to appear pursuant to Damiani orders, and if he was told by his paralegal that Newton did not appear as scheduled, he paid it no mind and took no steps to ascertain the reasons for Newton's non-appearance, but simply requested that another Damiani order be submitted for a new date. (Irvin: H3. 130-31, 155, 156-57, 159-60, 162).

Based on the foregoing, Defendant asserts that Newton's testimony was improperly procured by coercion and, had the trial justice known this, he would not have permitted such testimony into evidence. As Defendant and the trial court were denied this knowledge by the prosecutor, the present revelations constitute grounds for Defendant's motion. However, as noted above, we reject Defendant's contention that the trial judge would have precluded the testimony

of Newton even had the judge been aware of all the matters disclosed on this motion, and instead consider whether these revelations might have affected the verdict.

*d.    Analysis*

We shall first consider the various grounds alleged by Defendant individually, and then their effect cumulatively as the jurisprudence requires, to determine whether relief is warranted. (*See Kyles v. Whitley*, 514 US 419, 437 n. 10 (1995)) ("We evaluate its cumulative effect for purposes of materiality[.]; *Wearry v. Cain*, 136 S Ct 1002, 1007 (2016). In *Wearry*, 136 S Ct at 1006, the United States Supreme Court held that "[t]o prevail on his *Brady* claim, [defendant] need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. *Smith v. Cain*, 132 S Ct 627, 629–631 (2012) (internal quotation marks and brackets omitted). He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict. *Ibid.*

As to the alleged "forging" of ADA Irvin's signature on affirmations in support of Damiani orders, the Court holds that this does not constitute sufficient grounds to support the motion. While it was improper for Irvin's name to have been signed to affirmations by a paralegal, and doubly improper for that to have been done without any indication thereon that Irvin himself had not signed his affirmations, Irvin testified that this procedure was done with his authorization, and was in accord with office protocol. While the then extant practices of the District Attorney have no legal significance, we hold that the signing of Irvin's name by another, but with Irvin's explicit authorization, does not provide grounds for CPL 440 relief. We also reject the allegations of "bullpen therapy" – to wit, the repeated production of Newton from state custody to Rikers Island for pre-trial meetings with the District Attorney to supposedly overcome his reluctance to testify. The only case cited by Defendant to discuss "bullpen therapy," *Pinaud v County of Suffolk*, 52 F3d

1139, 1145 (2d Cir. 1995), did so in noting that the plaintiff in that case withdrew these allegations, albeit for strategic purposes, and the facts of our case do not require us to rule on this novel theory as a matter of first impression.

The purported lack of consent by Newton to his multiple meetings in the District Attorney's office is far more troublesome. While Irvin testified that Newton never expressed any opposition to the meetings (Irvin: H3. 39:8-11), the documentary evidence does not support his testimony.[9] Rather, *all* the Damiani orders produced by the District Attorney lack Newton's signature, and one such order, requiring production on July 13, 1998, contains the notation "refused." (see Ex O). The DOCCS documents further reveal that on May 13, 1998, Newton attempted suicide in his cell rather than meet with Irvin. (Def Ex T).

Each application for a Damiani order contains the explicit representation, signed in the name of Irvin under penalty of perjury, that "the inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate." (see e.g. Ex K). Whether or not Newton can be deemed to have consented to these meetings, notwithstanding the absence of his signature, this representation, made on each application, was repeatedly and consistently breached by Irvin. Indeed, Irvin's own testimony conceded that he did nothing to obtain Newton's written consent, but at best left it to others and never verified whether it was obtained.[10] (Irvin: H3. 136-37), Moreover, Irvin asserted that on those scheduled dates that Newton did not appear, he did not investigate the reason why, and paid it no mind. (Irvin: H3. 149, 155, 159-60, 162, 163).

---

[9] Irvin did disclose that Newton told Irvin that he would not testify at trial – immediately following his grand jury testimony in 1995, in March 1998, and in July 1998, on the night before he actually testified. (People PHM 68-69; Def PHM 93). But this is different than disclosing the times when Newton refused to even meet.

[10] This testimony overcomes the People's speculative argument in their Post Hearing Memo that perhaps other copies of the order bearing Newton's signature were lost.

Whether Irvin actually knew Newton had not signed prior orders to indicate his consent when Irvin repeated the same representation in his serial applications for Damiani orders, he and the People are rightfully charged with knowledge that Newton did not sign any of the Damiani orders to indicate his written consent, and we hold it to be of no moment whether Irvin had actual knowledge. By making this representation to the court, in each Damiani order, he specifically undertook to make himself knowledgeable to assure, if not himself obtain, Newton's "written consent" to meeting, and cannot avoid that obligation by averting his eyes and deliberately failing to follow through to verify that Newton in fact gave his written consent to the meetings. "[O]strich-like behavior on the part of the prosecution is not tolerated by Brady and its progeny." *Valentin v. Mazzuca*, 2011 WL 65759, at *17 (WDNY Jan 10, 2011). Irvin's studied indifference to his written representations to the Court are of no avail to relieve him of the responsibility he undertook to ensure that Newton would not be produced without his "written consent."

It is clear that the lack of Newton's written consent to meetings in violation of Irvin's repeated representations that Newton would not be produced without such consent, constituted material which could have been used to further impeach Newton. At the very least, Newton's May suicide attempt, explicit refusal to production on July 13, and lack of written consent to production on even a single date, could have supported the defense argument that Newton's testimony was coerced and not credible. While the defense made many other attacks on Newton's credibility, they were denied the opportunity to attack his testimony as being coerced. *See Bond*, 95 NY2d at 843 ("while defendant was able to challenge Green's credibility based on her drug usage, he was denied the opportunity to challenge the credibility of the People's key witness as a liar.") *See also People v. Rutter*, 202 AD2d 123, 133-34 (1st Dept 1994) (When…the defendant is thus deprived of the opportunity to explore weaknesses in the People's proof, both the fairness of the trial and

the validity of its result are fundamentally called into question."). Moreover, Irvin's breach of his representations may well have undercut the credibility of the prosecutors, as well as that of Newton himself.

The next event to allegedly constitute grounds for relief involves Marilyn Connor, who was also an eyewitness to the shooting. Prior to trial, the People had repeatedly represented that they were unable to locate Ms. Connor, and would rely on Shawn Newton as their sole eyewitness. This representation was repeated many times during *voir dire* (V. 11, 532, 757), and the People's opening statement referred only to Newton as an eyewitness. (T. 13-22). Nevertheless, apparently during *voir dire*, the People made a renewed effort to locate Ms. Connor, which proved successful. They then obtained a material witness order for Connor, dated July 10, 1998, from Justice Dabiri (Def Ex 15 to Moving Papers). Notwithstanding their repeated representations on the record that they would not be calling her, Connor was produced in Justice Belen's court on the first day of trial, and was called as a witness by the People. (T. 79-97, 105-125).

However, the People never disclosed the existence of Justice Dabiri's material witness order. Upon questioning at trial, Connor testified that she appeared only because she was pressured by detectives. Moreover, when Justice Belen raised the possibility of issuing a material witness order to assure Ms. Connor's return for cross-examination,[11] ADA Irvin stood mute and did not disclose that such an order had already been issued by Justice Dabiri. (T. 141-143, 233-236). Nor did he choose to mention it at the charge conference when counsel discussed Connor (T. 1143-1150).

---

[11] As noted in our Interim Order, Irvin attempted to compel Spruill's trial counsel to cross-examine Connor immediately after her direct examination, notwithstanding Irvin's numerous representations during *voir dire* that he would not be calling her, and Spruill's trial counsel asserting that he was therefore unprepared to conduct cross-examination. As this is apparent from the record, we cite it only for background and to complete the narrative, and do not rely upon this in reaching our determination.

When questioned at our hearing, Irvin asserted that he did not need to disclose the material witness order issued by Justice Dabiri, in that Connor had not been arrested under that order, but rather under outstanding bench warrants for her own cases where she failed to appear. (H1. 49) This court finds that testimony unavailing. While it is accurate that Ms. Connor had three outstanding bench warrants, those warrants were for cases in different counties. (T: 150-153, H1: 49-50). She had no warrants in Kings County, and certainly none that required her appearance before the Court for this trial. The only basis for producing her before Justice Belen was the material witness order issued by Justice Dabiri, the existence of which the People, by their silence, concealed from both defense counsel and the Court. We hold this conduct to constitute prosecutorial misconduct. However, we also hold that taken in isolation, this violation is not material, in view of Connor's trial testimony that she appeared only as a result of being pressured by detectives. (Connor T. 140). By itself, the improper concealment of the material witness order had no possible, let alone probable, impact on the verdict.

The next significant allegation of prosecutorial misconduct arises from testimony given by Newton, now conceded to be false and further conceded to have been known by Irvin at time of trial to be false. Newton testified on direct examination at trial that he had met with Irvin about 20 times before trial. (Newton: T. 450, 1121). At our hearing, Irvin testified that there were only 7-8 such meetings, and that at the moment Newton testified, Irvin knew that that Newton's testimony was incorrect, but did nothing to correct it. (Irvin: H1: 24-25, H2. 73:16-74:5). Irvin thereby violated the rule that a prosecutor has a duty to correct testimony he knows to be false. *People v. Savvides*, 1 NY2d 554 (1956); *People v. Colon*, 13 NY3d 343 (2009). Where a prosecutor elicits or fails to correct such inaccurate testimony, reversal and a new trial are necessary unless there is no "reasonable possibility that the error contributed to the conviction."

19

*Colon, id. See Su v. Filion* 335 F3d 199 (2d Cir 2003) ("[I]f it is established that the prosecutor knowingly permitted the introduction of false testimony reversal is virtually automatic").

To make matters worse, rather than correcting Newton's false testimony, Irvin compounded his misconduct by explicitly referring to this testimony in his summation. (T. 1121).[12] As the only people who knew how many such meetings occurred were Irvin and Newton,[13] by explicitly referring to this testimony in his summation, Irvin became, in effect, an unsworn witness as to a matter he knew to be false, thereby improperly bolstering the testimony and vouching for Newton's credibility, on testimony he knew to be false. This was clearly improper. *People v. Colon*, 13 NY3d 343 (2009). *See also People v. Hunter*, 11 NY3d 1, 5 (2008) (Brady requires vacatur "irrespective of the good faith...of the prosecution").

While so much of Irvin's explanation for this failure to correct Newton's false testimony, that the more meetings they had, the greater support there would be for a defense rejoinder that Newton was coached,[14] has some surface appeal, it does not explain, let alone excuse, Irvin's deliberate reference in his summation to testimony he knew to be false. The People assert that this prosecutorial misconduct is insufficient to grant any relief. But considered in context, particularly in conjunction with Newton's suicide attempt, his trial testimony that the decedent was shaking hands with Spruill's brother for "like a good hour, thirty minutes, forty-five," minutes before being shot[15] (T. 669), Newton's exaggeration of the number of meeting by 250-300%, and his

---

[12] This conduct precisely parallels that which was one of the grounds of the dissent at the Appellate Division. The dissenter noted that the document allegedly shown to Newton in Rikers for purposes of intimidation could not possibly have been his grand jury testimony, as Newton asserted. Justice Goldstein held that "In his summation, the prosecutor compounded the error when he argued that the witness was shown his 'very own sworn testimony to the grand jury,' knowing full well that this could not have been the case." 299 AD2d at 376.

[13] Bennett testified that she participated in two of the meetings but only after being added to the trial team on the eve of trial. (Bennett: H2. 21, 27, 47).

[14] Irvin also explained that he knew Newton was not good at estimating time, and that he did not want to upset Newton during his testimony. (Irvin: H2. 73:16-74:5). These explanations have no validity in law.

[15] Interestingly, in his summation, Irvin argued that this testimony was incorrect and that it was only 2-3 minutes (T. 1104: 18-21) Thus, there were two entirely separate portions of Newton's testimony that were incorrect and known to

20

testimony as to being high on marijuana on the day of the shooting would have provided additional fodder for an attack on his ability to accurately recall and relate events and his credibility.[16] *See Su v. Filion* 335 F3d 199 (2d Cir 2003) ("It is...hard to be confident that a correction by the prosecutor on this point would not have affected the jury's evaluation of [the] witness."). *See also Jenkins v. Artuz*, 294 F3d 294 (2d Cir 2002) ("Any doubts we might have about the existence of an increment of incorrectness beyond error are eliminated by ADA Lendino's summation, which placed the State's credibility behind Morgan's untruthful testimony") (internal quotations and citations omitted)

The People's case was largely based upon Newton's credibility. They did not expect to have Connor as a second eyewitness (T. 85-86), and after she testified, Justice Belen deemed her testimony to be "all over the map." (T. 366, 368-69). As Newton and Defendant knew each other well, identification was not an issue. Rather, the issue was Newton's credibility, particularly given the medical examiner's testimony that the fatal shot could have been fired from the front passenger's seat where Newton himself was sitting. (Frederic: T. 930-31). In these circumstances, Irvin's improper reference on summation to so much of Newton's testimony as he knew to be wrong, thereby acting as an unsworn witness to bolster such false testimony and vouching for Newton's credibility, cannot be easily dismissed.

While there were other grounds asserted in Defendant's lengthy motion and post-hearing papers, we do not deem it necessary to discuss each of them, but only those which we deem most significant. To the extent that Defendant's allegations are not specifically discussed herein, they

be incorrect, but Irvin did not correct the only one as to which he had personal knowledge of its falsity.
[16] At trial, Newton testified that on the day of the shooting, he had smoked about $100 worth of marijuana (T. 485), a truly prodigious quantity, that taken alone provided the basis to dispute his ability to accurately recall events.

are either insufficiently proven or deemed not to have reasonably possibly affected the verdict, even if taken in conjunction with other matters.

d.    The People's Opposition

The People assert both procedural and substantive arguments in opposition to this motion. As to the DOCCS documents evidencing that on May 13, 1998, Newton attempted suicide in his cell rather than attend a meeting with Irvin, the People, relying on *People v. Howard*, 87 NY2d 940 (1996) and its progeny, argue that because DOCCS is an administrative rather than a law enforcement agency, information known by DOCCS is not deemed to be in the People's control for *Brady* purposes (*see* People PHM 72-73). Next, they argue that even if the court were to consider the attempted suicide, it is not Brady material in that the reason Newton attempted suicide was fear of Spruill. The People posit that had Newton been cross-examined on his attempted suicide, it would have opened the door to the jury hearing not only about his fear of Spruill, but the basis for that fear, including the fact that another eyewitness to the crime, Pearson, had been murdered. Thus, Newton's attempted suicide purportedly would not have been helpful to Defendant for impeachment or otherwise, and would not have been used. (People PHM 72-73).

While we recognize the authority of *People v. Howard*, neither *Howard* nor any case cited by the People would appear to encompass our unique fact pattern. Here, the DOCCS records were not merely records of events, such as a prison disciplinary hearing, while Newton was in DOCCS custody. Rather, they were records directly relating to the production of Newton to the Kings County District Attorney's office pursuant to a Damiani order obtained by Irvin, upon Irvin's specific representation that Newton would not be produced without his written consent. Yet Irvin testified that when Newton was not produced on that date, he did nothing to ascertain the reason for Newton's non-appearance. ((Irvin: H3. 155-160).

22

We hold this constitutes a breach of his representations. Thus, given that Newton's production was pursuant to a Damiani order obtained by the District Attorney, coupled with Irvin's representations in his Damiani application, *Howard* does not bar consideration of the DOCCS records regarding Newton's suicide attempt.

In response to the People's argument that even if the DOCCS documents are considered, Newton's suicide attempt is not Brady material, as it would be unfavorable to the defense, Spruill asserts several rejoinders. Spruill initially argues that the attempted suicide would have demonstrated the alleged "fragility" of Newton's mental state, and affect his credibility, the major issue in the trial. (Def PHM 8-9). Moreover, according to Spruill, the suicide attempt might have supported the proposition that Newton himself was perhaps the real killer, an argument alluded to by the defense at trial. (Def PHR 12-14, T 1083[summation])

In response to the People's argument that any cross-examination on his suicide attempt would have opened the door to Newton's fear of Spruill, and would allow the jury to hear that Pearson, another eyewitness to the murder, had been killed before trial, Spruill argues persuasively first, that Newton's fear of Spruill was already before the jury, based upon testimony as to another inmate at Rikers supposedly showing Newton a copy of his Grand Jury testimony and labeling Newton a snitch (T. 693-696), and second, that in no event would Justice Belen have allowed hearsay testimony that Newton believed Spruill responsible for the killing of Pearson. (T. 381-387). Rather, the jury was permitted to learn only that Pearson was deceased and thus, could not testify, but not that he had been murdered.

To reiterate, we hold that the DOCCS documents regarding Newton's attempted suicide rather than meet with Irvin to be Brady material which should have been disclosed. This court cannot determine whether, and how, Spruill's trial counsel might have used Newton's attempted

suicide. But by failing to disclose that which should have been disclosed, the prosecution prevented defense counsel from making that determination. The determination of whether, and how best to use this information should have been made by "single minded defense counsel," (*People v. Rosario*, 9 NY2d 286, 290 (1961)) and not usurped by the prosecution. Further, we note that Justice Belen had already barred any mention at trial that eyewitness Pearson had been killed, and we think it unlikely that he would have allowed such testimony, particularly if hearsay, in rebuttal of cross-examination on Newton's attempted suicide. Irvin and the People are chargeable with constructive knowledge of Newton's attempted suicide, and had Irvin in fact done that which he represented to the court he would do in his Damiani application, he would have had actual knowledge of Newton's suicide attempt.

The People make a similar argument as to the other days when Newton was scheduled to be produced for meetings at the District Attorney's office with Irvin, but was not produced. They argue, based on Irvin's hearing testimony, that Irvin had no knowledge that Newton ever refused production, and that this information in any event would not have been useful to the defense and is not Brady material. The same reasoning as set forth with regard to Newton's suicide attempt applies here to reject the People's arguments as to the other occasions Newton refused to meet with Irvin. His refusals to meet with Irvin for however many occasions that Newton so refused, should have been disclosed, but were not.[17]

By his representations contained in each application for a Damiani order, Irvin undertook to verify that Newton would be produced only upon his written consent. While Irvin testified that he took no steps to follow up on this representation, made in each and every application, but merely

---

[17] Irvin disclosed only the occasions when they did in fact meet, and Newton advised that he would not testify.

assumed consent from Newton's appearance in his office, and never investigated the reasons for his non-appearance on multiple scheduled dates, there are several problems with this testimony.

First, given Irvin's undertaking in the applications for the Damiani orders, he should have investigated whether Newton's failure to appear on certain scheduled dates was due to Newton's refusal or some other reason, as the People now suggest (*see* People PHM 67), albeit without any supporting evidence.

Second, one of the scheduled dates on which Newton was not produced, July 13, 1998, was the first day of testimony in the Spruill trial. Documents produced during our hearing show that on July 13, Newton explicitly refused to attend (See Hearing Ex O). Given Irvin's testimony that without Newton, he would have dismissed the case (Irvin: H3. 126-28, 144), we find it contrary to common sense that, at least on that date, if not on prior occasions, Irvin took no steps to investigate why Newton was not produced.[18] Moreover, Irvin offered no explanation as to why he would not have investigated the non-production of his main witness on the first day of trial. (Irvin: H3. 159 -160, 162). This is all the more remarkable in light of Irvin's hearing testimony that he was uncertain until the moment Newton eventually took the stand as to whether he would agree to testify or whether Irvin would drop the case. (Irvin: H3. 125-28) Finally, while Irvin testified as to several other cases he ultimately dismissed, those were all cases where he concluded that the defendant was not guilty. (H3: 150-152). By contrast, he believed Spruill guilty.

---

[18] In view of the fact that Newton testified before the Grand Jury and there identified Spruill as the killer, we also find it unusual, especially since the second eyewitness, Connor, was located and testified at trial, that Irvin would not have requested a *Sirois* hearing (*Matter of Holtzman v. Hellenbrand and Sirois*, 92 AD2d 405 (2d Dept.1983)) to have Newton's Grand Jury testimony read to the jury in the event he refused to testify at trial. Former ADA Bennett testified that she was added to the trial team in the event Irvin had to testify himself as to statements made to him by a witness (Bennett: H2: 19-21), which is consistent with a *Sirois* hearing, given Irvin's testimony that Newton frequently expressed his fear of Spruill. Irvin also indicated that such a *Sirois* hearing would have subjected Newton to danger. (Irvin: H3. 128). We do not understand how he could be put in more danger by having his Grand Jury testimony read to the jury if permitted after a *Sirois* hearing than by actually testifying at trial. In any event, the worst that might have happened if a Sirois hearing was not permitted or was unsuccessful is that Irvin then would have then dismissed the case. There appeared to be no downside in seeking such a hearing.

Whether the court credits Irvin's testimony on this point, the result is the same – Newton's refusal to be produced on July 13 was Brady material, which should have been disclosed. Newton was then in DOC custody, not DOCCS custody, so *People v. Howard* is inapplicable, and, as a result of Irvin's representations in his application for the Damiani order for Newton's production, Irvin is chargeable with knowledge of Newton's refusal to appear, whether or not Irvin had actual knowledge.

While the People might have attempted to rehabilitate Newton by eliciting testimony that the reason he refused to be produced was his fear of Spruill, that testimony was already before the jury as part of his redirect examination as to the Rikers Island incident. (T. 549-550). Moreover, defense counsel now posits that one explanation for Newton's refusals to be produced, and his suicide attempt, was that Newton feared Spruill because Newton knew he had falsely accused an innocent man of murder (Def PHM 9), and the implication that perhaps Newton was the real killer.[19]

As with Newton's attempted suicide, we hold that given Irvin's serial representations in applications for Damiani orders that Newton would be produced only upon his written consent, Newton's refusals to be produced constituted Brady material which should have been disclosed, at which point it would have been up to "single minded defense counsel" as to whether and how best to use that information.

The People also argue that Spruill could have placed on the record at trial that Newton had repeatedly refused to be produced and attempted to commit suicide, and submit that this motion should be denied pursuant to CPL § 440.10 (3)(a), in that Spruill "unjustifiably failed to adduce

---

[19] The forensic testimony of Dr. Frede Frederic, while setting forth that the shooting was consistent with the shot being fired from outside the driver's side window, where Spruill was alleged to be standing, into the car, also conceded that it could have been fired from the front passenger seat of the car, where Newton was seated. (Frederic: T. 930-31).

such matter prior to sentence..." This argument is based primarily upon Newton's trial testimony, now admitted at our hearing by Irvin to be exaggerated and false, that he met with Irvin about twenty times before testifying. The People submit that based on this testimony, Spruill's trial counsel could have sought disclosure of the Damiani orders and applications, orders to produce, and even DOCCS records. (People PHM 48-49)

Leaving aside the now-admitted falsity as to the number of meetings between Spruill and Irvin, we nevertheless find this argument to be unsupported by either the facts or the cases relied upon by the People. Newton's testimony as to twenty pre-trial meetings with Irvin did not provide any basis for defense counsel to conject that Newton had ever refused production, let alone attempted to commit suicide rather than meet with Irvin. If anything, the exaggerated number of meetings testified to by Newton gave the opposite impression, that Newton was always a willing participant in these meetings. To suggest that this testimony should have given rise to an investigation by defense counsel as to whether Newton in fact was a willing participant defies logic. As the Supreme Court stated in *Strickler v. Greene*, 527 US 263, 286-287 (1999):

> The presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.

(internal citation and quotation marks omitted). *See Su v. Filion*, 335 F3d 119, 128 (2d Cir 2003) (it would be an 'unreasonable application of federal law, as determined by the Supreme Court, to fault the defendant for not proceeding' on the assumption that the prosecutor is a liar.")

Moreover, the history of the People's initial response to Spruill's FOIL requests indicate that any such mid-trial investigation as posited by the People would likely have been futile. Spruill's initial motion included only two Damiani orders produced in response to his FOIL

requests, both of which were lacking Newton's signature. It was only in response to further searches in lieu of subpoenas during the pendency of this hearing, that additional documents were located, which included the order to produce for July 13, the first day of trial testimony marked "refused," (Def Ex O) as to which Irvin during his hearing testimony denied knowledge. In these circumstances, even had counsel requested these orders during trial, Irvin, not having actual knowledge of Newton's refusal to be produced, might well have objected to production on grounds that these documents did not constitute Brady material, as the People now argue in opposition to the current motion. (*see* People PHM 21-24).

None of the cases upon which the People rely (People PHM 50) for their CPL § 440.10(3)(a) argument involve facts similar to the case at bar. In *People v. Thorsen*, 20 AD 595, 597-98 (3d Dept 2005), "all relevant facts …were known to the defendant prior to this trial." In *People v. Thomas*, 226 AD3d 484, 485 (2d Dept 1996), the matter of whether a witness could observe defendant from a certain vantage point could easily have been investigated prior to or even during trial. In *People v. Adorno*, 202 AD2d 439 (2d Dept 1994), defendant knew at trial the facts on which he based his 440 motion. By contrast, it is clear that Spruill did not know, and had no way of knowing at trial of Newton's attempted suicide and refusals to meet with Irvin.

While the People and Spruill dispute whether the standard to be employed on this motion is that of reasonable probability, as opposed to reasonable possibility (*see Vilardi*, 76 NY2d at 77), we hold that the cumulative effect of undisclosed matters (*Kyles v. Whitley*, 514 US 419, 437 n. 10 (1995)) causes us to lack confidence in the verdict. We hold the suppressed Brady matters and prosecutorial misconduct, taken in their entirety, to be both non-cumulative and material. While we cannot say that the undisclosed matters would have changed the jury's verdict, neither can we say with any confidence that they would not have done so. The verdict stood on the testimony of

two eyewitnesses, each of whom had substantial credibility problems. As noted by the dissenting justice at the Appellate Division:

> The defendant's conviction was based upon the testimony of two witnesses with lengthy criminal records. One witness had been unable to identify the defendant from photographs when interviewed by the police. She later invoked the Fifth Amendment on cross-examination, and in exchange for her testimony was granted use immunity with respect to her participation in drug dealings.
>
> The other witness, who was serving a term of imprisonment in state prison and was to serve time in punitive segregation for violation of prison rules, testified in exchange for promises that the prosecutor would ask to have him kept out of punitive segregation, request his transfer to a facility where he could secure work release, and urge his release on parole. The prosecutor successfully kept him out of punitive segregation, and agreed to the remaining conditions.

*People v. Spruill*, 299 AD2d 374, 377 (2002).

Despite their credibility issues, the jury credited so much of Newton's and Connor's testimony, presumably based on their vantage points and familiarity with Defendant, that Defendant was the murderer. Given their credibility issues, we cannot say that the addition of the improperly withheld matters – including Newton's suicide attempt, his other refusals to be produced, his false testimony as to the number of times he met with Irvin, plus the undisclosed material witness order for Connor – would have changed the verdict, but neither can we feel confident that it would have been the same.[20]

It is not the duty of this court to become the proverbial 13th juror and decide how the jury would have reacted to the suppressed information. Given the strong challenges made at trial to Newton's and Connor's credibility on the evidence before them, it would not have been unreasonable for the jury to have convicted Defendant even had these additional facts been fully

---

[20] We further note that while Justice Belen noted after the verdict that the witnesses against Defendant were "compelling and credible" (People PHM 20), the affirming majority of the Appellate Division did not hold the evidence to be overwhelming. (*People v. Spruill*, 299 AD2d 374) Moreover, Irvin himself conceded in our hearing that, because of both Newton's and Connor's credibility problems, the evidence was not strong. (H3. 129.)

developed at trial, and we decline to hold that these additional facts would have constituted the proverbial straw that broke the camel's back to change the verdict. But nor can we hold that they would not. Rather, we hold that previously undisclosed matters regarding Newton might have caused the jury to reject his testimony in its entirety and thereby undermine confidence in the verdict.

*e.     Prejudice*

The People also rely on *People v. Dennis*, 141 AD3d 730 (2d Dept 2016), and other cases denying CPL 440 motions on grounds that defendant's delay in moving for relief constitutes prejudice. Upon analysis, it is clear that *Dennis* does not apply to our facts. *Dennis* had made two prior 440 motions, without raising the issue – a supposed conflict of counsel—raised on his third motion. Dennis was well aware of the supposed conflict when he made the prior motions and offered no reason why he did not previously include the ground raised on his third motion. In those circumstances, the Appellate Division reversed the lower court which had granted relief. Here, by contrast, Spruill has made no prior 440 motions. His FOIL requests were largely rejected, and after much litigation, the People's FOIL response was clearly incomplete, as many additional documents were produced only during the pendency of this motion, particularly the documents evidencing Newton's suicide attempt and subsequent refusal to be produced for the first day of trial.

We agree that given Newton's current mental illness, it is unlikely that he will be available to testify at any retrial, and the People will unquestionably be prejudiced. However, where Defendant has made no prior 440 motions, and lacked the opportunity to earlier make such motions due to the People fighting his FOIL requests, and then responding incompletely and inadequately, it is well settled that the ensuing prejudice to any retrial does not constitute a defense to an

otherwise meritorious motion where the defendant's motion is not procedurally barred. *See People v. Colon*, 13 NY3d 343, 346 (2009) (reversing denial of 440 motion and vacating two 16-year-old murder convictions on knowing use of false evidence grounds, without considering prejudice to the People's ability to retry defendants); *People v. Jimenez*, 142 AD3d 149 (1st Dept 2016) (reversing the denial of a 440 motion raising a Brady claim in an almost nine-year-old murder case without considering the prosecution's difficulty in retrying the case.)

*f.    Relief*

The conduct of the trial prosecutor – which appears to be largely, if not entirely, deliberate – as in his failing to disclose the material witness order for Connor, and failing to correct the false testimony of Newton that he met with Irvin about 20 times, and instead making himself an unsworn witness by repeating in his summation testimony he knew to be false – and his studied indifference to his representations on applications for Damiani orders that Newton would be produced only if he so consented, and failing to learn that on multiple occasions Newton refused to be produced, and even attempted suicide, and failing to investigate the reasons for Newton's repeated non-production in response to Damiani orders, and disclose these matters, meets the requirements of several subsections of CPL § 440.

Spruill relies on multiple subsections of CPL § 440.10(1) as grounds for relief. First, we reject the claim under subsection (g), newly discovered evidence. That section does not permit relief on new evidence which is merely impeaching, which we hold to be primarily the case here. We also reject application of subsection (c). The only "false" evidence known by the prosecutor to be false was Newton's testimony as to the number of pre-trial meetings with Irvin. As noted above, while this becomes material when taken cumulatively with other suppressed evidence, Irvin

31

asserted that he was unaware at trial of that other evidence. Taken by itself and out of context, the discrepancy and false testimony as to the number of meetings would not be material.

We find relief to be warranted under each of subsections (b), (f), and (h). CPL § 440.10(1)(b) requires only a showing by a preponderance of the evidence, that the conviction was procured by misrepresentation or fraud, rather than either the reasonable probability or possibility standard. *See People v. Seeber*, 94 AD3d 1335, 1377 (3d Dept 2012) (affirming lower court's holding that "the defense has the burden of proof by a mere preponderance of the evidence[,] CPL § 440.30(6)" and that burden had "easily been met on the issues of the judgment being procured by misrepresentation or fraud[.]") [21]

As to subsection (b), there was evidence that Newton was subject to duress by being repeatedly produced to meet with Irvin after his suicide attempt and refusals, whether or not Irvin actually knew of the refusals and attempted suicide. As to subsection (f), we hold that the events recited herein, had they been on record, would likely have resulted in reversal on appeal, particularly in view of the fact that the affirmance was by a divided court. As to subsection (h), we hold Defendant's due process rights, including but not limited to those under Brady, were violated.

Under the facts herein, we hold that it is both reasonably probable, and therefore reasonably possible that had all the matters now before this court been before the jury, the outcome would have been more favorable to Defendant.

---

[21] In *Weary v. Cain*, 136 S Ct 1002, 1006 (2016), the United States Supreme Court held that "[t]o prevail on his *Brady* claim, Weary need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. *Smith v. Cain* 132 S Ct 627, 629–631 (2012) (internal quotation marks and brackets omitted). He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict. *Ibid.*"

## The Legal Standard

As to which standard applies, we hold first that Defendant did not make a specific request for any of the improperly withheld Brady material, but only a generalized such request. However, in view of our holding that the People had an obligation, based on Irvin's Damiani applications, to ensure that Spruill was produced only upon his written consent, but repeatedly breached that obligation and thus denied themselves knowledge of Spruill's refusals and suicide attempt, the reasonable possibility standard should apply. Both defense counsel and, equally importantly, the Court itself were entitled to rely on Irvin's representations in each application for Damiani orders, that Newton would be produced only upon his consent to production. We hold that Irvin's representations, made to the Court itself, and under penalty of perjury, coupled with what we deem his deliberate disregard of those representations, obviate what might otherwise be held to require a specific request for Brady documents relating to Newton's refusals to be produced, and application of the "reasonably probable" standard, and allow us to instead rely on only the defense's general request for Brady material, coupled with the People's representation, now found to be false, that all such material had been produced, to invoke the lesser "reasonable possibility" standard. *See Banks v. Dretke*, 40 US 668, 695 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed.")

Moreover, Irvin's deliberate reference in summation to so much of Newton's testimony as he personally knew to be false, thereby vouching for Newton's credibility, and himself becoming an unsworn witness, and his deliberate silence when he had a duty to disclose that Connor appeared

33

as a witness pursuant to a material witness order, also support the "reasonable possibility" standard.

As the court, after an evidentiary hearing and consideration of the entire trial record, lacks confidence in the verdict, we find both standards to be met. *See People v. Steadman*, 82 NY2d 1 (1993) ("Prosecutors occupy a dual role as advocates and as public officers and, as such, they are charged with the duty not only to seek convictions but also to see that justice is done. In their role as public officers, they must deal fairly with the accused and be candid with the courts"). *Colon, supra*:

> In their role as public officers, prosecutors must deal fairly with the accused and be candid with the courts. This duty requires prosecutors not only to disclose exculpatory or impeaching evidence but also to correct the knowingly false or mistaken material testimony of a prosecution witness. Where a prosecutor elicits or fails to correct such inaccurate testimony, reversal and a new trial are necessary unless there is no 'reasonable possibility' that the error contributed to the conviction.

(internal citations and quotations omitted). *See United States v. Bagley*, 473 US at 682 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.")

## Conclusion

The Court is mindful that Defendant may well have been guilty of murder, as found by the jury. But our legal system mandates that a finding of guilty, to be valid, can only come after a fair trial consistent with our notions of due process. As we hold the trial in this case not to have met that high standard, we grant Defendant's motion, subject to a new trial. *See CPL 440.10(4).*

**ENTERED**

MAR 2 7 2017

NANCY T. SUNSHINE
COUNTY CLERK

MICHAEL GERSTEIN
Acting Justice of the Supreme Court

2005 WL 1743828
Only the Westlaw citation
is currently available.
United States District Court,
E.D. New York.

Tasker SPRUILL, Petitioner,
v.
William E. PHILLIPS, Respondent.

No. 04 CV 1382(NG)(MDG).
|
July 25, 2005.

**Attorneys and Law Firms**

Richard Ware Levitt, Attorney at Law, New
York, NY, for Petitioner.

Kings County District Attorneys Office and
New York State Attorney Generals Office,
for Respondent.

## *OPINION AND ORDER*

GERSHON, United States District Judge.

**\*1** Petitioner Tasker Spruill, through his
counsel, applies to this court under 28 U.S.C.
§ 2254 for a writ of habeas corpus, alleging
that he is being held in custody in violation
of the Constitution and laws of the United
States pursuant to the judgment of a court
of the State of New York. For the reasons
set forth below, petitioner's application is
denied.

## PROCEDURAL HISTORY

On October 22, 1993, Tracey Thomas was
shot and killed while sitting in a parked car
in Brooklyn. In connection with this crime,
petitioner was convicted of intentional
murder in the second degree, N.Y. Penal
Law § 125.25[1], following a jury trial in New
York Supreme Court, Kings County (Belen,
J.). Petitioner was sentenced on September
16, 1998 to a term of imprisonment of
twenty-five years to life.

On direct appeal to the Appellate Division,
Second Department, petitioner raised two
claims through his appellate counsel: (1)
petitioner's constitutional right to a fair
trial was violated by the prosecutor's
improper comments during summation, and
(2) petitioner's constitutional right to a
fair trial was violated by the wrongful
admission of two items of consciousness of
guilt evidence. Petitioner raised additional
claims in a *pro se* supplemental brief. By
order dated November 4, 2002, the Appellate
Division affirmed petitioner's conviction,
over the dissent of one justice. *People v.
Spruill,* 299 A.D.2d 374 (2d Dep't 2002). The
court held that the trial court "providently
exercised its discretion" in admitting both
items of consciousness of guilt evidence. *Id.*
at 375. The court also held that, although
certain comments made by the prosecutor
during summation were improper, "that
error does not warrant reversal." *Id.* The
court found petitioner's remaining claims to
be without merit. *Id.* The dissenting justice
found that neither item of consciousness of
guilt evidence should have been admitted,

and that the errors were compounded by the prosecutor's arguments during summation. *Id.* at 376-77. "In view of the quality of the evidence adduced against the defendant," the justice concluded, "the errors cannot be deemed harmless." *Id.* at 377. Petitioner's application for leave to appeal to the New York Court of Appeals was denied on January 13, 2003.

Petitioner filed the instant application for a writ of habeas corpus on April 12, 2004. In it, he raises only one claim: that his constitutional right to a fair trial was violated by the wrongful admission of the consciousness of guilt evidence.

## FACTS

At trial, the prosecution called two eyewitnesses to the shooting. Marilyn Connor testified that she was present at the scene of the crime, and that she was familiar with both the victim and the petitioner "from the neighborhood." Tr. at 127, 131. According to Connor, Thomas, the victim, was a drug dealer. At the time of the shooting, Thomas was sitting in his car, a black Saab, which was parked. From a distance of about five feet, Connor saw petitioner standing in front of the car and heard a shot. She then fled the scene. Connor admitted to being a heroin addict, to having been arrested multiple times for shoplifting and prostitution, and to having lied to an assistant district attorney during an interview while under oath. During cross-examination, she invoked her Fifth Amendment privilege against

self-incrimination, and was granted use immunity with respect to her participation in drug dealings in exchange for her further testimony.

**\*2** Shawn Newton a/k/a Derrick Wright also testified as an eyewitness to the shooting. Newton said that he had known both Thomas and petitioner since childhood. He also identified Thomas as a drug dealer, and testified that petitioner, who was known by the nickname "Pike," owned a game room in Brooklyn. According to Newton, on the night of the shooting, Thomas, Newton, and a third man named Greg Pearson were driving around in Thomas's car, a black Saab. They stopped near petitioner's game room, where a crowd of people they knew were gathered on the street, and began to socialize. Thomas remained inside the car; Newton and Pearson got out. At some point, petitioner's brother Marty, who was standing in front of the game room, motioned for Thomas to come and talk to him. By this time, Newton and Pearson had returned to the car. Thomas retrieved a gun that was hidden in the car and put it in his lap. He then drove over to where Marty was standing and parked the car. Marty approached the car on the driver's side and shook Thomas's hand through the window, which was rolled all the way down. He began making small talk with Thomas, but never let go of his hand. A few minutes later, petitioner came out from the game room with another gun and approached the car. Reaching around his brother, petitioner "put the gun in Tracey's chest, and he shot him one time." Tr. at 497. Thomas immediately put the car in gear and drove around the

corner, at which point he lost control of the car and crashed into a parked car. Newton and Pearson climbed out of the car's back window and fled.

Newton admitted to being a daily marijuana smoker since the age of five, and to having smoked "a lot" of marijuana on the day of the shooting. Tr. at 485. He also admitted to being a drug dealer and acknowledged that, at the time of his testimony, he was incarcerated for selling drugs. In exchange for his testimony, Newton asked the prosecutor for the following benefits: that he be transferred to a different corrections facility; that he be placed on work release; that he receive parole at his earliest eligibility; that he be removed from solitary confinement, where he was placed after engaging in lewd conduct in a public area of the prison; and that his family be relocated. The prosecutor agreed to request these benefits for Newton, but indicated that he could not guarantee them because they involved matters beyond his control.

Following a hearing outside the presence of the jury, Newton was permitted to testify on redirect that, while being held at Rikers Island prior to petitioner's trial, he was confronted by another inmate who called him a snitch. The other inmate brandished a document, which Newton believed to be the minutes of his Grand Jury testimony.[1]

[1] It is unlikely that the document actually could have been the minutes of Newton's Grand Jury testimony because, at the time that the exchange at Riker's Island allegedly took place, unredacted minutes of Newton's testimony, bearing his name, had not been released to anyone by the prosecutor.

Q. Did someone approach you?
A. Yes.

Q. Did you know who this person was?

A. No.

Q. Do you know his name as you sit here today?

A. No, I don't recall his name.

*3 Q. Did he show you something?

A. Yes.

Q. Could you tell the members of the jury what he showed you?

A. He showed me some statements that I had supposedly had made at the Grand Jury.

Q. Statements that who had made?

A. Me.

Q. And when he showed you the statements that you had made, had you given him those statements?

A. Nah.

Q. Did he say anything to you?

A. Yes.

Q. What was that?

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Overruled.

A. He said I was a snitch. We was like arguing. I'm saying about defendant, we was arguing about the defendant.

[DEFENSE COUNSEL]: Objection, your Honor.
THE COURT: Overruled.

A. He was like, yo, you is a snitch. I said everybody in the house is snitching on my house. I'm telling him I don't care about his man. His man did something to my friend so I don't care about his man.

Q. You actually saw the papers that he had?

A. Yeah.

Q. And those papers, did they relate to your testimony in this case?

A. Yes.

Q. Did you receive-keep those papers from him?

A. He kept from me.

Q. I'm sorry?

A. He kept them from me. He showed me, tried to make himself look big.

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: He showed you to what?

THE WITNESS: Make himself look big.

THE COURT: Overruled. I'll allow that.

Q. Did he give you a copy of the papers?

A. No, sir.

Tr. at 694-96. Newton interpreted the incident as a threat. On cross-examination, he acknowledged that he had volunteered to other inmates, both upstate and at Rikers Island, that he intended to testify as a witness against petitioner.

The prosecution also called Morris Rogers a/k/a Big Ray to testify. Rogers, a friend of Thomas, was present at the scene of the crime but did not witness the shooting. He did see the subsequent car crash and attempted to assist Thomas. When the police arrived at the scene, they found Rogers removing money from Thomas's car. Rogers was detained and questioned in connection with the shooting, but was eventually released.

The prosecution's other witnesses included two police officers who responded to the crime scene, several New York detectives who worked on the case, a detective from Baltimore, Maryland, a ballistics expert, and a medical examiner. Collectively, the testimony of these witnesses established that, despite extensive search efforts, the

police were not able to locate petitioner for four years following the shooting. He was finally apprehended in 1997 in Baltimore, Maryland, at which time he told the police that his name was Kevin Michael Mulberry. Thomas's cause of death was a gunshot wound to the chest. A gun recovered from Thomas's car by the police was not the murder weapon; the gun used to shoot Thomas was never recovered.

The parties stipulated that petitioner "at one time had a small tattoo on the outside bicep area of his left arm. The tattoo said, 'Pike.' " After the stipulation was read into the record, petitioner displayed his left arm for the jury. On it, there was a tattoo of a panther surrounded by moneybags. The tattoo did not contain any lettering. In addition, a redacted copy of the death certificate of Gregory Pearson, who had been killed prior to trial, was admitted into evidence.

*4 The defense called two witnesses at trial, both of whom were detectives who interviewed Marilyn Connor in 1993. At the time of Ms. Connor's interview, Morris Rogers was still a suspect, and the detectives showed her a photo array containing Rogers's picture. Although a report filed by one of the detectives states that Connor did not identify anyone in the photo array as the shooter, a handwritten notation on the back of the picture of Rogers indicates a positive identification by Connor. Neither detective had an independent recollection of the interview with Connor. The prosecution recalled Connor in rebuttal. She testified that she never identified Morris Rogers as the shooter.

During summation, the prosecutor argued that both the implied threat made to Newton at Rikers Island and the alteration of petitioner's tattoo demonstrated consciousness of guilt on the part of petitioner. The prosecutor also argued that Newton's willingness to testify in spite of the threat made to him bolsters his credibility: "Do you think that Derrick Wright [Newton], after he saw that Grand Jury testimony at Rikers, wanted to be here, other than the fact that he wanted to tell you about what happened to his friend?" Tr. at 1138. Defense counsel did not make any arguments concerning the threat or the tattoo during summation.

The court gave the following charge with respect to consciousness of guilt evidence:
In this case, the People have introduced evidence of certain behavior and conduct by the defendant from which the People contend that you, the jury, draw an inference that such conduct evidence is a consciousness of guilt.

The evidence upon which the People rely is as follows:

The People contend that the defendant's flight from Brooklyn soon after Tracey Thomas was killed, and for four years thereafter; the defendant's alleged use of a false name when apprehended by the Baltimore police in August 1997; the alleged threats made to Shawn Newton while in Rikers Island concerning his testifying

against the defendant; and the alleged attempt by this defendant to alter his appearance by removing the "Pike" tattoo from his arm are all evidence of the consciousness of guilt.

Whether or not the evidence I have mentioned does in fact evidence a guilty mind on the part of the defendant and, if so, what weight should be given to such evidence is exclusively a jury question. Under some limited circumstances proof of such conduct may be considered by the jury.

I instruct you now under what circumstances you may consider such conduct.

Your first duty is to decide whether evidence of defendant's conduct upon which the People rely if believed by you does in fact evidence a consciousness of guilt on the part of the defendant. You must examine such evidence carefully. Such conduct may have an innocent explanation. If you find such an explanation from the nature of the conduct itself, you must disregard such evidence totally, forget you heard it. For example, common experience teaches that even an innocent person who finds himself placed under suspicion may instinctively or protectively resort to conduct which might create the appearance of guilt in order to avoid arrest or prosecution.

**\*5** Thus, if an innocent purpose may be drawn from the evidence you must disregard it completely. Only if you find that the conduct of the defendant was solely motivated by consciousness of guilt may you consider it and weigh it in your deliberations.

I instruct you that proof of conduct evidencing consciousness of guilt has slight value. Standing alone such evidence may never be the basis for a finding of guilt. However, when the People have introduced other direct and substantial evidence pointing toward the guilt of the defendant, then evidence of alleged flight, alleged resort to a false identity by use of an alias when apprehended, evidence of alleged threat to a witness and evidence of intent to conceal identity by removing tattoo from an arm may be considered by you together in considering other direct evidence of guilt in arriving at your verdict. Tr. at 1164-66.

## DISCUSSION

### I. Standard of Review

Since this petition for a writ of habeas corpus was filed after April 24, 1996, it is subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. 104-132, 110 Stat. 1214 (1996). AEDPA mandates deference to state court decisions by federal courts conducting habeas corpus review. Under its provisions, an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court,

or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The habeas court must presume that the state court's determination of factual issues is correct unless the petitioner demonstrates otherwise by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Supreme Court has held that a state court decision is "contrary to" clearly established Supreme Court precedent if it "contradicts the governing law set forth in [Supreme Court] cases or confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The Court has further held that a state court decision is "an unreasonable application of" clearly established Supreme Court precedent if, from an objective standpoint, the state court applied Supreme Court precedent unreasonably, not simply incorrectly or erroneously. *Id.* at 411. The Court of Appeals for the Second Circuit has clarified this standard, holding that "[although] some increment of incorrectness beyond error is required ... the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Sellen v. Kuhlman*, 261 F.3d 303, 315 (2d Cir.2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000)).

## II. Admission of the Consciousness of Guilt Evidence

*6 Federal habeas corpus relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). It is not the province of a federal habeas court to reexamine state court determinations on state law questions. *Id.* at 67-68. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Id.* at 68.

The introduction of improper evidence against a defendant does not amount to a constitutional violation unless the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice" guaranteed by the Due Process Clause of the Fourteenth Amendment. *Dunnigan v. Keane*, 137 F.3d 117, 125 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). To meet this standard, the improperly admitted evidence must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. *Id.* In assessing materiality, a court must review the improperly admitted evidence in light of the entire record before the jury. *Id.*

### A. The Threat
Petitioner argues that Newton's testimony concerning the implied threat made to him at Rikers Island was admitted improperly because no competent evidence linked petitioner to the threat. The Appellate Division found that "[t]he witness' testimony of his conversation with the fellow inmate circumstantially connected the defendant to the threat." 299 A.D.2d at 375. Whether or not the Appellate Division was correct in

its conclusion, the admission of the threat evidence does not entitle petitioner to habeas corpus relief.

Drawing on the findings made by the dissenting justice in the Appellate Division concerning the quality of the evidence against petitioner at trial, petitioner contends that the case against him was so weak that, but for the admission of the challenged consciousness of guilt evidence, he would have been acquitted. The court does not agree. Two eyewitnesses identified petitioner as the shooter. Petitioner correctly points out that both witnesses had lengthy criminal records, but this fact is not fatal to the witnesses's credibility. Both witnesses testified about their records, as well as about the benefits they hoped to receive as a result of their testimony, and were thoroughly crossexamined on these topics. Notably, the witnesses did not know each other; their identifications were independent and corroborative of one another. Moreover, the unchallenged consciousness of guilt evidence-that defendant fled New York following the crime, abandoning his game room business and evading apprehension by the police for four years, and that, when eventually apprehended in Baltimore, petitioner gave a false name to police-is powerful in itself and renders the challenged consciousness of guilt evidence cumulative. In light of all of the evidence presented to the jury in this case, the testimony concerning the threat was not sufficiently material to provide the basis for petitioner's conviction, nor to remove a reasonable doubt that would have existed on the record without it. Indeed, if the jury found Newton's testimony

concerning the threat credible, then it likely also found credible Newton's testimony that he witnessed petitioner shoot Thomas. Furthermore, the impact of the testimony concerning the threat was mitigated by the court's instructions to the jury that "even an innocent person who finds himself placed under suspicion may instinctively or protectively resort to conduct which might create the appearance of guilt in order to avoid arrest or prosecution" and that "proof of conduct evidencing consciousness of guilt has slight value." Accordingly, the decision of the Appellate Division with respect to the testimony concerning the threat was neither contrary to, nor an unreasonable application of, clearly established federal law.

### B. The Tattoo

*7 Petitioner argues that the admission of evidence concerning the alteration of his tattoo was improper because no competent evidence established that the alteration occurred after the shooting. Again, petitioner's argument, even if correct under New York law, fails to state a constitutional claim. The alteration of petitioner's tattoo, in itself, could not have been dispositive of the jury's verdict. In light of the other evidence introduced by the prosecution, including the unchallenged consciousness of guilt evidence, and the court's instructions with respect to the consciousness of guilt evidence, the admission of the evidence concerning the alteration of the tattoo did not violate due process. Thus, the decision of the Appellate Division with respect to the evidence concerning alteration of petitioner's tattoo was neither contrary to,

nor an unreasonable application of, clearly established federal law.

## CONCLUSION

For the reasons set forth above, petitioner's application for a writ of habeas corpus is denied. Since petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied pursuant to 28 U.S.C. § 2253(c).

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1743828

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

299 A.D.2d 374
Supreme Court, Appellate Division,
Second Department, New York.

The PEOPLE, etc., Respondent,
v.
Tasker SPRUILL, Appellant.

Nov. 4, 2002.

**Synopsis**

Defendant was convicted, after a jury trial
in the Supreme Court, Kings County, Belen,
J., of second-degree murder. Defendant
appealed. The Supreme Court, Appellate
Division, held that: (1) evidence of implied
threat to witness, and of defendant's
alteration of tattoo, was admissible to
show consciousness of guilt, and (2)
prosecutor's improper summation did not
require reversal.

Affirmed.

Goldstein, J., filed a dissenting opinion.


West Headnotes (3)

**[1]    Homicide**
     ⟲ Statements by Third Person
Witness' testimony regarding
an implied threat made by
a fellow inmate concerning
witness' testimony in defendant's
murder case was admissible;
the testimony circumstantially
connected defendant to the threat,
and the testimony was evidence

of defendant's consciousness of his
guilt.

7 Cases that cite this headnote

**[2]    Homicide**
     ⟲ Concealment of Identity
Evidence that after the shooting,
defendant had altered a tattoo
on his arm, which said "Pike,"
was admissible in prosecution
for murder, to show defendant's
consciousness of guilt, where the
suspected shooter police had been
searching for, for almost three
years, was a man named or
nicknamed "Pike."

1 Cases that cite this headnote

**[3]    Criminal Law**
     ⟲ Comments on Failure to
     Produce Witnesses or Evidence
Prosecutor's improper summation,
which implied that defendant
should have called his brothers,
who were present at crime scene, as
witnesses, did not require reversal
of conviction for second-degree
murder.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*312** Lynn W.L. Fahey, New York, N.Y. (Barry Stendig of counsel), for appellant, and appellant pro se.

Charles J. Hynes, District Attorney, Brooklyn, N.Y. (Leonard Joblove, Jane S. Meyers, and Dahlia Fredericks of counsel), for respondent.

MYRIAM J. ALTMAN, J.P., GLORIA GOLDSTEIN, HOWARD MILLER and REINALDO E. RIVERA, JJ.

**Opinion**

**\*374** On October 22, 1993, Tracey Thomas was shot and killed as **\*375** he sat in his car outside a game room operated by the defendant, who was known as "Pike." During the course of the police investigation of the incident, a man named "Pike" was identified as a suspect. The police attempted to locate the defendant, but were unable to do so until August 1997 when he was apprehended in Baltimore. When he was apprehended he claimed that his name was Kevin Michael Mulberry.

At trial, two eyewitnesses identified the defendant as the shooter. As evidence of consciousness of guilt, one of the witnesses was permitted to testify regarding an implied threat made by a fellow inmate concerning his testimony in this case. The People also contended that the defendant's alteration of a tattoo on his arm constituted evidence of consciousness of guilt. The People and the defendant stipulated that the defendant "at one time had a small tattoo on * * * his left arm" which said "Pike." At the time of trial, the word "Pike" had been covered with a picture of a panther, which was shown to the jury.

**\*\*313** [1] Contrary to the defendant's contention, the trial court providently exercised its discretion in permitting the testimony regarding the implied threat. The witness' testimony of his conversation with the fellow inmate circumstantially connected the defendant to the threat (*see People v. Cotto,* 222 A.D.2d 345, 635 N.Y.S.2d 623; *People v. Kornegay,* 164 A.D.2d 868, 559 N.Y.S.2d 552). The witness' credibility was a matter for the jury.

[2] The trial court also providently exercised its discretion in permitting the alteration of the defendant's tattoo to be considered as evidence of consciousness of guilt (*see People v. Torres,* 179 A.D.2d 696, 578 N.Y.S.2d 262). While there was no direct evidence as to when the defendant altered his tattoo, there was sufficient evidence from which it could be inferred that the tattoo was altered after the shooting. Further, the trial court gave a comprehensive instruction regarding evidence of consciousness of guilt, advising the jury that such proof has slight value, must be scrutinized carefully, and that there could be innocent explanations for such conduct.

[3] While the prosecutor improperly implied during his summation that the defendant should have called his brothers, who were present at the crime scene, as witnesses, that error does not warrant reversal (*see People v. Gonzalez,* 97 A.D.2d 423, 467 N.Y.S.2d 260).

The defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit.

ORDERED that the judgment is affirmed.

ALTMAN, J.P., H. MILLER, and RIVERA, JJ., concur.

GOLDSTEIN, J., dissents and votes to reverse the judgment, on the law, and to order a new trial, with the following memorandum: *376
I disagree with the majority, and would hold that the improper admission of evidence of purported intimidation of a witness and the prosecutor's arguments in summation warrant reversal of the defendant's conviction and a new trial.

During the course of the trial the prosecutor, over objection, elicited testimony from a key eyewitness that about four months prior to the trial an unidentified inmate in Riker's Island Correctional Facility accused him of being a "snitch" and showed him a copy of a document containing his prior statements. The witness claimed that his name was typed on the document. This testimony was admitted as evidence that the defendant attempted to intimidate the witness, demonstrating consciousness of guilt.

Three to four months prior to trial, certain police reports had been released to the defendant. However, the witness' name had

been redacted from the reports. Further, it is undisputed that the prosecutor only released a copy of the Grand Jury minutes to the defense counsel at the commencement of the trial. These undisputed facts indicated that the documents shown to the witness could not have been documents released by the prosecutor to the defendant. The evidence was thus insufficient to circumstantially relate the alleged threatening conduct to the defendant, and accordingly should have been excluded (see People v. Rivera, 160 A.D.2d 267, 553 N.Y.S.2d 707; cf. People v. Pitts, 218 A.D.2d 715, 630 N.Y.S.2d 544).

In his summation, the prosecutor compounded the error when he argued that the witness was shown his "very own sworn testimony to the Grand Jury," knowing full well that such could not have **314 been the case. The defendant's objection to this comment was overruled.

The prosecutor also attempted to demonstrate that the defendant altered a tattoo, which originally bore his nickname "Pike," as evidence of consciousness of guilt. The defense counsel noted that such evidence could only be relevant to consciousness of guilt if the tattoo was altered after the instant crime was committed in 1993. There is no evidence in the record as to when the defendant altered his tattoo. The prosecutor acknowledged that he could not produce such evidence because a witness was "now dead." Without objection, the parties stipulated that the defendant "at one time had a small tattoo" which said "Pike" and the defendant showed his arm to the jury to

demonstrate what the tattoo looked like at the time of the trial.

In summation, the prosecutor argued that the defendant demonstrated his consciousness of guilt by "changing his tattoo *377 which said 'Pike'." As previously noted, the prosecutor could not establish when the defendant changed the tattoo, and therefore could not establish consciousness of guilt based upon the defendant's alteration of the tattoo. His comments in summation were a calculated effort to insert facts not in evidence (*see People v. Taylor*, 296 A.D.2d 512, 745 N.Y.S.2d 477).

Further, the prosecutor noted in summation that the defendant's two brothers were present when the crime occurred, and did not identify someone other than the defendant as the perpetrator. The defendant's brothers did not testify at the trial. The prosecutor's comments implied that the defendant had some obligation to call his brothers as witnesses, and thus shifted the burden of proof to the defendant (*see People v. Walters*, 251 A.D.2d 433, 674 N.Y.S.2d 114).

The defendant's conviction was based upon the testimony of two witnesses with lengthy criminal records. One witness had been unable to identify the defendant from photographs when interviewed by the police. She later invoked the Fifth Amendment on cross-examination, and in exchange for her testimony was granted use immunity with respect to her participation in drug dealings.

The other witness, who was serving a term of imprisonment in State prison and was to serve time in punitive segregation for violation of prison rules, testified in exchange for promises that the prosecutor would ask to have him kept out of punitive segregation, request his transfer to a facility where he could secure work release, and urge his release on parole. The prosecutor successfully kept him out of punitive segregation, and agreed to the remaining conditions.

In view of the quality of the evidence adduced against the defendant, the errors cannot be deemed harmless.

Accordingly, it is my opinion that the judgment must be reversed and a new trial ordered.

**All Citations**

299 A.D.2d 374, 750 N.Y.S.2d 312, 2002 N.Y. Slip Op. 07973

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

## TABLE OF EXHIBITS

EXHIBIT A           Voluntary Disclosure Form

EXHIBIT B           Excerpt of Spruill's Trial Transcripts

EXHIBIT C           ADA Irvin's 15 Counterfeit Affirmations & The Court
Orders He Obtained With Them

EXHIBIT D           Excerpt of August 17, 2016, Appearance Transcript
On Spruill's CPL § 440 Motion

EXHIBIT E           Excerpt of DA's Appellate Brief Appealing The Vacatur
Of Spruill's Conviction

EXHIBIT F           Newton's Suicide Report

EXHIBIT G           *Damiani* order indicating Newton "Refused"

EXHIBIT H           Newton's Letter To The Attorney General Complaining
About Irvin's Conduct

EXHIBIT I           Secret Material Witness Order & Warrant Regarding
Connor

EXHIBIT J           Handwriting Expert Report

EXHIBIT K           Excerpt of State's Opposition To Spruill's CPL § 440
Motion

EXHIBIT L           DA Opposition To Spruill's Article 78 Petition

EXHIBIT M           Excerpt of July 13, 2016, Appearance Transcript Spruill's
CPL § 440 Motion

# EXHIBIT A

## Voluntary Disclosure Form

COUNTY OF KINGS

OFFICE OF THE
District Attorney
KINGS COUNTY

THE PEOPLE OF THE STATE OF NEW YORK
-against-

CHARLES J. HYNES

1. _TASKER SPRUILL_    Docket/Indictment# _13008/95_

2. _____    Docket/Indictment# _____
            Defendant(s)

### VOLUNTARY DISCLOSURE FORM

Form prepared by: _D.DA LEVITT_    Date: _10/18/95_

Form served by: _____ /Upon: _____    Date: _____

(1) Approximate date, time and place of offense:

| Offense | Date | Time | Place |
|---|---|---|---|
| MURDER 2° | 10/28/93 | APPROX | HOPKINSON & |
| CPW 2° |  | 12:30 | MCDONOUGH |
| CPW 3° |  | A.M. |  |

(2) Approximate date, time and place of arrest:

|  | Date | Time | Place |
|---|---|---|---|
| Defendant #1: |  |  |  |
| Defendant #2: | TO BE ARRESTED ON INDICTMENT |  |  |

(3) Arresting Officer:    Name    Shield    Command

Defendant #1: _____

Defendant #2: _See ABOVE_

(4) Other police officers, excluding any officer whose identity must be confidential, known by the prosecutor to have been present at the time of arrest.

|  | Name | Shield | Command |
|---|---|---|---|
| Defendant #1: |  |  |  |
| Defendant #2: | See ABOVE |  |  |

(5) The following written reports or documents or portions thereof, relating to this case were made by or at the request or direction of a public servant engaged in law enforcement activity, or were made by a person whom the prosecutor intends to call as a witness on the People's direct case at trial, and are either appended or will be made available to counsel at a mutually convenient time. Addresses of witnesses have been redacted, and in appropriate cases, names of witnesses will also be redacted.

BCAB-22b

( ) Arrest Report
( ) Arrest Warrant
( ) Ballistics Report
( ) Breathalyzer Report
( ) Complaint Report ("UF 61")
( ) Complaint Follow-up Report ("DD 5") Numbers:

( ) Handwriting Analysis
( ) Medical Examiner's Report
( ) Mental Examination
( ) Narcotics Lab Report
( ) Physical Examination
( ) Police Aided Card
( ) Search Warrant
( ) Serology Report
( ) Other

(6) The following property is either appended or will be made available to counsel at a mutually convenient time:

(✓) Photograph(s) or drawing(s) relating to the case which were made or completed by a public servant engaged in law enforcement activity, or which was made by a person whom the prosecutor intends to call as a witness on its direct case at trial or which the People intend to introduce on its direct case at trial.

(✓) Tapes or other electronic recordings, in addition to those disclosed pursuant to CPL 710.30, which the People intend to introduce on its direct case at trial, and irrespective of whether such recording was made during the course of the criminal transaction.

Any other property obtained from the defendant or other co-defendant to be tried jointly, as reflected in police property voucher which is appended or will be made available to counsel at a mutually convenient time.

(7) Type of weapon, if any, involved: HANDGUN
( ) Weapon was recovered. (✓) Weapon was not recovered.

(8) The People intend to prove at trial that each defendant acted as principal, accomplice, or both, as indicated:

| | Principal | Accomplice | Both |
|---|---|---|---|
| Defendant #1: | (✓) | ( ) | ( ) |
| Defendant #2: | ( ) | ( ) | ( ) |

(9) Copies of any transcript of testimony relating to this case, if given before the Grand Jury by the defendant, or by a co-defendant(s) to be tried jointly, will be provided as soon as possible and before trial.

(10) Anything the District Attorney determines is required to be disclosed, prior to trial, to the defendant, by the prosecutor, pursuant to the constitutions of New York State or of the United States is listed below:

NOTHING PRESENTLY KNOWN TO PEOPLE

(11) If subsequent to the disclosure of the items specified above, additional items are revealed which the District Attorney believes would be subject to disclosure under the provisions of this form, such items will be disclosed unless a protective order to prohibit their discovery would be warranted, in which case a notice to that effect will be provided.

II. PLEASE TAKE NOTICE that, pursuant to and within the meaning of
Section 710.30(1)(b) of the Criminal Procedure Law, the People
intend to offer on its direct case at trial of this action
testimony regarding an observation of the defendant either at
the time and place of the commission of the offense or upon
such other occasion relevant to the case by a witness who has
previously identified the defendant:

Defendant # __1__    Defendant # _____    Defendant# _____

Name of
witness
(unless con-
fidential)    _CONFIDENTIAL_ _____    _____

Photograph    (X)                ( )              ( )

  Date:    1/26/95    _____    _____

  Time:    12:30 PM    _____    _____

  Place:    ~~ORGANIZED CRIME~~ _____    _____

Police officer
present: Name: _DET. ROBERT SCHLESINGER_ _____

Shield, Command: _5456, 73SQ_ _____

Lineup    ( )                ( )              ( )

  Date:    _____    _____    _____

  Time:    _____    _____    _____

  Place:    _____    _____    _____

Police officer
Present: Name:    _____    _____    _____

Shield, Command: _____    _____    _____

Corporeal
Non-Lineup    ( )                ( )              ( )

  Date:    _____    _____    _____

  Time:    _____    _____    _____

  Place:    _____    _____    _____

Police officer
present: Name:    _____    _____    _____

Shield, Command: _____    _____    _____

-2-

BCA8-22a.

# EXHIBIT B

# Excerpt of Spruill's Trial Transcripts

Proceedings

1

2     MR. KRINSKY:  I'll object to that,
3     your Honor.

4         This is creating an issue --

5         THE COURT:  I will not -- Mr. Irvin,
6     you know, the woman is at least in her
7     40's; is that right?

8         MR. FARRELL:  Thirty-nine.

9         THE COURT:  She's what?

10        MR. FARRELL:  Thirty-nine.

11        THE COURT:  She's 39 years old.  She's
12    been in courts many times.  She's, with
13    all due respect, streetwise.

14        I am sure if that was an issue, she
15    would convey that, either to me yesterday
16    or to her lawyer.

17        MR. IRVIN:  Well, she started to
18    yesterday.

19        THE COURT:  I don't think so, sir.

20        MS. BENNETT:  Her companion did say to
21    to me yesterday after court --

22        THE COURT:  I read to you the
23    transcript.

24        MR. IRVIN:  Well, if you compare that
25    to her statement, when he objected is when

Proceedings

1
2  she started to go into her statement when
3  she talks about -- "in the next day one of
4  the guys from the same period went over to
5  the building where I was staying at and
6  kicked the door. Anyhow, they left a
7  message, you know, with my mother."
8     THE COURT: What are you talking
9  about? This is from the statement to the
10 D.A. years ago?
11    MR. IRVIN: Right.
12    At that point, when she started to
13 talk about her mother and the people
14 coming by, that's when yesterday Mr.
15 Krinsky objected.
16    THE COURT: We ended way before that
17 yesterday.
18    MR. IRVIN: When he objected was when
19 she started to talk about people coming by
20 her mother's house.
21    THE COURT: Counsel, show me that in
22 the transcript.
23    MS. BENNETT: When she started
24 saying --
25    THE COURT: Show me what you're

DRS

1

2  talking about.

3      MR. KRINSKY:  She was referring to

4  five years ago, in November of '93.

5      THE COURT:  Right.

6      MS. BENNETT:  Your Honor, as I stated

7  this morning when court broke yesterday

8  and I went out into the hallway, I was

9  informed by her companion that she was

10  concerned about threats that had been made

11  to her.

12      MR. IRVIN:  On page 329, line 12,

13  right after she talked about "one of my

14  mother's tenants were calling back and

15  forth telling my mother someone had been

16  coming over--" Mr. Krinsky said, "Your

17  Honor, I would object."

18      THE COURT:  All right.  Now look,

19  since this time, Mr. Irvin, she hired a

20  lawyer.  Right?  And Mr. Farrell I've

21  known for sometime now.  He's an

22  experienced attorney.  If this was a

23  real -- in my mind, sir, if this was a

24  real concern of hers -- and I got to tell

25  you will this lady's all over the map now

Proceedings

in her testimony. She's not -- if you're
asking me to make some kind of credibility
call, with respect to her, it's a real
issue in my mind. Okay?

I mean, her lawyer himself is telling
me she's concerned about possible
perjury.

So, if that was such an important
thing, she would have told me that in one
form or another by now.

MR. IRVIN: She started to yesterday
and Mr. Krinsky objected.

THE COURT: I understand that, but I'm
not going to suggest that her lawyer
suggest to her that that's a possible way
for her not to testify or anything like
that.

MR. IRVIN: We're not saying that.

THE COURT: I know you're not.

MR. IRVIN: But, if we have had
represented to us by her companion about
her concern and by her directly to me
about a certain relative, and again we get
back --

DRS

Proceedings

1

2  ask the Court to infer immunity with

3  respect to any drug dealing by my client.

4      However, absent an order by you giving

5  her immunity for any possible perjury, I

6  respectfully request that she can invoke

7  the right because something -- your Honor,

8  two sworn statements that are somewhat --

9      THE COURT:  What sworn statement?

10     MR. FARRELL:  Well, I can't anticipate

11  Mr. Krinsky's questions, but there may be

12  something that comes up relating to the

13  incident that her answer today --

14     THE COURT:  Relating to the shooting

15  itself?

16     MR. FARRELL:  Correct.

17     We know what she said on direct.  If

18  she was asked questions today, she may

19  well give different answers under oath,

20  contradictory, such that those two

21  contradictory sworn statements could be

22  the basis of a perjury prosecution.

23     And I think the witness has an

24  absolute right to not answer that

25  question, and the jury can be instructed

Proceedings

1
2  appropriately, and that's for counsel and
3  the Court to decide.

4      My interest is in protecting my client
5  from potential jeopardy, and I can tell
6  the Court, as an experienced criminal
7  lawyer, that we're not invoking this right
8  lightly.  It's after due deliberation on
9  my part and after consultation with my
10  client that there could well be a chance
11  that she would implicate herself by
12  answering the question that Mr. Krinsky
13  asked honestly.  It may well be in
14  contradiction to what she's already
15  testified to under oath in this courtroom,
16  and perjury can be based on two sworn
17  statements that are diametrically
18  opposed.

19      And I respectfully submit that that is
20  a proper invocation of her right.

21      THE COURT:  All right, Mr. Krinsky,
22  I'll hear you on that.

23      First of all, let me hear the
24  prosecutor.  What do you have to say to
25  that?

DRS

430

Proceedings

1                       

2   objection to that, Mr. Krinsky.

3       MR. KRINSKY:  Thank you.

4       THE COURT:  At that point, Mr. Irvin,

5   you raised the other question, which you

6   just did now, that earlier during the

7   discussions today Mr. Farrell had, on

8   behalf of Miss Connor, indicated that

9   there may be some questions on

10   Mr. Krinsky's cross-examination in

11   relation to the incident itself where she

12   would have to take the Fifth Amendment.

13      And, Mr. Irvin, you've conveyed to

14   myself and to Mr. Krinsky your concern

15   that if those answers that she would plead

16   the Fifth on were in relation to

17   exculpatory testimony, that she just

18   simply didn't want to talk about on the

19   record here in court, that you had an

20   affirmative obligation as a prosecutor to

21   try and determine what, if any,

22   exculpatory information Miss Connor had to

23   offer.

24      Specifically, you indicated your

25   concern that she was going to say that the

DRS

Proceedings

defendant was not the shooter.

I ruled at the time we concluded cross-examination and you've now raised the question again.

I think that's a fair statement of what's happened; is that right, Mr. Krinsky?

MR. KRINSKY: Yes, your Honor.

THE COURT: Mr. Farrell, I ask you sir, to your knowledge, was she going to -- does she have any exculpatory information, vis-a-vis Mr. Spruill, the defendant in the case at bar?

MR. FARRELL: I believe the answer is yes, she might have, your Honor.

She told me -- and I'm not going into the substance of any client conversations at this point, though it's -- it's possible.

I couldn't accurately predict how she was going to answer any of the questions she was asked, but her answers now are a matter of record.

THE COURT: Tell me this: Do her

DRS

1

2          A F T E R N O O N   S E S S I O N

3          THE COURT:  Counsel, step up.

4          (Off-the-record side-bar conference

5      held.)

6          THE COURT:  All right.  For the

7      record, we had a side-bar conference

8      outside the presence of the jury, and I'm

9      directing that Miss Connor -- Miss Connor,

10     madam, that you be here next Monday

11     morning -- that's Monday, July 27th, at 10

12     a.m., along with Mr. Farrell.

13         MR. FARRELL:  Yes, we'll be here, your

14     Honor.

15         THE COURT:  At that point I'll look

16     into this issue further as to any

17     potential exculpatory information you may

18     have with reference to this case.  Okay?

19         MR. FARRELL:  Yes.  I'll do the

20     research we discussed at the bench.

21         Thank you.

22         THE COURT:  Now, Mr. Farrell, you

23     don't have to give me a brief, although

24     one would be appreciated, but you

25     certainly should make copies of any Second

                           DRS

1    Proceedings

2    Department or appellate law that you have

3    from the Court of Appeals and make copies

4    for both the prosecution and defense and

5    this Court.

6        MR. FARRELL:  I'll do that, your

7    Honor.  Thank you.

8        THE COURT:  Thank you.  See you then.

9        All right.  Now, let me ask you

10    this -- off the record.

11        (Off-the-record side-bar conference

12    held.)

13        THE COURT:  All right.  Let's get the

14    jury in the box, please.

15        Before we bring in the jury I have to

16    put something else on the record.

17        Mr. Irvin, I understand it's your

18    intention to call Derrick Wright now; is

19    that right?

20        MR. IRVIN:  Yes.

21        THE COURT:  All right.  Can you please

22    state for the record the nature of any and

23    all promises that have been made to this

24    individual in exchange for his testimony,

25    either in the past or here today?

DRS

1       Proceedings

2           MR. IRVIN:  Yes.

3           He got infraction violations from the

4       Department of Corrections and we -- he was

5       going to be put in the bing, b-i-n-g, for

6       120 days --

7           THE COURT:  The bing is solitary

8       confinement.

9           MR. IRVIN:  We contacted the bing

10      and -- or not the bing.  We contacted a

11      deputy warden and told him he was a

12      witness on a murder case.  They agreed not

13      to put him in the bing as long as he

14      didn't cause any problems in between

15      time.

16          THE COURT:  That's one thing you've

17      done for him.

18          In other words, you contacted the

19      deputy warden in the New York City

20      Department of Corrections, and Mr. Wright

21      is not placed in punitive segregation,

22      also known, colloquially, as the bing, in

23      return for cooperating in testifying.

24          Next.

25          MR. IRVIN:  Yes.

                        DRS

1          Proceedings

2          He asked us to contact the Department

3      of Corrections to try and help him get

4      work release, and we spoke to a --

5          THE COURT:  This is the state

6      Department of Corrections, correct?

7          MR. IRVIN:  Yes.  Spoke to a James

8      Racore (ph).  He told us that Mr. Wright

9      is eligible for work release because he's

10     there on a nonviolent crime, a drug

11     charge; and, given his history and record,

12     he can be eligible.  He told us to tell

13     Mr. Wright that we can make no promises.

14     It's up to them, even though we'd write

15     the letter.  They still decide.

16          So we told Mr. Wright that.

17          We provided a copy to defense counsel

18     of the draft of the letter, not on

19     letterhead.

20          And he also asked us to contact the

21     Parole Board to write a letter on his

22     behalf to see if he could be, when his

23     parole comes up, released.

24          Once again, we told him there's no

25     guarantee they'll do that.  That's up to

                     DRS

Proceedings

the Department of Corrections.  We
included that in the letter to
Mr. Racore -- or to a Parole Board
letter.  We gave the defense counsel a
copy of that.

He is -- his concern was that he's
currently in a maximum facility.  If the
defendant's convicted and is sent to a
maximum facility, there's a chance they
can end up in the same facility.

Also, even if they were at different
facilities, because of the nature of the
people in those facilities, he was
concerned about his safety.

So he asked if it's possible to try
and see if they can relocate him in a non-
maximum facility.

We, in the letter to Mr. Racore,
mentioned that, and again we told him that
we can make no assurance, that that's up
to the Department of Corrections to
determine.

He also requested us to drive him when
he's done testifying, instead of --

DRS

1    Proceedings

2    normally, he would wait a period of time

3    before they take him back to the

4    Department of Corrections.  He asked us if

5    we could take him --

6        THE COURT:  In other words, to take

7    him from the custody of the New York City

8    Corrections at Rikers Island or wherever

9    back upstate, and when you say "we" you

10   mean --

11       MR. IRVIN:  The DA's office.

12       His concern was that once he

13   testifies, if he's still where he's

14   currently being held, that he's in

15   jeopardy, and we told him we would do

16   that.

17       THE COURT:  Okay.  Other than -- I

18   mean, besides all this, there was the

19   promise initially made to him in the Grand

20   Jury --

21       MR. IRVIN:  He also -- I'm sorry,

22   Judge.  He also requested us if -- he said

23   his wife had been threatened, approached

24   by a member of the defendant's family, and

25   she's in housing, public housing.  He

DRS

Proceedings

asked if it's possible, since they know
where she lives and they've approached her
and threatened her, if she could be
relocated. We asked him to have her call
me or to come in.

To date, she has not done that.

If she comes in our office, we will do
a threat analysis to determine whether or
not there has been a threat. If there
has, then we would contact the Housing
Authority to tell them that there is
evidence of a threat by the defendant
against a family member of a witness. And
ask them if they can move her to a
different location.

But that hasn't -- there's been
nothing done on that since she has not
contacted me.

MR. IRVIN: Also for the record, he
finally when he came in today told us he
decided he wouldn't testify last night.

When he left he told Miss Bennett and
myself he wasn't sure yet if he was going
to because of the danger to himself.

DRS

```
 1              Proceedings
 2         There had been a point in time,
 3    back -- I believe it was in February or
 4    March, after he testified in the Grand
 5    Jury, where he told me he wasn't going to
 6    testify, and he didn't care what, if
 7    anything, was done; he wasn't going to
 8    testify.
 9         So, the offer was withdrawn to help
10    him.
11         Since that time, he's been very
12    hesitant because of what he knows happened
13    to his friend, Greg, and the threat to his
14    wife and the reports showing up at Rikers,
15    and he's been very concerned about the
16    safety.  He says that "you won't be with
17    me at Rikers; you can't guarantee what's
18    going to happen to me there or anyplace
19    else, and you can't be with my family when
20    I get out.  If he's not convicted, are you
21    going to be with me every day?"
22         Those were his expressed concerns;
23    those were his hesitancies.
24         He only decided this morning to go
25    ahead and testify.
```

DRS

1          Proceedings

2          MR. KRINSKY:  So waived.

3          THE COURT:  Okay.  Good afternoon,

4     everyone.

5          All right.  Mr. Irvin.

6          MR. IRVIN:  We would call Derrick

7     Wright.

8          THE COURT:  Come up, sir.

9          COURT OFFICER:  Mr. Wright, please

10    step up.  (Witness complying.)

11         COURT OFFICER:  Raise your right hand;

12    face the Clerk of the Court, please.

13         S H A W N   N E W T O N,  also known

14    as D E R R I C K   W R I G H T, called as

15    a witness on behalf of the People, having

16    first been duly sworn by the Clerk of the

17    Court, took the witness stand and

18    testified as follows:

19         THE CLERK:  Please be seated.

20         Sir, please state your full name and

21    spell your last name.

22         THE WITNESS:  My name is Shawn Newton,

23    a/k/a Derrick Wright.

24         My date of birth?

25         THE COURT:  Shawn, who, sir?

                    DRS



1  Proceedings

2          THE WITNESS:  Shawn Newton,

3       N-e-w-t-o-n.

4          THE COURT:  N-e-w-t-o-n.  Newton.

5          Also known as Derrick Wright, you

6       said; right?

7          THE WITNESS:  Yeah.

8          THE COURT:  Mr. Irvin?

9  DIRECT EXAMINATION

10 BY MR. IRVIN:

11     Q.    Good afternoon.

12          Would you prefer me to go by Mr. Newton,

13 Mr. Wright?

14     A.    Mr. Newton.

15     Q.    Mr. Newton, I'd like to direct your

16 attention to October 22nd of 1993.  On that date,

17 during the early-morning hours, were you present

18 with a person by the name of Tracey Thomas?

19     A.    Yes.

20     Q.    And did anything happen to him while you

21 were with him?

22     A.    Yes.

23     Q.    What was that?

24     A.    He was shot.

25     Q.    Do you see the person in the courtroom

Newton - direct

2   facility?

3       A.   No, sir.

4       Q.   Now, you're here today -- have you and I

5   spoken since October of 1995, between that time and

6   today?

7       A.   Yeah.

8       Q.   And do you recall -- how many times would

9   you say you and I have spoken between that time and

10  today?  Just a rough estimate.

11      A.   A good -- about 20 times.

12      Q.   How many?

13      A.   About 20 times.

14      Q.   Okay.  And that was where at?

15      A.   In your office.

16      Q.   And, during those times, were there times

17  that you expressed other things that you would like

18  for me to do?

19      A.   Yes.

20      Q.   And could you tell the members of the jury

21  what you requested of me I would consider doing if

22  you testified?

23              MR. KRINSKY:  I'll object to the form

24          of the question.

25              THE COURT:  Overruled.

DRS

COUNTY OF KINGS:   CRIMINAL TERM   PART 44

- - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK      :  Indictment
                                            No.13008/95
         - against -                     :

TASKER SPRUILL,                          :

                       Defendant    :

- - - - - - - - - - - - - - - - - - - - -X


                    JURY TRIAL
               (Testimony to Verdict)
                  360 Adams Street
                  Brooklyn, New York
                  July 27 - 31, 1998

BEFORE:

              HONORABLE ARIEL BELEN, Justice

APPEARANCES:

              HON. CHARLES J. HYNES, ESQ.
              District Attorney, Kings County
              BY:  STAN IRVIN, ESQ.
              Assistant District Attorney
              AND BY:  KAREN BENNETT, ESQ.
              Assistant District Attorney
              For the People

              BARRY KRINSKY, ESQ.
              Attorney for the Defendant
              50 Court Street
              Brooklyn, New York   11201


                            LOIS CIVELIA
                            OFFICIAL COURT REPORTER

2      How old are you now, sir?

3   A.   Twenty-four.

4   Q.   Excuse me?

5   A.   Twenty-four.

6   Q.   Would you do me a favor?  Would you keep your

7   voice loud enough so I can hear you?

8        You're twenty-four years old.  And when is

9   it that you began robbing people?  At what age?

10       MS. BENNETT:  Objection.

11       THE COURT:  Sustained.

12  Q.   Well, you told us, sir, that on or about

13  March 23rd, 1992, you were involved in an incident in

14  which you robbed someone, is that correct?

15  A.   No.

16  Q.   Excuse me?

17  A.   Attempt robbery.  No.

18       THE COURT:  Attempted robbery?

19       THE WITNESS:  Yeah.

20       THE COURT:  What's the date of that, now?

21  Q.   March 23rd, 1992, in which you, along with

22  other persons, robbed jewelry from one Keith Hersy.

23  Do you remember that incident?

24  A.   Yes.

25  Q.   Why don't you tell us what happened?  What

did you do?

   A.   What did I do?

   Q.   Yeah, what did you do?

   A.   I took the ring.

   Q.   Well, where did this happen and what did you do? How did you take a ring from someone?

   A.   I just went up to him and took it.

   Q.   Excuse me?

   A.   I went up to him and took it.

   Q.   Just like that?

   A.   Yeah.

   Q.   In other words, you went up to this person and did you have a conversation with the person?

   A.   No.

   Q.   Did you know the person?

   A.   Yeah.

   Q.   You knew the person you took the ring from?

   A.   Yeah.

   Q.   Were you with somebody else when you did this?

   A.   Yeah.

   Q.   And did you hit the person?

   A.   No.

   Q.   Well, isn't it a fact that you, along with

two other persons, on March 23rd, 1992, in the

vicinity of Howard Avenue and Halsey Street -- you

know where Howard and Halsey Streets are?

A.    Yeah.

Q.    That you, along with two other people, at

about three o'clock in the afternoon approached this

person, Mr. Hersy, and that you, along with them,

displayed handguns and that you took a ring from this

person and then you hit him about the face, causing

this Mr. Hersy to have swelling and lacerations to his

lip, his eyes, scratches to the side of his face and

to suffer substantial pain.

Isn't that in fact what happened in

connection with this incident on March 23rd, 1992?

A.    No, sir.

Q.    Did you plead guilty to being involved in

this incident?

A.    I plead guilty because I didn't know anything

about the law at that time.

Q.    You didn't know anything about the law,

that's why you pled guilty, not because you were

guilty?

A.    Yes.

Q.    So, in other words, you went in front of a

Judge --

                By the way, what name did you use when you
got arrested in that case?

A.      I don't know.

Q.      You don't remember?

A.      No.

Q.      You don't remember.  Well, if I was to tell
you you used the name of Jermaine Johnson would that
refresh your recollection?

A.      Yes.

Q.      So on March 23rd, 1992, when you got
arrested, you used the name of Jermaine Johnson,
right?

A.      Yes.

Q.      But at first you wouldn't tell them what your
name was at all so they called you John Doe, isn't
that correct?

A.      Yes.

Q.      So first you didn't tell them any name and
they called John Doe and then you told them your name
was Jermaine Johnson, right?

A.      Yes.

Q.      You were advised that you were being charged
with acting together with other people on an armed

1

2   robbery in which guns were used and the victim was

3   beaten up?

4       A.    No, sir.

5       Q.    You weren't told that?

6       A.    No, sir.

7       Q.    You had a lawyer in the case, right?  You

8   were represented?

9       A.    Yes, sir.

10      Q.    So you're saying to me you were arrested and

11  had a lawyer, but you were never advised what the

12  nature of the charges were?

13      A.    Yes, sir.

14      Q.    Is that what you're saying?

15      A.    Yes, sir.

16      Q.    In other words, the complaint I read to you,

17  that was never read to you by the lawyer, by the

18  Judge, no one?

19      A.    No.

20      Q.    So, in other words, you just pled guilty to

21  something because you didn't know what the law was?

22      A.    Yes.

23      Q.    Well, when you came in front of the Court

24  there was a Judge there, right?

25      A.    Yes.

Newton - Cross - Krinsky          651

THE COURT:  He told you it's not mandatory
you would get work release, but he would write
a letter, is that right?

THE WITNESS:  Yes.

Q.    And he also promised you --

THE COURT:  Stay away from that word
because I don't seem to think that's what's
happening.

He told you he was going to do certain
things, is that right?

THE WITNESS:  He told me it's not definite
it's going to happen.  I'm here because I want
to be here.

THE COURT:  He's trying to find out what
the D.A. would do for you, but the D.A. said
these things wouldn't necessarily happen
because Corrections doesn't have to honor what
D.A. asks, is that right?

THE WITNESS:  Yes.

Q.    And he promised you he would write a letter
to the parole authorities to have you released?

A.    He didn't tell me nothing.  He said he would
write a letter.

Q.    Well, he promised you --

THE COURT: That I'll sustain.

A.     Yes.

THE COURT: Sustained.

Q.     Now, the defense attorney was asking you about promises made and promises made as recently as July 9th after the incident with the infraction. Let me ask you this to preface it: You said before that you and I met and had spoken about twenty times, is that correct?

A.     Yes.

Q.     When was the first time that we actually went over what happened that night?

A.     First time after the incident happened, like the next day.

Q.     Well, though, I'm talking about with myself, not with an A.D.A. When did you and I actually, for the first time, sit down and go over your testimony and talk about what had actually happened?

A.     Like around April, when I first came down from Upstate.

Q.     Okay.

THE COURT: Did you hear him?

JUROR: No.

THE COURT: You have to keep your voice

COURT OFFICER:  Step up, remain standing,
raise your right hand.  The Clerk will swear
you in.

THE CLERK:  Raise your right hand, please.

F R E D E   F R E D E R I C   , called as a witness on
behalf of the People, having been first duly
sworn by the Clerk of the Court, upon being
examined, testified as follows:

THE CLERK:  Please be seated.  In a loud,
clear voice, please state your name, spell
your last name, and your occupation.

THE WITNESS:  Frede, F-R-E-D-E, Frederic,
F-R-E-D-E-R-I-C; City Medical Examiner.

THE COURT:  Doctor?

THE WITNESS:  Yes.

THE COURT:  Doctor, it's Dr. Frede
Frederic, F-R-E-D-E-R-I-C?

THE WITNESS:  Yes.

THE COURT:  Ms. Bennett?

DIRECT EXAMINATION

BY MS. BENNETT:

    Q.  Good morning, Dr. Frederic.

    A.  Good morning.

    Q.  I'm going to ask you to talk very loud

2    questions properly.

3    Q.    Within a reasonable degree of scientific

4    certainty, if two people are involved in a struggle in

5    the front seat of the car and during the course of

6    that struggle the body of the deceased is turned in

7    the direction of the person he is struggling with, is

8    that consistent with the course of the bullet in this

9    particular case?

10    A.    The muzzle of the gun has to be in a higher

11    position than --

12    Q.    As long as the muzzle of the gun is in a

13    higher position --

14    A.    -- than the deceased; that could be.

15    Q.    So --

16         THE COURT:  As long as the muzzle is

17         higher than the deceased, than the dead

18         person?

19         THE WITNESS:  Yes, than the dead person.

20    Q.    You, of course, have no personal knowledge of

21    the circumstances under which the deceased was in fact

22    shot, correct?

23    A.    No, I don't.

24    Q.    So the critical piece in the equation, then,

25    for you, as I understand it, is as long as the muzzle

knew five years old was using drugs.  I know I

didn't know anyone.  Later, but not at five

And at thirteen, I doubt that anyone sitting

here was selling drugs.  It's not good, it's

not right, but it says something about our

society also.  And he says, well blame it on

Shaun Newton.  Yeah, he should be convicted

for what he did and he said, I sold drugs a

lot, for a lot of years in Manhattan, I sold a

lot of drugs and the time I was prosecuted, I

went to court, I pled not guilty because I

hadn't done it that way and the jury convicted

me.  And Mr. Krinsky, he sits up here and says

you should be insulted because he tells you

he's not guilty and the jury convicts him.

Well, ladies and gentlemen of the jury, like

Shaun Newton do, people everyday say they are

not guilty and go to trial and a jury convicts

them and some defendants appeal their case and

still say they didn't do it and that's why our

Appellate Courts are full of cases right now.

So he says, well, you can discount Shaun

Newton because he asked for a trial and he

appealed his case and he continues to say he's

not guilty.  On the gun thing he said, I was

falsely identified, it was someone else.  Mr.

Krinsky said, don't believe him, the

accusation was made, it must be true.

MR. KRINSKY:  Objection,

mischaracterization, your Honor.

THE COURT:  Again, ladies and gentlemen of

the jury, you have to consider whether that's

a fair statement of the defense's argument in

the prosecution's rebuttal.

MR. IRVIN:  Derrick Wright, why does he

ask for what he got?  The deals.  Mr. Krinsky

tried to ask him repeatedly.  The D.A., Mr.

Irvin, he promised you, he promised you.  And

Derrick, Shaun Newton, probably is not

fortunate to have the level of education of an

attorney.  But he said, he didn't promise me.

He said, he said he would write letters to

parole, to the work release, to try to get him

relocated.  He said, but he can't promise me

that's going to happen.  That's up to the

Department of Corrections and I know it's a

risk, it may not happen.  And despite the fact

that he said he'll write the letters and it

may not happen, I'm still willing to tell you

what happened.  The street smart person knows

he may not get these things, but he's willing,

for once in his life, when he knows it's a

risk and it may not happen, a person that's

been using drugs since five, selling them from

thirteen, sold drugs for a long time, goes to

trial, for once in his life is willing to say

that even though I know it may not happen, I'm

willing to sit up here and tell you what I

told the police the next day, what I told the

A.D.A. the next day, what I told the Grand

Jury.

Remember jury selection?  Some of you in

the early group -- not all of you -- there was

a young lady sitting over there and she

objected to sitting on a murder trial at all

because of the fact that it was murder trial

and that made her uncomfortable and very

nervous even being a juror, as you are.  Think

of this:  You spoke to the detectives, you

spoke to the A.D.A.  You or you or you went

before the Grand Jury and testified in 1995.

Two years later -- three years later, April of

Summation - Irvin                    1121

1998, after that gentleman is arrested, you're
in Rikers.  And a person comes up to you in
Rikers and hands you or you or you your very
own sworn testimony to a Grand Jury against
that gentleman.  Says you're a snitch, you're
going to snitch, you're going to tell what he
did.  Think of your reaction.  Shaun Newton's
reaction, until just before he testified,
he wasn't sure if he was going to go ahead and
testify.

MR. KRINSKY:  Objection, your Honor,
that's not part of the record.

THE COURT:  Overruled.

MR. IRVIN:  He said we talked about this
for days.  We met about twenty times.  And he
said, I asked to be relocated from where I'm
at.  I asked to try to get the work release,
even though I may not.  But do you remember
what else he asked for?  My family.  They
still live in that neighborhood.  Can you
relocate my family?

Now, who can promise anything that for
sure will happen?  And yet, knowing that most
of these promises that Mr. Krinsky talked

credibility.  And each and every one of you,
you might turn to you and say that, well, the
D.A., he did tell us that.  We told you one
thing, that we would still listen to what they
had to say to determine what happened that
night and we wouldn't hold it against Tracey
Thomas or the People's case because if he was
involved in drugs, going to do what he was
going to do with the church, he still, if
accused, he still has the right to a trial.
And the D.A. Or the police or no one has the
right to walk up to him while he's sitting in
a car, even if he has a gun himself.  This is
no duel.  It's no shoot-out, no claim of
self-defense.  And walk up to him and put the
gun instantly to his chest and shoot him.  A
person deserves the chance to live.  You said
you wouldn't hold it against us for that.  You
said the same with Derrick Wright.  I asked
you about just Derrick Wright.  But we also
brought you Marilyn Connor.

Now, the hardest thing, in closing, will
be, when you get back to the jury room, and
you may sit there and you may sit there or

you, sir, may sit there and wonder what's
going to happen.  And that's where his Honor
comes in, if you find the defendant guilty.
And if you're a good and decent person, that
will cross your mind and you'll wonder,
everyone does.  But the reason that each of
you are here, the reason Derrick Wright was
here and Morris Rogers and Marilyn Connor were
here is not because they necessarily wanted to
be.  Do you think Derrick Wright, after he saw
that Grand Jury testimony at Rikers, wanted to
be here, other than the fact that he wanted to
tell you about what happened to his friend?
Marilyn Connor, do you think she wanted to be
here?  She told you she had to be brought in
by detectives.  She didn't want to be here.
Probably none of us do.  But the reasons that
we're here are not because of our choices, but
because of his; the choice he made when he
walked up to that car, the choice he made with
the gun when he pulled the trigger and the
choices he made thereafter.

     Madam Foreperson, after the jury is
charged, after you deliberate, I'm asking you

# EXHIBIT C

## ADA Irvin's 15 Counterfeit Affirmations And The Court Orders He Obtained With Them

# LIST OF IRVIN'S 15 COUNTERFEIT AFFIRMATIONS
## & THE COURT ORDERS HE OBTAINED WITH THEM

(1)    Irvin's January 22, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(2)    Irvin's March 2, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(3)    Irvin's April 30, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(4)    Irvin's June 23, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(5)    Irvin's June 29, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(6)    Irvin's July 13, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(7)    Irvin's July 17, 1998, affirmation in support of his *ex parte* motion for an order to produce, and court order of the same date;

(8)    Irvin's July 7, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(9)    Irvin's July 10, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order dated July 6, 1998 (sic);

(10)    Irvin's July 16, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(11)    Irvin's July 21, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(12)    Irvin's July 27, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(13)   Irvin's July 28, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(14)   Irvin's July 28, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date;

(15)   Irvin's July 28, 1998, affirmation in support of his *ex parte* motion for a *Damiani* order, and court order of the same date.

At a Criminal Term, Part Misc. of the
Supreme Court of the State of New York,
held in and for the County of Kings, at
the Courthouse thereof, Civic Centro,
Montague Street, Brooklyn, New York on
_____ January 22 _____, 19___.

PRESENT: HON. __HON. REINALDO E. RIVERA__
_____ Justice.

------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

        Plaintiff,

   - against -

Tasker Spruill

        Defendant.

Derrick Wright

   re: Witness
   AKA Shawn Newton

------------------------------------------X

**ORDER TO PRODUCE**

[ ] defendant (CPL § 560.10)

[XX] witness (CPL § 630.10)

Indictment # 13008/95
Institution: Oswaghla
Inmate # 95A492

NYSID # 7121225L
D.O.B.

UPON reading and filing the below affirmation of the Assistant
District Attorney, it is

ORDERED, that the Superintendent of the institution or whoesoever shall
have the supervision and control of __Derrick Wright__, shall deliver the said
__Derrick Wright__, in civilian clothes into the custody of the
Commissioner of Correction of the City of New York, and it is further

ORDERED, that the Commissioner of Correction of the City of New York
receive the said __Derrick Wright__ from the said Warden and produce him in
Part Misc. of this Court on __February 9, 1998__ at 9:30 a.m. of that day at the
Courthouse located at

[X] 360 Adams Street      [ ] 120 Schermerhorn Street
and on all adjourned dates, and it is further

ORDERED, that upon completion, the prisoner shall be returned to the
custody whence he came.

E N T E R,

HON. REINALDO E. RIVERA
    J.S.C.

STATE OF NEW YORK )
            ss.:
COUNTY OF KINGS )

__Stan Irwin__, an attorney-at-law, duly licensed to practice
in the Courts of the State of New York, affirms under the penalty of perjury:

That I am on the staff of the District Attorney of Kings County and
am familiar with the within proceedings.

That one __Derrick Wright__ is presently confined in __Oswaghla__
Corr. Facility. That said prisoner's attendance is required in the
Supreme Court of the State of New York, County of Kings on __February 9__,
19_98_ for the reason that said prisoner

[ ] has been charged in this County with the crime of _____
_____, and said case has been scheduled on the Court calendar.

[X] is required to be present in said Supreme Court Kings County to be a
witness in the above-entitled matter.

WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Correction of the City of New York to
produce __Derrick Wright__, above-named, in Part Misc. at the Supreme Court,

[XX] 360 Adams Street    [ ] 120 Schermerhorn Street, Brooklyn, NY, at
9:30 a.m. for the above-noted purpose, after which said prisoner is to await the
further order of this Court.

Dated:   Brooklyn, New York
       __January 22__, 19_98_

               Assistant District Attorney
               Stan Irwin

-Pf-18 N.SC.

At a Criminal Term, Part Misc. of the AMKC
Supreme Court of the Stat of New
York, held in and for the County of
Kings, at the Courthouse thereof,
Civic Centre, Montague Street,
Brooklyn, New York on March 2, 1998.

PRESENT: HONORABLE REINALDO E. RIVERA
Justice.
----------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

Plaintiff,

-against-

TASKER SPRUILL,

Defendant.

Re: DERRICK WRIGHT,
AKA "SHAWN NEWTON"
Witness.
----------------------------------X

ORDER TO PRODUCE

___ Defendant (C.P.L. §560.10)
_X_ Witness (C.P.L. §630.10)

Indictment #13008/95
Institution: Rikers

Inmate Number #895-98-00475
NYSID #7121225L

Upon reading and filing the below affirmation of the Assistant District
Attorney, it is

ORDERED, that the Superintendent of the institution, or whatsoever shall
have the supervision and control of Derrick Wright, shall deliver the said Derrick
Wright in civilian clothes into the custody of the Commissioner of Correction of
the City, and it is further

ORDERED, that the Commissioner of Correction of the City of New York
receive the said Derrick Wright from the said Warden and produce him in Part Misc.
of this Court on March 9, 1998 at 9:30 a.m. of that day at the Courthouse located
at 360 Adams Street,

and on all adjourned dates, and it is further

ORDERED, that upon completion, the prisoner shall be returned to the
custody whence she came.

ENTERED
MAR 2 1998
ARTHUR A. IRVIN
[_____] CLERK

ENTER

HON. LEWIS L. DOUGLASS
HON.                        J.S.C.

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF KINGS    )

STAN IRVIN, an attorney-at-law, duly licensed to practice in the Courts
of the State of New York, affirms under the penalty of perjury:

That I am on the staff of the District Attorney of Kings County of Kings
County and am familiar with the within proceedings.

That one Derrick Wright is presently confined in Rikers.  That said
prisoner's attendance is required in the Supreme Court of the State of New York,
County of Kings on March 9, 1998, for the reason that said prisoner

___ has been charged in this County with the crime of Murder 2°, and said case
has been scheduled on the Court calendar.
_X_ is required to be present in said Supreme Court, Kings County, to be a
witness in the above-entitled matter.

WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Correction of the City of New York to produce
Derrick Wright, above-named, in Part Misc. at the Supreme Court, 360 Adams Street,
Brooklyn, New York at 9:30 a.m. for the above-noted purpose, after which said
prisoner is to await the further order of this Court.

Dated: Brooklyn, New York
       March 2, 1998

Stan Irvin
STAN IRVIN
Assistant District Attorney
Homicide Bureau
(718) 250-2399

At a Criminal Term, Part _____ of the
Supreme Court of the State of New York,
held in and for the County of Kings, at
the Courthouse thereof, Civic Centre,
Montague Street, Brooklyn, New York on
April 30, _____, 19__

PRESENT: HON. Neil J. Firetog

        Justice.

------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

              Plaintiff,

   - against -

Tasker Spruill aka Shawn Newton

              Defendant.

      re: Witness

------------------------------------------X

**ORDER TO PRODUCE**

[X] defendant (CPL § 560.10)

[ ] witness (CPL § 630.10)

Indictment # 13008-95
Institution# Comsockie
Inmate # 9584552

NYSID # 7121225L
D.O.B.

UPON reading and filing the below affirmation of the Assistant
District Attorney, it is

ORDERED, that the Superintendent of the institution or whosoever shall
have the supervision and control of Tasker Spruill , shall deliver the said
Tasker Spruill , in civilian clothes into the custody of the
Commissioner of Correction of the City of New York, and it is further

ORDERED, that the Commissioner of Correction of the City of New York
receive the said Tasker Spruill from the said Warden and produce him in
Part 10 of this Court on May 18,1998 at 9:30 a.m. of that day at the
Courthouse located at

[X] 360 Adams Street      [ ] 120 Schermerhorn Street
and on all adjourned dates, and it is further

ORDERED, that upon completion the prisoner shall be returned to the
custody whence he/she came

ENTERED

APR 30 1998

WINSTON A. IRVIN
COUNTY CLERK

Neil J. Firetog    J.S.C.

STATE OF NEW YORK )
            ) ss.:
COUNTY OF KINGS )

Stan Irvin , an attorney-at-law, duly licensed to practice
in the Courts of the State of New York, affirms under the penalty of perjury:

That I am on the staff of the District Attorney of Kings County and
am familiar with the within proceedings.

That one Tasker Spruill is presently confined in Comsockie
Correctional Facility . That said prisoner's attendance is required in the
Supreme Court of the State of New York, County of Kings on May 18,1998 ,
19___ for the reason that said prisoner

[X] has been charged in this County with the crime of Murder 2° 
_____, and said case has been scheduled on the Court calendar.

[ ] is required to be present in said Supreme Court Kings County to be a
witness in the above-entitled matter.

WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Corrections of the City of New York to
produce Tasker Spruill , above-named, in Part 10 at the Supreme Court,

[X] 360 Adams Street    [ ] 120 Schermerhorn Street, Brooklyn, NY, at
9:30 a.m. for the above-noted purpose, after which said prisoner is to await the
further of this Court.

Dated:   Brooklyn, New York
        April 30, _____, 1998

Stan Irvin
Assistant District Attorney
(718) 250-2399

At a Criminal Term, Part 10 of the
Supreme Court of the State of New York,
held in and for the County of Kings, at
the Courthouse thereof, Civic Center,
Montague Street, Brooklyn, New York, on
the 23rd day of June, 1998.

PRESENT:

HONORABLE  NEIL J. FIRETOG
                J.S.C.

------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

    - against -            ORDER TO PRODUCE

TASKER SPRUILL         ,                Witness (CPL § 630.10)
                Defendant.              Indictment # 13008/95
     •                                 Institution Coxsackie Corr. Facility
                                        Inmate # 95A4552
SHAWN NEWTON                            NYSID # 7121225L
                RE: WITNESS
------------------------------------X
    Upon reading and filing the below affirmation of the Assistant
District Attorney, it is

    ORDERED, that the Superintendent of Coxsackie Correctional Facility
or whosoever shall have the supervision and control of Shawn Newton, shall
deliver the said Shawn Newton, in civilian clothes into the custody of the
Commissioner of Correction of the City of New York, and it is further

    ORDERED, that the Commissioner of Correction of the City of New
York receive the said Shawn Newton from the said Warden and produce him in
Part 10 of this Court on July 6, 1998, at 9:30 a.m. of that day at the
Courthouse located at 360 Adams Street and on all adjourned dates, and it is
further

    ORDERED, that upon completion, the prisoner shall be returned to
the custody whence he came.

                **ENTERED**    E N T E R

                JUN 23 1998

             WILBUR A. DEVER  HON. NEIL J. FIRETOG, J.S.C.
STATE OF NEW YORK  )    COUNTY CLERK
                   ) ss.:
COUNTY OF KINGS    )

    STAN IRVIN, an attorney-at-law, duly licensed to practice in the
Courts of the State of New York, affirms under the penalty of perjury:

    That I am on the staff of the District Attorney of Kings County of
Kings County and am familiar with the within proceedings.

    That one Shawn Newton is presently confined in Coxsackie
Correctional Facility.  That said prisoner's attendance is required in the
Supreme Court of the State of New York, County of Kings, on July 6, 1998, for
the reason that said prisoner is required to be present in said Supreme Court
Kings County to be a witness in the above-entitled matter.

    WHEREFORE, affirmant prays that an Order to Produce be issued by
this Court directing the Commissioner of Correction of the City of New York
to produce Shawn Newton, above-named, in Part 10 at the Supreme Court, 360
Adams Street, Brooklyn, NY, at 9:30 a.m. for the above-noted purpose, after
which said prisoner is to await the further order of this Court.

Dated: Brooklyn, New York
      June 23, 1998

                         _Stan Irvin_
                         STAN IRVIN
                         Assistant District Attorney
                         (718) 250-2399

Rec by [signature]

At a Criminal Term, Part 10 of the
Supreme Court of the State of New
York, held in and for the County of
Kings, at the Courthouse thereof,
Civic Centre, Montague Street,
Brooklyn, New York on June 29, 1998.

PRESENT: HONORABLE NEIL J. FIRETOG
Justice.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
THE PEOPLE OF THE STATE OF NEW YORK,

                    Plaintiff,

          -against-

TASKER SPRUILL,
                    Defendant.

DERRICK WRIGHT aka SHAWN NEWTON
          Re: Witness.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ORDER TO PRODUCE

____ Defendant (C.P.L. §560.10)
_X_ Witness (C.P.L. §630.10)

Indictment #13008/95

Institution: Rikers - OBCC

Inmate [redacted]

NYSID [redacted]

Upon reading and filing the below affirmation of the Assistant District
Attorney, it is

ORDERED, that the Superintendent of the institution, or whatsoever shall
have the supervision and control of SHAWN NEWTON, shall deliver the said SHAWN
NEWTON in civilian clothes into the custody of the Commissioner of Correction of
the City, and it is further

ORDERED, that the Commissioner of Correction of the City of New York
receive the said SHAWN NEWTON from the said Warden and produce him in Part 10 of
this Court on July 6, 1998 at 9:30 a.m. of that day at the Courthouse located at
360 Adams Street.

and on all adjourned dates, and it is further

ORDERED, that upon completion, the prisoner shall be returned to the
custody whence he came.

ENTERED

JUN 30 1998

HON. NEIL J. FIRETOG, J.S.C.

WILBUR A.
COUNTY CLERK

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF KINGS      )

STAN IRVIN, an attorney-at-law, duly licensed to practice in the Courts
of the State of New York, affirms under the penalty of perjury:

That I am on the staff of the District Attorney of Kings County of Kings
County and am familiar with the within proceedings.

That one SHAWN NEWTON is presently confined in Rikers - OBCC. That said
prisoner's attendance is required in the Supreme Court of the State of New York,
County of Kings, on July 6, 1998, for the reason that said prisoner

___ has been charged in this County with the crime of Murder 2°, and said case has
    been scheduled on the Court calendar.
_X_ is required to be present in said Supreme Court, Kings County, to be a witness
    in the above-entitled matter.

WHEREFORE, affirmant prays that an Order to Produce be issued by this
Court directing the Commissioner of Correction of the City of New York to produce
SHAWN NEWTON, above-named, in Part 10 at the Supreme Court,

    _X_ 360 Adams Street    ____ 120 Schermerhorn Street, Brooklyn,

New York at 9:30 a.m. for the above-noted purpose, after which said prisoner is
to await the further order of this Court.

Dated: Brooklyn, New York
       June 29, 1998

                                        Stan Irvin
                                        STAN IRVIN
                                        Assistant District Attorney

0071



At a Criminal Term, Part 44 of the
Supreme Court of the State of New York,
held in and for the County of Kings, at
the Courthouse thereof, Civic Center,
Montague Street, Brooklyn, New York, on
the 13th day of July, 1998.

PRESENT:

HONORABLE   ARIEL BELEN
J.S.C.

-----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

- against -                          ORDER TO PRODUCE

TASKER SPRUILL,                      Witness (CPL § 630.10)
                 Defendant.          Indictment # 13008/95
                                     Institution RIKERS/JATC
                                     Inmate # 895-98-01838
DERREK WRIGHT,                       NYSID # 7121225L
a/k/a/ Shawn Newton,
                 RE: WITNESS

-----------------------------------------X
            Upon reading and filing the below affirmation of the Assistant
District Attorney, it is

            ORDERED, that the Superintendent of the institution or whosoever
shall have the supervision and control of Derrek Wright, shall deliver the
said Derrek Wright, in civilian clothes into the custody of the Commissioner
of Correction of the City of New York, and it is further

            ORDERED, that the Commissioner of Correction of the City of New
York receive the said Derrek Wright from the said Warden and produce him in
Part 44 of this Court on July 14, 1998, at 9:30 a.m. of that day at the
Courthouse located at 360 Adams Street and on all adjourned dates, and it is
further

            ORDERED, that upon completion, the prisoner shall be returned to
the custody whence he came.

                                     E N T E R

                                     |S| Ariel Belen
                                     HON. ARIEL BELEN,   J.S.C.

STATE OF NEW YORK   )
                    )  ss.:
COUNTY OF KINGS     )

            STAN IRVIN, an attorney-at-law, duly licensed to practice in the
Courts of the State of New York, affirms under the penalty of perjury:

            That I am on the staff of the District Attorney of Kings County of
Kings County and am familiar with the within proceedings.

            That one Derrek Wright is presently confined in Rikers/JATC.  That
said prisoner's attendance is required in the Supreme Court of the State of
New York, County of Kings, on July 14, 1998, for the reason that said
prisoner is required to be present in said Supreme Court Kings County to be
a witness in the above-entitled matter.

            WHEREFORE, affirmant prays that an Order to Produce be issued by
this Court directing the Commissioner of Correction of the City of New York
to produce Derrek Wright, above-named, in Part 44, at the Supreme Court, 360
Adams Street, Brooklyn, NY, at 9:30 a.m. for the above-noted purpose, after
which said prisoner is to await the further order of this Court.

Dated: Brooklyn, New York
       July 13, 1998

                                     Stan Irvin
                                     STAN IRVIN
                                     Assistant District Attorney
                                     (718) 250-2399

At a Criminal Term, Part 29 of the
Supreme Court of the State of New
York, held in and for the County of
Kings, at the Courthouse located at
Schermerhorn Street,
Brooklyn, New York on July 17, 1998.

URGENT! HEARING/TRIAL IN PROGRESS

_____X

THE PEOPLE OF THE STATE OF NEW YORK,

  Plaintiff,

 -against-

ERICK WRIGHT aka SHAWN NEWTON,

  Defendant.

No.
_____X

 [ ] Defendant (C.P.L. §640.10)
 [X] Witness (C.P.L. §630.10)
 Indictment #1306/98
 Institution: Rikers ... IDTC
 Date Board: ...
 DICD ...

ORDER TO PRODUCE

:torney, if it is

 Upon reading and filing the below affirmation of the Assistant District
Attorney, it is

 ORDERED, that the Superintendent of the institution, or whosoever shall
have the supervision and control of SHAWN NEWTON, shall deliver the said SHAWN
NEWTON in division together with the custody of the Commissioner of Correction of
the City, and it is further

 ORDERED, that the said SHAWN NEWTON from the said Warden and produce him in Part 29 of
his Court on July 20, 1998, at 9:30 a.m. of that day at the Courthouse located
at 120 Schermerhorn Street;
receive the ...
nd on all adjourned dates, and it is further

 ORDERED, that upon completion, the prisoner shall be returned to the
custody whence he came.

ENTERED
JUL 17 1998

   E N T E R

   HON. _____
          J.S.C.

STATE OF NEW YORK
COUNTY OF KINGS

 STAN IRWIN, an attorney-at-law, duly licensed to practice in the Courts
f the State of New York, affirms under the penalty of perjury:

 That I am on the staff of the District Attorney of Kings County and Kings
County and am familiar with the within proceedings.

 That our SHAWN NEWTON is presently confined in Rikers ... IDTC. That said
risoner's attendance is required in the Supreme Court of the State of New York,
ounty of Kings, on July 20, 1998, for the reason that said prisoner

— had been charged in this County with the crime of Murder 2°; and
X is required to be present in said Supreme Court, Kings County, to be a witness
 in the above-entitled matter.

 WHEREFORE, affirmant prays that an Order to Produce be issued by this
ourt directing the Commissioner of Correction of the City of New York to produce
HAWN NEWTON, above-named, in Part 29 at the Supreme Court,

— 360 Adams Street X 120 Schermerhorn Street, Brooklyn,

ew York at 9:30 a.m. for the above-noted purpose, after which said prisoner is
o await the further order of this Court.

ated: Brooklyn, New York
   July 17, 1998

     STAN IRWIN
     Assistant District Attorney

0077

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
------------------------------------X
                                    :
           IN THE MATTER            :
                                    :
              OF                    :           ORDER
                                    :
AN EX PARTE APPLICATION BY THE KINGS :
COUNTY DISTRICT ATTORNEY REGARDING  :
A CONFIDENTIAL INVESTIGATION        :
                                    :
   RE: <u>DERRICK WRIGHT aka SHAWN NEWTON</u> :
       <u>NYSID #7121225L</u>           :
                                    :
       AN INMATE OF THE NEW YORK CITY :
       DEPARTMENT OF CORRECTION     :
------------------------------------X

      Upon the affirmation of Assistant District Attorney
STAN IRVIN, dated, July 7, 1998, and provided the above-captioned
inmate signs the written consent included in this order, thereby
agreeing to be released into the temporary custody of police
officers, including detective investigators, representing the
Office of the Kings County District Attorney, it is

      **ORDERED**, that on July 7, 1998, the New York City
Department of Correction deliver the custody of Shawn Newton,
now incarcerated in 120 Schermerhorn Street Pens to detective
investigators, representing the Office of the Kings County District
Attorney, and it is further

      **ORDERED**, that the inmate shall not be questioned about
matters relating to the prosecution of any criminal action against
the inmate in the absence of the inmate's attorney and it is
further

**ORDERED**, that the attorney for such inmate on any pending criminal matter, unrelated to the investigation for which the inmate is produced, shall be notified of the production of the inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

**ORDERED**, that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

**ORDERED**, that the inmate be returned to the custody of the New York City Department of Correction from whence taken, on the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.



ENTER

_Ariel E. Bel_

HONORABLE
J. S. C.   HON. ARIEL E. BELEN

Dated: July 7, 1998

I, Shawn Newton, hereby consent to be released into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

Date: _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
------------------------------------X
                                    :
          IN THE MATTER             :
                                    :
             OF                     :
                                    :
AN EX-PARTE APPLICATION BY THE KINGS :
COUNTY DISTRICT ATTORNEY REGARDING  :         AFFIRMATION
A CONFIDENTIAL INVESTIGATION        :
                                    :
RE:  DERRICK WRIGHT aka SHAWN NEWTON :
     NYSID #7121225L                :
                                    :
     AN INMATE OF THE NEW YORK      :
     CITY DEPARTMENT OF CORRECTIONS :
------------------------------------X

          I, STAN IRVIN, an attorney at law and an Assistant
District Attorney in Kings County, affirm under penalties of
perjury that:

          1.  I am submitting this affirmation in support of an
application for an Order authorizing the New York City Department
of Correction to transfer the above-captioned inmate into the
temporary custody of police officers, including detective
investigators, representing the Office of the Kings County District
Attorney.

          2.  The inmate has communicated to representatives of this
Office that the inmate possess information concerning criminal
matters unrelated to any criminal action pending against the
inmate, which the inmate desires to reveal to this Office.

          3.  Since the inmate appears to be a person with information
concerning criminal matters, it is necessary to interview this
inmate, in confidence, at the District Attorney's Office.

4. The inmate will not be questioned concerning the prosecution of any criminal action against the inmate in the absence of the inmate's attorney on that pending case.

5. This application is being made ex-parte, since the inmate has communicated to representatives of this Office that the inmate wishes to provide information concerning criminal matters unrelated to any criminal action pending against the inmate. However, the inmate's attorney on any pending criminal action shall be notified of the production of the inmate, unless the nature of the investigation for which the inmate is produced requires that such notification not be made.

6. The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

7. The inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate.

8. Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

9. A prior application has been made for production of this inmate.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

Dated: July 7, 1998
Brooklyn, New York

Stan Irvin

STAN IRVIN
Assistant District Attorney
Homicide Bureau
(718)250-2399

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
---------------------------------------X
                                       :
          IN THE MATTER                :
                                       :
              OF                       :        ORDER
                                       :
AN EX PARTE APPLICATION BY THE KINGS   :
COUNTY DISTRICT ATTORNEY REGARDING     :
A CONFIDENTIAL INVESTIGATION           :
                                       :
    RE: DERRICK WRIGHT aka SHAWN NEWTON :
        NYSID #7121225L                 :
                               :       :
        AN INMATE OF THE NEW YORK CITY  :
        DEPARTMENT OF CORRECTION        :
---------------------------------------X

          Upon the affirmation of Assistant District Attorney

STAN IRVIN, dated, July 10, 1998, and provided the above-captioned

inmate signs the written consent included in this order, thereby

agreeing to be released into the temporary custody of police

officers, including detective investigators, representing the

Office of the Kings County District Attorney, it is

          ORDERED, that on July 13, 1998, the New York City

Department of Correction deliver the custody of Shawn Newton,
                        120 Schermerhorn
now incarcerated in ~~960 Adams~~ Street Pens to New York Police

Detectives, representing the Office of the Kings County District

Attorney, and it is further

          ORDERED, that the inmate shall not be questioned about

matters relating to the prosecution of any criminal action against

the inmate in the absence of the inmate's attorney and it is

further

**ORDERED**, that the attorney for such inmate on any pending criminal matter, unrelated to the investigation for which the inmate is produced, shall be notified of the production of the inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

**ORDERED**, that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

**ORDERED**, that the inr te be returned to the custody of the New York City Department of Correction from whence taken, on the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.

ENTERED

JUL 6 1998

WILBUR A. ENTER
COUNTY CLERK

_____
HONORABLE
J. S. C.        HON. ARIEL E. BELEN

Dated: _July 6, 1998_

I, Shawn Newton, hereby consent to be released into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

Date: _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
---------------------------------------X
                                       :
              IN THE MATTER            :
                                       :
                  OF                   :
                                       :
AN EX-PARTE APPLICATION BY THE KINGS   :
COUNTY DISTRICT ATTORNEY REGARDING     :          AFFIRMATION
A CONFIDENTIAL INVESTIGATION           :
                                       :
RE:  <u>DERRICK WRIGHT aka SHAWN NEWTON</u> :
     <u>NYSID #7121225L</u>               :
                                       :
     AN INMATE OF THE NEW YORK         :
     CITY DEPARTMENT OF CORRECTIONS    :
---------------------------------------X

        I, STAN IRVIN, an attorney at law and an Assistant
District Attorney in Kings County, affirm under penalties of
perjury that:

        1.   I am submitting this affirmation in support of an
application for an Order authorizing the New York City Department
of Correction to transfer the above-captioned inmate into the
temporary custody of police officers, including detective
investigators, representing the Office of the Kings County District
Attorney.

        2.   The inmate has communicated to representatives of this
Office that the inmate possess information concerning criminal
matters unrelated to any criminal action pending against the
inmate, which the inmate desires to reveal to this Office.

        3.   Since the inmate appears to be a person with information
concerning criminal matters, it is necessary to interview this
inmate, in confidence, at the District Attorney's Office.

4. The inmate will not be questioned concerning the prosecution of any criminal action against the inmate in the absence of the inmate's attorney on that pending case.

5. This application is being made ex-parte, since the inmate has communicated to representatives of this Office that the inmate wishes to provide information concerning criminal matters unrelated to any criminal action pending against the inmate. However, the inmate's attorney on any pending criminal action shall be notified of the production of the inmate, unless the nature of the investigation for which the inmate is produced requires that such notification not be made.

6. The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

7. The inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate.

8. Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

9. A prior application has been made for production of this inmate.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

Dated: July 15, 1998
       Brooklyn, New York

STAN IRVIN
Assistant District Attorney
Homicide Bureau
(718) 250-2399

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN THE MATTER

OF                                              <u>ORDER</u>

AN EX PARTE APPLICATION BY THE KINGS
COUNTY DISTRICT ATTORNEY REGARDING
A CONFIDENTIAL INVESTIGATION

RE: <u>DERRICK WRIGHT aka SHAWN NEWTON</u> :       <u>NYSID</u> 

AN INMATE OF THE NEW YORK CITY
DEPARTMENT OF CORRECTION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Upon the affirmation of Assistant District Attorney
STAN IRVIN, dated, July 16, 1998, and provided the above-captioned
inmate signs the written consent included in this order, thereby
agreeing to be released into the temporary custody of police
officers, including detective investigators, representing the
Office of the Kings County District Attorney, it is

ORDERED, that on July 16, 1998, the New York City
Department of Correction deliver the custody of Shawn Newton,
now incarcerated in 120 Schermerhorn Street Pens to detective
investigators, representing the Office of the Kings County District
Attorney, and it is further

ORDERED, that the inmate shall not be questioned about
matters relating to the prosecution of any criminal action against
the inmate in the absence of the inmate's attorney and it is
further

0073

ORDERED, that the attorney for such inmate on any pending criminal matter, unrelated to the investigation for which the inmate is produced, shall be notified of the production of the inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

ORDERED, that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

ORDERED, that the inmate be returned to the custody of the New York City Department of Correction from whence taken, on the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.

ENTERED

JUL 16 1998

Dated: July 16, 1998

ENTER

HONORABLE
J. S. C.

I, Shawn Newton, hereby consent to be released into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

Date: _____

0074

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                       :

        IN THE MATTER           :

            OF              :

AN EX-PARTE APPLICATION BY THE KINGS  :
COUNTY DISTRICT ATTORNEY REGARDING   :     **AFFIRMATION**
A CONFIDENTIAL INVESTIGATION         :

RE:   DERRICK WRIGHT aka SHAWN NEWTON  :     NYSID #▇▇▇▇

                       :

       AN INMATE OF THE NEW YORK    :
       CITY DEPARTMENT OF CORRECTIONS  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        I, STAN IRVIN, an attorney at law and an Assistant District Attorney in Kings County, affirm under penalties of perjury that:

        1.   I am submitting this affirmation in support of an application for an Order authorizing the New York City Department of Correction to transfer the above-captioned inmate into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

        2.   The inmate has communicated to representatives of this Office that the inmate possess information concerning criminal matters unrelated to any criminal action pending against the inmate, which the inmate desires to reveal to this Office.

        3.   Since the inmate appears to be a person with information concerning criminal matters, it is necessary to interview this inmate, in confidence, at the District Attorney's Office.

**0075**

4.    The inmate will not be questioned concerning the prosecution of any criminal action against the inmate in the absence of the inmate's attorney on that pending case.

5.    This application is being made ex-parte, since the inmate has communicated to representatives of this Office that the inmate wishes to provide information concerning criminal matters unrelated to any criminal action pending against the inmate. However, the inmate's attorney on any pending criminal action shall be notified of the production of the inmate, unless the nature of the investigation for which the inmate is produced requires that such notification not be made.

6.    The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

7.    The inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate.

8.    Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

9.    A prior application has been made for production of this inmate.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

Dated:    July 16, 1998
          Brooklyn, New York

STAN IRVIN
Assistant District Attorney
Homicide Bureau

**0076**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
-------------------------------------X
                                     :
        IN THE MATTER                :
                                     :
            OF          .            :        ORDER
                                     :
AN EX PARTE APPLICATION BY THE KINGS :
COUNTY DISTRICT ATTORNEY REGARDING   :
A CONFIDENTIAL INVESTIGATION         :
                                     :
   RE: DERRICK WRIGHT aka SHAWN NEWTON :      NYSID #7121225L
                                     :
                                     :
        AN INMATE OF THE NEW YORK CITY :
        DEPARTMENT OF CORRECTION      :
-------------------------------------X

　　　　　Upon the affirmation of Assistant District Attorney

STAN IRVIN, dated, July 21, 1998, and provided the above-captioned

inmate signs the written consent included in this order, thereby

agreeing to be released into the temporary custody of police

officers, including detective investigators, representing the

Office of the Kings County District Attorney, it is

　　　　　ORDERED, that on July 27 1998, the New York City

Department of Correction deliver the custody of Shawn Newton,

now incarcerated ~~in 120 Schermerhorn Street Pens~~ "120 Schermerhorn St Pens" to detective

investigators, representing the Office of the Kings County District

Attorney, and it is further

　　　　　ORDERED, that the inmate shall not be questioned about

matters relating to the prosecution of any criminal action against

the inmate in the absence of the inmate's attorney and it is

further

**ORDERED,** that the attorney for such inmate on any pending criminal matter, unrelated to the investigation for which the inmate is produced, shall be notified of the production of the inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

**ORDERED,** that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

**ORDERED,** that the inmate be returned to the custody of the New York City Department of Correction from whence taken, on the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.

```
ENTERED

JUL 21 1998

WILBUR A. LEVIN
COUNTY CLERK
```

ENTER

_Paul E. Bel_
_____
**HONORABLE**
J. S. C.

Dated: July 21, 1998

I, Shawn Newton, hereby consent to be released into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

_____

Date: _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
------------------------------------X
                                    :
          IN THE MATTER             :
                                    :
              OF                    :
                                    :
AN EX-PARTE APPLICATION BY THE KINGS  :
COUNTY DISTRICT ATTORNEY REGARDING    :        AFFIRMATION
A CONFIDENTIAL INVESTIGATION          :
                                    :
RE:   DERRICK WRIGHT aka SHAWN NEWTON  :       NYSID #7121225L
                                    :
                                    :
      AN INMATE OF THE NEW YORK      :
      CITY DEPARTMENT OF CORRECTIONS  :
------------------------------------X

          I, STAN IRVIN, an attorney at law and an Assistant
District Attorney in Kings County, affirm under penalties of
perjury that:

          1.    I am submitting this affirmation in support of an
application for an Order authorizing the New York City Department
of Correction to transfer the above-captioned inmate into the
temporary custody of police officers, including detective
investigators, representing the Office of the Kings County District
Attorney.

          2.    The inmate has communicated to representatives of this
Office that the inmate possess information concerning criminal
matters unrelated to any criminal action pending against the
inmate, which the inmate desires to reveal to this Office.

          3.    Since the inmate appears to be a person with information
concerning criminal matters, it is necessary to interview this
inmate, in confidence, at the District Attorney's Office.

4. The inmate will not be questioned concerning the prosecution of any criminal action against the inmate in the absence of the inmate's attorney on that pending case.

5. This application is being made ex-parte, since the inmate has communicated to representatives of this Office that the inmate wishes to provide information concerning criminal matters unrelated to any criminal action pending against the inmate. However, the inmate's attorney on any pending criminal action shall be notified of the production of the inmate, unless the nature of the investigation for which the inmate is produced requires that such notification not be made.

6. The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

7. The inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate.

8. Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

9. A prior application has been made for production of this inmate.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

Dated:   July 21, 1998
         Brooklyn, New York

STAN IRVIN
Assistant District Attorney
Homicide Bureau
(718)250-2399

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
------------------------------------X
                                    :
          IN THE MATTER             :
                                    :
              OF                    :          ORDER
                                    :
AN EX PARTE APPLICATION BY THE KINGS :
COUNTY DISTRICT ATTORNEY REGARDING  :
A CONFIDENTIAL INVESTIGATION        :
                                    :
    RE: <u>DERRICK WRIGHT aka SHAWN NEWTON</u> :     <u>NYSID #7121225L</u>
                                    :
                                    :
       AN INMATE OF THE NEW YORK CITY :
       DEPARTMENT OF CORRECTION      :
------------------------------------X

   Upon the affirmation of Assistant District Attorney
STAN IRVIN, dated, July 28, 1998, and provided the above-captioned
inmate signs the written consent included in this order, thereby
agreeing to be released into the temporary custody of police
officers, including detective investigators, representing the
Office of the Kings County District Attorney, it is

   ORDERED, that on July 28, 1998, the New York City
Department of Correction deliver the custody of Shawn Newton,
now incarcerated in 120 Schermerhorn Street Pens to detective
investigators, representing the Office of the Kings County District
Attorney, and it is further

   ORDERED, that the inmate shall not be questioned about
matters relating to the prosecution of any criminal action against
the inmate in the absence of the inmate's attorney and it is
further

ORDERED, that the attorney for such inmate on any pending criminal matter, unrelated to the investigation for which the inmate is produced, shall be notified of the production of the inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

ORDERED, that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

ORDERED, that the inmate be returned to the custody of the New York City Department of Correction from whence taken, on the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.



JUL 27 1998

Dated: July 27, 1998

ENTER

_Ariel E Bel_

HONORABLE
J. S. C.
HON. ARIEL E. BELEN
JUSTICE OF THE SUPREME COURT

I, Shawn Newton, hereby consent to be released into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

Date: _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
---------------------------------------X
                                       :
        IN THE MATTER                  :
                                       :
            OF                         :
                                       :
AN EX-PARTE APPLICATION BY THE KINGS   :
COUNTY DISTRICT ATTORNEY REGARDING     :        AFFIRMATION
A CONFIDENTIAL INVESTIGATION           :
                                       :
RE:  DERRICK WRIGHT aka SHAWN NEWTON   :        NYSID #7121225L
                                       :
                                       :
        AN INMATE OF THE NEW YORK      :
        CITY DEPARTMENT OF CORRECTIONS :
---------------------------------------X

      I, STAN IRVIN, an attorney at law and an Assistant District Attorney in Kings County, affirm under penalties of perjury that:

      1. I am submitting this affirmation in support of an application for an Order authorizing the New York City Department of Correction to transfer the above-captioned inmate into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

      2. The inmate has communicated to representatives of this Office that the inmate possess information concerning criminal matters unrelated to any criminal action pending against the inmate, which the inmate desires to reveal to this Office.

      3. Since the inmate appears to be a person with information concerning criminal matters, it is necessary to interview this inmate, in confidence, at the District Attorney's Office.

4. The inmate will not be questioned concerning the prosecution of any criminal action against the inmate in the absence of the inmate's attorney on that pending case.

5. This application is being made ex-parte, since the inmate has communicated to representatives of this Office that the inmate wishes to provide information concerning criminal matters unrelated to any criminal action pending against the inmate. However, the inmate's attorney on any pending criminal action shall be notified of the production of the inmate, unless the nature of the investigation for which the inmate is produced requires that such notification not be made.

6. The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

7. The inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate.

8. Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

9. A prior application has been made for production of this inmate.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

Dated:    July 27, 1998
          Brooklyn, New York

STAN IRVIN
Assistant District Attorney
Homicide Bureau
(718)250-2399

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
----------------------------------------X
                                        :
        IN THE MATTER                   :
                                        :
            OF                          :         ORDER
                                        :
AN EX PARTE APPLICATION BY THE KINGS    :
COUNTY DISTRICT ATTORNEY REGARDING      :
A CONFIDENTIAL INVESTIGATION            :
                                        :
    RE: DERRICK WRIGHT aka SHAWN NEWTON :         NYSID #71212254
                                        :
                                        :
        AN INMATE OF THE NEW YORK CITY  :
        DEPARTMENT OF CORRECTION        :
----------------------------------------X

        Upon the affirmation of Assistant District Attorney

STAN IRVIN, dated, July 28, 1998, and provided the above-captioned

inmate signs the written consent included in this order, thereby

agreeing to be released into the temporary custody of police

officers, including detective investigators, representing the

Office of the Kings County District Attorney, it is

        ORDERED, that on July 29, 1998, the New York City

Department of Correction deliver the custody of Shawn Newton,

now incarcerated in Rikers Island, C-74 to detective investigators,

representing the Office of the Kings County District Attorney, and

it is further

        ORDERED, that the inmate shall not be questioned about

matters relating to the prosecution of any criminal action against

the inmate in the absence of the inmate's attorney and it is

further

ORDERED, that the attorney for such inmate on any pending criminal matter, unrelated to the investigation for which the inmate is produced, shall be notified of the production of the inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

ORDERED, that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

ORDERED, that the inmate be returned to the custody of the New York .

the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.

ENTERED

JUL 28 1998

WILBUR A. LEVIN
COUNTY CLERK

Dated: July 28, 1998

ENTER

_Ariel E Bel_

HONORABLE
J. S. C. HON. ARIEL E. BELEN
JUSTICE OF THE SUPREME COURT

I, Shawn Newton, hereby consent to be released into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

Date: _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:

----------------------------------------X
                                        :
            IN THE MATTER               :
                                        :
                OF                      :
                                        :
AN EX-PARTE APPLICATION BY THE KINGS    :
COUNTY DISTRICT ATTORNEY REGARDING      :        AFFIRMATION
A CONFIDENTIAL INVESTIGATION            :
                                        :
RE:  DERRICK WRIGHT aka SHAWN NEWTON    :        NYSID #7121225L
                                        :
                                        :
                                        :
      AN INMATE OF THE NEW YORK         :
      CITY DEPARTMENT OF CORRECTIONS    :
----------------------------------------X

            I, STAN IRVIN, an attorney at law and an Assistant

District Attorney in Kings County, affirm under penalties of

perjury that:

            1.  I am submitting this affirmation in support of an

application for an Order authorizing the New York City Department

of Correction to transfer the above-captioned inmate into the

temporary custody of police officers, including detective

investigators, representing the Office of the Kings County District

Attorney.

            2.  The inmate has communicated to representatives of this

Office that the inmate possess information concerning criminal

matters unrelated to any criminal action pending against the

inmate, which the inmate desires to reveal to this Office.

            3.  Since the inmate appears to be a person with information

concerning criminal matters, it is necessary to interview this

inmate, in confidence, at the District Attorney's Office.

4. The inmate will not be questioned concerning the prosecution of any criminal action against the inmate in the absence of the inmate's attorney on that pending case.

5. This application is being made ex-parte, since the inmate has communicated to representatives of this Office that the inmate wishes to provide information concerning criminal matters unrelated to any criminal action pending against the inmate. However, the inmate's attorney on any pending criminal action shall be notified of the production of the inmate, unless the nature of the investigation for which the inmate is produced requires that such notification not be made.

6. The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

7. The inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate.

8. Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

9. A prior application has been made for production of this inmate.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

Dated: July 28, 1998
Brooklyn, New York

STAN IRVIN
Assistant District Attorney
Homicide Bureau
(718) 250-2399

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------X

'98 JUN 26 A9

IN THE MATTER                              :

OF                                         :

AN EX PARTE APPLICATION BY THE KINGS       :      ORDER
COUNTY DISTRICT ATTORNEY REGARDING
A CONFIDENTIAL INVESTIGATION               :

RE: Derrick Wright                         :
    a/k/a Shawn Newton
    AN INMATE OF THE NEW YORK CITY         :      NYSID#
    DEPARTMENT OF CORRECTIONS
-----------------------------------------X

        Upon the affirmation of Assistant District Attorney

Stan Irvin, dated July 28, 1998, and provided the above-captioned

inmate signs the written consent included in this order, thereby

agreeing to be released into the temporary custody of police

officer, including detective investigators representing the Office

of the Kings County District Attorney, it is

        ORDERED, that on July 28, 1998, the New York City

Department of Corrections deliver the custody of Shawn Newton

now incarcerated in 120 Schermerhorn Street pens to detective

investigators representing the Office of the Kings County District

Attorney, and it is further

        ORDERED, that the inmate shall not be questioned about

matters relating to the prosecution of any criminal action against

the inmate in the absence of the inmate's attorney, and it is

further

        ORDERED, that the attorney for such inmate on any pending

criminal matter, unrelated to the investigation for which the

inmate is produced, shall be notified of the production of the

0078

inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

ORDERED, that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

ORDERED, that the inmate be returned to the custody of the New York City Department of Correction from whence, taken, on the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.

E N T E R,

_Fred E. Bel_
J. S. C.

Date: July 28, 1998

ENTERED

JUL 28 1998

WILBUR A. LEVIN
COUNTY CLERK

I, _____, hereby consent to be released into the temporary custody of police officers, including detective investigators representing the Office of the Kings County District Attorney.

_____

Date: _____

**0079**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------X

IN THE MATTER

OF

AN EX PARTE APPLICATION BY THE KINGS
COUNTY DISTRICT ATTORNEY REGARDING
A CONFIDENTIAL INVESTIGATION

RE: Darrick Wright
a/k/a Shawn Newton
AN INMATE OF THE NEW YORK CITY
DEPARTMENT OF CORRECTIONS

-------------------------------------X

**AFFIRMATION**

I, Sean Irvin, an attorney-at-law and an Assistant District Attorney in Kings County, affirm under penalties of perjury that:

1. I am submitting this affirmation in support of an application for an Order authorizing the New York Department of Corrections to transfer the above-captioned inmate into the temporary custody of police officers, including detective investigators, representing this Office of the Kings County District Attorney.

2. The inmate has communicated to representatives of this Office that the inmate possess information concerning criminal matters unrelated to any criminal action pending against the inmate, which the inmate desires to reveal to this Office.

3. Since the inmate appears to be a person with information concerning original matters, it is necessary to interview this inmate, in confidence, at the District Attorney's Office.

4. The inmate will not be questioned concerning the prosecution of any original action against the inmate in the absence of the inmate's attorney on that pending case.

5. This application is being made ex-parte, since the inmate has communicated to representatives of this Office that the inmate wishes to provide information concerning criminal matters unrelated to any criminal action pending against the inmate. However, the inmate's attorney on any pending criminal action shall be notified of the production of the inmate, unless the nature of the investigation for which the inmate is produced requires that such notification not be made.

6. The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

7. The inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate.

8. Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

9. A prior application for production of this inmate has been made and granted.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

DATED:    Brooklyn, New York
          July 28, 1998

_Stan Flint_

ASSISTANT DISTRICT ATTORNEY

0081

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------X

IN THE MATTER

OF

AN EX PARTE APPLICATION BY THE KINGS
COUNTY DISTRICT ATTORNEY REGARDING
A CONFIDENTIAL INVESTIGATION

RE: Derrick Wright
a/k/a Shawn Newton
AN INMATE OF THE NEW YORK CITY
DEPARTMENT OF CORRECTIONS

ORDER

NYSID# 7121125L

-------------------------------------X

Upon the affirmation of Assistant District Attorney
Stan Irvin, dated July 24, 1998, and provided the above-captioned
inmate signs the written consent included in this order, thereby
agreeing to be released into the temporary custody of police
officer, including detective investigators representing the Office
of the Kings County District Attorney, it is

ORDERED, that on July 24, 1998, the New York City
Department of Corrections deliver the custody of Shawn Newton
now incarcerated in Rikers C-74 to detective
investigators representing the Office of the Kings County District
Attorney, and it is further

ORDERED, that the inmate shall not be questioned about
matters relating to the prosecution of any criminal action against
the inmate in the absence of the inmate's attorney, and it is
further

ORDERED, that the attorney for such inmate on any pending
criminal matter, unrelated to the investigation for which the
inmate is produced, shall be notified of the production of the

inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

      ORDERED, that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

      ORDERED, that the inmate be returned to the custody of the New York State~~ Department of Corrections~~ _Coxsackie Correctional Facility_ the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.

Date: July 28, 1998

                         E N T E R ,

                       _Paul E. Bel_

                         J. S. C.

                         ENTERED

                         JUL 28 1998

                         WILBUR A. LEVIN
                         COUNTY CLERK

      I, _____, hereby consent to be released into the temporary custody of police officers, including detective investigators representing the Office of the Kings County District Attorney.

Date: _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------X
                                    :
                    IN THE MATTER   :
                                    :
                        OF          :
                                    :
AN EX PARTE APPLICATION BY THE KINGS   :          AFFIRMATION
COUNTY DISTRICT ATTORNEY REGARDING     :
A CONFIDENTIAL INVESTIGATION           :
                                    :
    RE: Derrick Wright              :
        a/k/a Sharon Newton         :          NYSID# 7121225L
        AN INMATE OF THE NEW YORK CITY :
        DEPARTMENT OF CORRECTIONS   :
                                    :
------------------------------------X

    I, Stan Irvin, an attorney-at-law and an Assistant District
Attorney in Kings County, affirms under penalties of perjury that:

    1.  I am submitting this affirmation in support of an
application for an Order authorizing the New York Department of
Corrections to transfer the above-captioned inmate into the
temporary custody of police officers, including detective
investigators, representing the Office of the Kings County District
Attorney.

    2.  The inmate has communicated to representatives of this
Office that the inmate possess information concerning criminal
matters unrelated to any criminal action pending against the
inmate, which the inmate desires to reveal to this Office.

    3.  Since the inmate appears to be a person with information
concerning criminal matters, it is necessary to interview this
inmate, in confidence, at the District Attorney's Office.

    4.  The inmate will not be questioned concerning the
prosecution of any criminal action against the inmate in the
absence of the inmate's attorney on that pending case.

5. This application is being made ex-parte, since the inmate has communicated to representatives of this Office that the inmate wishes to provide information concerning criminal matters unrelated to any criminal action pending against the inmate. However, the inmate's attorney on any pending criminal action shall be notified of the production of the inmate, unless the nature of the investigation for which the inmate is produced requires that such notification not be made.

6. The inmate will be advised of the ability to communicate with counsel and should the inmate express a desire to communicate with counsel, the inmate will be provided an opportunity to do so.

7. The inmate will not be taken from the custody of the New York City Department of Corrections without the written consent of the inmate.

8. Appropriate security measures will be maintained at all times the inmate is in the custody of persons representing the Office of the Kings County District Attorney.

9. A prior application for production of this inmate has been made and granted.

WHEREFORE, it is respectfully requested that the Court sign the attached Order.

DATED: Brooklyn, New York
July 28, 1998

Steven Tannen
ASSISTANT DISTRICT ATTORNEY

# EXHIBIT D

# Excerpt of August 17, 2016, Transcript Spruill's CPL § 440 Motion

1   CRIMINAL COURT OF THE CITY OF NEW YORK

2   COUNTY OF KINGS                    PART 38
    ------------------------------------------X
3   THE PEOPLE OF THE STATE OF NEW YORK,

4
         -against-                              Indictment No.
5                                               13008-95
    TASKER SPRUILL,
6                                               HEARING
                          Defendant.
7   ------------------------------------------X
                              120 Schermerhorn Street
8                             Brooklyn, New York 11201
                              August 17, 2016
9   B E F O R E:

10       THE HONORABLE MICHAEL GERSTEIN, Acting Supreme Court

11       Justice

12

13  A P P E A R A N C E S:

14  FOR THE PEOPLE:

15       OFFICE OF KENNETH THOMPSON
         District Attorney Kings County
16       350 Jay Street
         Brooklyn, New York 11201
17       BY:  MORGAN J. DENNEHY, ESQ.
              OLATOKUNBO OLANIYAN, ESQ.
18            Assistant District Attorneys

19  FOR THE DEFENDANT:

20       LAW OFFICE OF RITA DAVE, ESQ.
         188 Lincoln Avenue
21       Mineola, New York 11501
         BY:  RITA DAVE, ESQ.
22            JABBAR COLLINS, Legal Assistant

23       CUOMO, LLC
         200 Old Country Road, Suite 2 South
24       Mineola, New York 11501
         BY:  OSCAR MICHELEN, ESQ.
25
                   CHRISTINA CRUZ, OFFICIAL COURT REPORTER

1    Q    Even though you would direct your paralegal to

2    undertake the steps you needed for a witness, you were aware

3    that affirmations were required to produce that request;

4    correct?

5    A    There would be signatures on it, yes.

6    Q    You were aware of the contents of those affirmations?

7    A    Yes.

8    Q    So, for example --

9         THE COURT:  I think we have fully established

10    from the papers -- Mr. Dennehy will correct me that the

11    People do not dispute that the relevant affirmations were

12    as Mr. Irvin testified were signed by a paralegal at the

13    direction of Mr. Irvin.  Have I got that right, Mr. Irvin?

14              THE WITNESS:  Yes.

15              THE COURT:  Mr. Dennehy?

16              MR. DENNEHY:  Correct, Judge.

17              THE COURT:  I don't think we need more of that.

18    Move on.

19              MS. DAVE:  I was going to move on.

20              THE COURT:  Please do so.

21    Q    The order to produce you would require, you are aware

22    that you would be making representation to a judge and

23    specifically I am going to lay out the representations.  You

24    would be required -- that you required a particular individual

25    who was an inmate at a correctional facility to be produced as

1    couple of days before the Wade hearing and there was an

2    order to produce that I recall in January and one in March.

3    Q    Similarly -- withdrawn.  In terms of the order to

4    produce, when the inmate is being brought down, were you aware

5    at that time of the process that was followed for the inmate

6    to be brought to the court?

7    A    No, ma'am.

8    Q    You were not aware if they were brought in at

9    4:00 a.m. or 5:00 a.m. on a bus or handcuffed; were you aware

10   of that?

11   A    I knew they would be brought in on a bus, but wasn't

12   involved in the process of bringing him in.  That was

13   Department of Corrections.

14   Q    But you were aware of the conditions and the

15   circumstances under which an inmate would be transported;

16   correct?

17              MR. DENNEHY:  Objection.

18              THE COURT:  Sustained as to form.

19   Q    Were you aware as to the circumstances and the

20   procedures of what an inmate would go through to be produced?

21   A    No.

22              MR. DENNEHY:  Objection.

23              THE COURT:  The answer obviates the objection I

24   think.

25   Q    Now similarly to the order to produce in the timeframe

1    that we indicated earlier, you were also aware of the process

2    of using Damiani orders; correct?

3        A    Yes.

4        Q    And you also in a Damiani order as an officer of a

5    court would have to make certain representations to a judge as

6    to what you needed a witness for?

7        A    Yes.

8        Q    And so you would submit an affirmation along with the

9    Damiani order for a judge to sign?

10       A    Yes, ma'am.

11       Q    And in that affirmation you would indicate that you

12   needed to have an inmate transferred from a prison and brought

13   over to you?

14       A    Yes.

15       Q    Because that individual possessed certain information

16   concerning a criminal matter which he wanted to reveal to your

17   office?

18       A    It would be either because we knew they possessed or

19   we wanted to find out if they possessed it, if they were a

20   witness to it, to information that's pertinent to the case.

21       Q    So it's not necessarily just that the inmate had

22   information for you or reached out to you, it may be that you

23   wanted information so you needed to bring the inmate to you at

24   your office?

25       A    In this case, yes.  Particularly the January one.

1     Q    I did not hear that.

2     A    Particularly the January order to produce.

3     Q    You would also affirm in that affirmation that the

4 inmate would not be questioned at all about their underlying

5 criminal case?

6     A    Their pending cases, yes.

7     Q    And because this was an ex parte application, you

8 would affirm also that you would notify the inmate's attorney

9 if in fact you were requesting for that inmate to be produced

10 pursuant to a Damiani order?

11     A    If they had an open pending case, charges pending

12 against them, yes, I would.  It would be my understanding that

13 if an inmate had an open pending case and if I was going to

14 even question at all about their open case I would have an

15 obligation before I even entered into that to notify the

16 attorney what I was going to do.

17     Q    You would also advise the inmate they have the ability

18 to consult a lawyer if they so wished?

19     A    For -- about their open pending cases or what?

20     Q    Just in general because the inmate would be brought to

21 your office they have the ability to have counsel present if

22 they wanted to have representation?

23     A    I didn't understand that to be part of the procedure.

24 We weren't accusing them of any crime.  There was nothing

25 being alleged against them.

# EXHIBIT E

# Excerpt of DA's Appellate Brief Appealing The Vacatur Of Spruill's Conviction

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                        Appellant,

            -against-

TASKER SPRUILL,

                  Defendant-Respondent.

Appellate Division
Docket Number
2017-04490

Kings County
Indictment Number
13008/95

APPELLANT'S BRIEF

LEONARD JOBLOVE
VICTOR BARALL
MORGAN J. DENNEHY
Assistant District Attorneys
      of Counsel

July 13, 2017

**ERIC GONZALEZ**
**ACTING DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

the shooting (A.73-105); and Detective MICHAEL SHEPTUK, of the Police Department's Crime Scene Unit, who photographed and sketched the crime scene (A.106-15).. The court recessed for lunch after Detective Sheptuk's direct examination, but before his cross-examination (A.116).

When the trial resumed after lunch, the People informed the court and defense counsel that they had located Marilyn Connor at 11:00 a.m. that morning, and that she was at the courthouse and ready to testify. Defense counsel objected to the timing of Connor's proposed testimony and requested an adjournment to prepare. The court noted that if Connor did not testify during the afternoon session, then she would have to wait eight days to do so, because an eight-day adjournment of the trial was necessary to accommodate a judicial conference (A.117-20).

ADA Stan Irvin explained that he had spoken with Connor for the first time during the lunch recess. ADA Irvin referred to Connor's November 4, 1993 statements to the authorities, and he detailed the threats that had been made to her by defendant and his associates, warning her not to testify against defendant. ADA Irvin expressed his concern that Connor, who was a reluctant and scared witness, would not return to court and might disappear if her testimony was adjourned for a week (A.120-22).

Defense counsel acknowledged that he had been in receipt of Connor's prior statements, the first of which was detailed in a police complaint follow-up report, and the second of which was a

7

<u>The Hearing on the Motion to Vacate the Judgment</u>

<u>Defendant's Case</u>

On August 17, 2016, the defense called former ADA STAN IRVIN. Irvin worked in the Kings County District Attorney's Office from May 1992 to September 2000, when he left to become a minister. Before coming to the office, he had been a prosecutor for eight years in Illinois. During his tenure as a prosecutor in Brooklyn, Irvin conducted 65 homicide trials (A.1470-72, 1505-06).

Irvin was assigned to prosecute defendant, and his co-counsel was Karen Bennett. Irvin used orders to produce, <u>Damiani</u> orders, and material witness orders in his cases. His practice was to direct his paralegal to prepare the paperwork necessary to obtain the orders to produce certain witnesses on certain dates, and then the paralegal would obtain the orders without his involvement. The only order that would come back to him was a material witness order. The practice in the Office at the time was for the paralegal to sign the ADA's name on the paperwork, and then the Office's detective investigators would execute the material witness orders and <u>Damiani</u> orders (A.1472-75, 1507-08).

Irvin was not involved with the execution of any orders to produce witnesses. When he wanted to meet with an incarcerated witness, he would ask his paralegal to prepare the paperwork to obtain the court order, and then he would meet with the witness in his office. He was not "involved in the steps in between," and he was unaware of the procedures that the Department of Corrections

had in place to transport incarcerated witnesses (A.1478, 1481, 1527).

Irvin understood that if an incarcerated witness had a pending case, and if he wanted to speak with that witness in his office pursuant to a _Damiani_ order, then he had to notify that witness's attorney on the pending case. Irvin also understood that if the witness did not consent to being taken to Irvin's office, then the witness could not be produced. Irvin assumed that if the witness appeared at his office, the witness had consented to being brought there. When he met with witnesses under these circumstances, he did not have a copy of the _Damiani_ order or the affirmation that had been used to obtain the order (A.1483-84, 1509).

Irvin first met with Newton in October 1995, when Newton testified in the grand jury in connection with defendant's case. Irvin then met with Newton seven or eight times in 1998, in the months leading up to defendant's trial.[3] The first meeting was in January 1998. During these meetings, Newton expressed his reluctance to testify, and, at Newton's request, Irvin made several promises to him in exchange for his testimony. Irvin had

---

[3] Irvin explained that Newton's trial testimony that he had met with Irvin twenty times was inaccurate (Irvin: H1. 24-25). Irvin did not correct Newton because: it was early in his examination, and he did not want to ask him any questions that would "make him defensive;" Irvin believed that the inaccuracy was damaging to the People rather than defendant; and Newton had difficulty accurately estimating numbers (A.1535-36, 1542-43).

apprised the trial judge of Newton's reluctance, including that on the night before he testified at defendant's trial, Newton had expressed a refusal to testify. Irvin also apprised the judge of the promises that Irvin had made to Newton. The trial judge had directed Irvin to place this information on the record (A.1485-86, 1515, 1518, 1520-22, 1524).

The meetings between Irvin and Newton were cordial. They occurred in Irvin's office, and, over time, they "developed more and more trust" (A.1518, 1531). Irvin's co-counsel, Karen Bennett, was present for some of the meetings. Irvin believed that Newton had "developed a crush on Karen" (A.1530). Irvin would let Newton call his wife, and Irvin would order food for him. Newton's handcuffs were removed (A.1540).

Newton never expressed a desire to call an attorney. Irvin believed that Newton would have had the right to consult with counsel only if he had an open criminal case, and Newton's criminal case was closed. Irvin preferred meeting with Newton in his office rather than at the correctional facility, because meeting at the prison carried with it a safety risk that Newton's cooperation with the prosecutor would be revealed to the other inmates A.1518-20, 1528-29, 1531).

At the hearing, Irvin was shown several orders to produce Newton to court, including orders directing him to be produced on February 9, 1998, March 9, 1998, July 6, 1998, and July 14, 1998. On those dates, Newton was not needed as a witness in a court

proceeding. Indeed, on three of those four dates, defendant's case was not calendared. Rather, Irvin wanted to speak with Newton on those dates so that Irvin could prepare defendant's case for trial (A.1488-93, 1499-1500, 1508-09).

As far as Irvin knew, Newton had never refused to meet with him. Newton never told Irvin that he did not want to be in Irvin's office speaking with him, and he never told Irvin to stop bringing him down from the correctional facility. No one ever told Irvin that Newton had refused to comply with an order to produce or with a Damiani order (A.1493-94, 1500, 1522, 1525-26, 1528).

Irvin never yelled at Newton or threatened him. Irvin never told Newton that he had to testify (A.1533-34). Irvin did not receive copies of the Damiani orders, and the first time that he had seen the Damiani order that directed Newton's production on July 16, 1998, which had a notation that Newton had refused to be produced, was on the day before his testimony at the hearing on the motion to vacate the judgment (A.1494-95).

Defense counsel asked, "[Y]ou knew he [Newton] did not want to testify and he told you he did not want to testify and you still continually brought him down knowing that he didn't want to cooperate?" Irvin responded:

> Yes. In the sense that I was seeing if he would testify. He would waver back and forth and his concern was not that he didn't want to testify or cooperate in that sense. His concern that he expressed to me were

27

> concerns of safety for his wife and for
> himself. He knew what happened to his friend
> Greg and he was very concerned about that.

(A.1500).

In addition, Irvin explained that of the three eyewitnesses, Gregory Pearson had been killed and the mother of Marilyn Connor had told detective investigators that Connor was dead, so Irvin believed that Newton was the only witness available to identify defendant at trial (A.1522-23).

When Irvin put Newton on the stand at defendant's trial, Irvin was fearful that Newton would refuse to testify. That was why Irvin asked Newton at the very beginning of his examination to make an in-court identification of defendant as the shooter (A.1522, 1534).

Although Irvin had obtained a material witness order for Connor, Irvin believed that the detective investigators did not execute it, instead bringing Connor in on the three outstanding warrants that she had -- two of which were from Queens and one of which was from Manhattan (A.1511-12).

The defense entered into evidence an affirmation from defendant's trial counsel, Barry Krinsky (A.1843-45). The affirmation stated that Krinsky had "no recollection" of having been provided the material witness order for Connor or the eight affirmations that had been used by Irvin to obtain orders to produce and Damiani orders for Newton. Krinsky affirmed that had he been in receipt of these documents at the time of trial, he

28

would have used them "to [his] client's benefit by pursuing all permissible legal relief." The relief that Krinsky believed was permissible included "moving to exclude Newton and Connor's testimony as having been improperly obtained, seeking to have the falsified affirmations entered into evidence, calling witnesses to establish their falsity, and arguing to the jury that the prosecution's deception rendered its case unworthy of belief." The hearing was adjourned to October 5, 2016 (A.1555).

At the conclusion of Irvin's testimony, the defense requested an adjournment to call former ADA Karen Bennett (A.1554). On October 5, 2016, former ADA Karen Bennett appeared in court. Defense counsel declined to call her. The Court asked the People if they wanted to call Bennett as a witness, and the People stated that they would call her. Over defense counsel's objection, the court permitted the People to call Bennett out of turn (A.1561, 1571-73).

After Bennett concluded her testimony (see Bennett's hearing testimony, summarized below at 39-43), the defense requested that Irvin be recalled so that he could be asked about records that the defense had subpoenaed from the New York City Department of Correction ("NYCDOC") (A.1607-09). Specifically, one of the DOCCS records stated that on May 13, 1998, a counselor at the correctional facility in which Newton was housed had visited Newton's cell after he had refused to go on a court trip. The counselor saw Newton tying a sheet around a pipe in an apparent

29

suicide attempt. Newton stated that he was "stressed," and did not want to go to court because he was afraid of defendant. The counselor advised Newton to "handle [the] matter while in court," and Newton complied without further incident (A.1846).

The People opposed the defense's application to recall Irvin, who resided in Illinois, arguing that Irvin had testified that he had no involvement with, and was not privy to, the details of Newton's transportation to his office (A.1610-12). The court directed that Irvin be recalled so that he could be asked about the new documents, and the hearing was adjourned for that purpose (A.1612, 1619-24).

On November 2, 2016, New York City Corrections Officer JASON GREGORY testified for the defense. Officer Gregory worked as a court productions staff member at Rikers Island. His duties included making sure that all of the court paperwork was filed the day before the inmates were transported to court (A.1643-44). Officer Gregory had brought with him a record called a "QMOV screen printout" from the NYCDOC Inmate Information System. This record documented Newton's movement within the NYCDOC system from February 1998 to June 1999 (A.1645-47) (A.1847-54).

According to Officer Gregory, each prisoner's movement was preceded by his office's receipt of either "a hard securing order that we get directly from the courts," an order to produce, or a take-out order (i.e., a Damiani order). Securing orders accounted for the movement of eighty-five to ninety percent of the inmates

who were transported to court each day. The securing orders usually consisted of notations from court personnel, and they did not involve the prosecutor (A.1655-58, 1689). An inmate was transported to court only pursuant to a court order, and would never be moved based upon a telephone call from an ADA (A.1689).

Newton's QMOV screen printout showed that Newton had been admitted into the computer system at Rikers Island on February 6, 1998 (A.1650-51). Each time a prisoner was taken to court, there were two "CRT" entries, which were abbreviations for "court." The first CRT entry reflected when the prisoner left the prison and the other reflected when the prisoner arrived at court. Similarly, there were two "CRTRET" entries, which were abbreviations for "court return." The first CRTRET entry reflected when the prisoner left the courthouse, and the other reflected when the prisoner arrived back at the prison (A.1670).

Newton's QMOV screen printout showed that Newton was taken to the Supreme Court, Kings County, on February 9, 1998, February 17, 1998, and February 20, 1998 (A.1653, 1660-61). It also showed that Newton refused to go to court on February 27, 1998. Officer Gregory could tell that there was a refusal on that date, because the record reflected only two CRTs and did not have any CRTRETs (A.1661-62).

Newton was next taken to the Brooklyn House of Detention (another New York City correctional facility) on March 16, 1998. There appeared to be some confusion in the record, but Officer

Gregory concluded that the Brooklyn House "kicked him right back [to Rikers Island], and then he sat in the Intake for several days waiting to get re-housed." Newton was not moved again until April 1, 1998, when he was transported back to his upstate correctional facility (A.1662-65, 1711-13).

Newton re-entered the NYCDOC system on May 18, 1998. The QMOV screen printout showed that Newton was taken to court on May 18, 1998, but that he refused to go to court on May 22, 1998 (A.1666). The printout then reflected several transfers within the Rikers Island complex, and court visits on June 29, 1998, July 6, 1998, and July 7, 1998. According to the printout, Newton refused to go to court on July 10, 1998, but was transported to court on July 14, July 15, July 16, July 20, July 21, and July 22. It was impossible to tell by looking at the printout if Newton's production was the result of a securing order, an order to produce, or a take-out order (A.1666-78). Officer Gregory testified that the printout reflected that Newton refused to go to court on July 23 and July 27.[4] On July 30, 1998, Newton was

---

[4] During redirect examination, Officer Gregory revised his testimony regarding Newton's movement on July 23, 1998. Officer Gregory testified that the QMOV printout showed that Newton had been transported to the Brooklyn House of Detention on that date, but that because the printout did not reflect the court booking him in or out, Newton apparently had not gone to court. Officer Gregory admitted that the QMOV printout could be wrong (A.1715-17, 1726-28). In fact, Newton testified on July 23 and July 27, 1998 (A.483-549, 560-660).

# EXHIBIT F

# Newton's Suicide Report

NEWTON, SERNN                    95A4552

QUARTERLY    Completed and filed.
6/2/97
SALAS

Chrono                Quarterly completed and filed.
9/10/97
Callanan

Chrono    Met inmate with C. Markham(Mental Health)-inmate claims stress
9/10/97   over not being allowed to see father when brought to wake 1 year
Callanan  ago.  Claims C.O.'s would not let him out of van.  Reason recorded
          on trip itinerary.  Also claims stressed because of school-no one
          teaching him, etc.  When speaking to teachers, discovers he is lazy
          and unproductive-  Trying to manipulate OMH and Guidance to remove
          him from school.  Recommended stay in school.                    cd

Chrono    Completed quarterly review.  Inmate stated during interview that
12/15/97  he needed to see medical because he had a brain tumor also stated
Zadlo     need to talk to OMH.  Notified hospital and ref. to OMH.          cd

Chrono    Quarterly completed and filed.                                    cd
12/15/97
Zadlo

CUSTODIAL TRANSFER    Form 3610 completed & filed.            rs
2/2/98

QUARTERLY                 Completed and filed.                      cd
3/2/98
Melecio

CHRONO    Inmate recently returned fromcourt (about 1 p.m.) Saw him at
4/20/98   approximately 1:45 p.m. at request of Sgt.  Would like to return
P.Melecio   to program of ASAT and School.

CUSTODIAL TRANSFER  Form 3610 completed and filed.            rs
5/12/98
P. Melecio

Chrono    At request of SCC, went to inmate's cell.  I/M refusing to move
5/13/98   to reception in order to prep for court trip.  Once I arrived
Melecio   at division, Officer went to release inmate out of cell in order
          to speak to me.  Inmate was in process of tying bed sheet around
          radiator pipe in what seemed to be an attempt at suicide.  I/M
          seen at officer's office.  I/M stated that he is stressed and
          does not want to goto court in fear of safety of himself and
          family.  Explained that he will have to go and he would have to
          handle matter while in court.  I/M stated he fears Spruill,
          Clayton(defendant) in case.  Assured that this will be noted and
          that there should be no contact between him and enemy as well as
          enemy's family.  I/M said he will pack up and move to reception
          w/o further incident.  OMH staff spoke to I/M afterwards.         c

QUARTERLY    Completed and filed.    6/1/98  Melecio              cd

CHRONO    Quarterly completed and filed.
9/4/98
MELECIO                                                                     ba

TRANSFERRED    Arthurkill C.P. this date.                        rs
10/29/98
P. Melecio

# EXHIBIT G

## *Damiani* order indicating Newton "Refused"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
------------------------------------X
                                    :
            IN THE MATTER           :
                                    :
               OF                   :          ORDER
                                    :
AN EX PARTE APPLICATION BY THE KINGS :
COUNTY DISTRICT ATTORNEY REGARDING   :
A CONFIDENTIAL INVESTIGATION         :
                                    :
  RE: DERRICK WRIGHT aka SHAWN NEWTON :
      NYSID #7121225L               :
                                    :
      AN INMATE OF THE NEW YORK CITY  :
      DEPARTMENT OF CORRECTION        :
------------------------------------X

        Upon the affirmation of Assistant District Attorney

STAN IRVIN, dated, July 10, 1998, and provided the above-captioned

inmate signs the written consent included in this order, thereby

agreeing to be released into the temporary custody of police

officers, including detective investigators, representing the

Office of the Kings County District Attorney, it is

        ORDERED, that on July 13, 1998, the New York City

Department of Correction deliver the custody of Shawn Newton,
                        120 Schermerhorn
now incarcerated in ~~360 Adams~~ Street Pens to New York Police

Detectives, representing the Office of the Kings County District

Attorney, and it is further

        ORDERED, that the inmate shall not be questioned about

matters relating to the prosecution of any criminal action against

the inmate in the absence of the inmate's attorney and it is

further

ORDERED, that the attorney for such inmate on any pending criminal matter, unrelated to the investigation for which the inmate is produced, shall be notified of the production of the inmate, unless it is determined, for reasons made known to the court, that such notification shall not be made and it is further

ORDERED, that appropriate security measures will be maintained by the Office of the Kings County District Attorney at all times the inmate is in the custody of persons representing that office, and it is further

ORDERED, that the inmate be returned to the custody of the New York City Department of Correction from whence taken, on the same day that the inmate was delivered into the temporary custody of the Office of the Kings County District Attorney.

_Ariel E Bel_
HONORABLE
J. S. C.        HON. ARIEL E. BELEN

Dated: _July 6, 1998_

I, Shawn Newton, hereby consent to be released into the temporary custody of police officers, including detective investigators, representing the Office of the Kings County District Attorney.

Date: _____

# EXHIBIT H

# Newton's Letter To The Attorney General Complaining About Irvin's Conduct

To: Attorney _____

I am writing _____ regarding _____ _____
murder trial against Clayton Spruill _____ made
obligation by me _____ _____ _____ not be
_____ _____ gifts _____ _____
_____ _____ _____ my family
move out of the _____ _____
_____ _____ with _____ _____
_____ _____ _____ _____ _____
I am scared for my life _____ _____ _____
_____ promise _____ _____ _____
my _____ $700 or _____ $200 _____ _____
verify that these bribes was made to
me, also he told me that my life will
be alright until I get out of prison. Right
now I am in special confinement unlawfully.
This district attorney told me that I will get
moved from the box of _____ as he call the
commissioner but nothing has occurred so he
be playing a dangerous game by _____ pushing
me to _____ up this case and tell the court
they got the wrong person in jail. This
district attorney has me very depressed
and taking medication so I can get over
my troubles day by day. I need you
to get in contact with _____ t _____
to be removed _____ the _____ _____
STATE CORRECTIONS 086
workin loose _____ _____

STATE CORRECTIONS

# EXHIBIT I

## Secret Material Witness Order & Warrant Regarding Connor

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                            Plaintiffs.

                vs.                        MATERIAL WITNESS ORDER

TASKER SPRUILL,
                            Defendant.

RE: MARILYN CONNOR,

                    Material Witness.
----------------------------------------X

        It appearing from the annexed affidavit of Stan Irvin
sworn to on the 10th day of July, 1998, that there is reasonable
cause to believe the existence of facts warranting the adjudication
of Marilyn Connor as a material witness, and it further appearing
that there is reasonable cause to believe that the said Marilyn
Connor would be unlikely to respond to an order directing her to
appear before this court at a designated time; it is now on motion
of Stan Irvin Assistant District Attorney in and for the County of
Kings, Brooklyn, New York.

        ORDERED that a warrant be issued addressed to a police
officer of the City of New York directing that the said police
officer take Marilyn Connor into custody within the State of New
York and to bring before the court forthwith in order that a
proceeding may be conducted to determine whether she is to be
adjudged a material witness.

        The within order is hereby granted.

DATED:   Brooklyn, New York
         July 10, 1998

                                    Justice of the Supreme Court
                                    of the State of New York
                                    HON. GLORIA M. DABIRI            ENTERED

                                                                    JUL 10 1998

                                    _____              WILBUR A. LEVIN
                                              Clerk                  COUNTY CLERK


        CHARLES J. HYNES
        District Attorney

   By:  _____
        STAN IRVIN
        Assistant District Attorney
        Kings County
        Municipal Building
        Brooklyn, New York

STATE OF NEW YORK )
                   )
COUNTY OF KINGS   )

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK

TO ANY POLICE OFFICER OF THE CITY OF NEW YORK

     An Order having been signed on the 10th day of July, 1998, in the Supreme Court of the State of New York, County of Kings, commencing a proceeding to determine whether or not Marilyn Connor be adjudged a material witness in the case of People vs. Tasker Spruill pursuant to Section 620.30 2B of the Criminal Procedure Law.

     YOU ARE THEREFORE COMMANDED FORTHWITH to arrest the above named Tasker Spruill within the State of New York and bring her before this court for this proceeding.

                             _____
                             Justice of the Supreme Court
                             Kings County

DATED:    Brooklyn, New York
         July 10, 1998

HON. GLORIA M. DABIRI

ENTERED

JUL 10 98

WILBUR A. LEVIN
COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:
------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                    Plaintiffs.

          vs.

TASKER SPRUILL,                              Indictment #13008/95

                    Defendant.

RE: MARILYN CONNOR,

               Material Witness.
------------------------------------------X

STATE OF NEW YORK )
                  )  ss.:
COUNTY OF KINGS   )

          Stan Irvin, being duly sworn, affirms and says:

          That he is an Assistant District Attorney; that the
above-named Tasker Spruill has been charged with the crime of
Murder in the Second Degree et. al., and that a criminal proceeding
has been commenced and is presently pending before the Supreme
Court, Part 44, County of Kings; that in the past, detectives from
the 73rd Precinct have spoken to Marilyn Connor's mother,
attempting to locate Marilyn Connor. The mother stated that her
daughter was dead. Upon checking two weeks ago Marilyn Connor's
social security number was still active. A warrant has been
pending since 1994 for Marilyn Connor for failure to appear in
Court on her own case. Marilyn Connor is an eyewitness to the
homicide of Tracy Thomas and she has given a sworn statement saying
she has been threatened in Tasker Spruill's case. Marilyn Connor
stated to detectives that she witnessed the incident and saw Tasker
Spruill shoot Tracy Thomas. Marilyn Connor also gave a tape
recorded sworn statement to an Assistant District Attorney in which
she also stated that she saw Tasker Spruill shoot Tracy Thomas. In
the sworn statement was when she stated that she had been
threatened. It is unlikely she would respond to a subpoena due to
the threat against her, and due to her not responding to Court on
the case against her, resulting in an arrest warrant being issued
against her. This demonstrates that she will not respond to an
order compelling her appearance to proceedings adjudicating her a
material witness.

          WHEREFORE YOUR DEPONENT RESPECTFULLY PRAYS for an order
of this court in pursuance to section 620.20 and 620.30 of the
Criminal Procedure Law for an order adjudicating Marilyn Connor a

material witness in this action and fixing bail to secure future attendance herein,

AND FURTHER, for the issuance of a warrant to a police officer of the City of New York directing such police officer to take the said Marilyn Connor into custody within the State of New York and bring her before the Court forthwith.

STAN IRVIN

# EXHIBIT J

# Handwriting Expert Report



**APPLIED FORENSICS**   HANDWRITING & DOCUMENT EXAMINATIONS SINCE 1992

Dennis J. Ryan
Forensic Document
Examiner*

Laura Mancebo
Forensic Document
Examiner*

Traci L. Moran
Forensic Document
Examiner*

Charlotte Ware
Forensic Document
Examiner*

Susan L. Fortunato
Forensic Document
Analyst

*Certified by The American
Board of Forensic Document
Examiners (ABFDE)

May 11, 2015

Rita Dave
26 Court St Ste 1212
Brooklyn, NY 11242

Re:   Stan Irvin Signature Examination

## SUBMITTED MATERIAL

### Questioned Material

Q-1   A copy of an Order to Produce for Derrick Wright dated 01/22/98
Q-2   A copy of an Order to Produce for Derrick Wright dated 03/02/98
Q-3   A copy of an Order to Produce for Derrick Wright dated 06/29/98
Q-4   A copy of an Order to Produce for Derrick Wright dated 07/13/98
Q-5   A copy of an Application for an Order to Produce dated 07/16/98
Q-6   A copy of an Order to Produce for Derrick Wright dated 07/17/98
Q-7   A copy of an Application for an Order to Produce dated 07/28/98
Q-8   A copy of an Application for an Order to Produce dated 07/27/98
See Appendix 1

### Known Writing

The following was submitted as the known writing of Stan Irvin

K-1-1   A copy of a Material Witness Request for Derek Moore dated 11/7/94
K-1-2   A copy of a Material Witness Request for Ricardo Williams dated
11/7/94
K-1-3   A copy of a Material Witness Request for Lenora Moore dated 11/7/94
K-1-4   A copy of a Material Witness Request for Mica Johnson dated 11/7/94
K-1-5   A copy of a letter re: Lenora Moore dated 11/21/94 to "Janice
English...."
K-1-6   A copy of a letter re: Lenora Moore dated 11/21/94 to "Harold Sole..."
K-1-7   A copy of an unknown type document dated 01/30/97
K-1-8   A copy of the signature page of an Affidavit dated 06/27/94

888-883-1352 • info@appliedforensics.com • www.appliedforensics.com

New York
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429
FAX 516-409-0285

Washington, D.C.
5268G Nicholson Ln
Suite 125
Kensington, MD 20895
202-657-5187
FAX 301-560-6597

Connecticut
222 Main Street
#219
F armington, CT 06032
860-331-8228
FAX 860-606-9583

Boston
75 Arlington St
Suite 500
Boston, MA 02216
617-523-2959
FAX 617-249-0419

North Carolina
8116 South Tryon Street
Suite B3,220
Charlotte, NC 28273
704-557-0230
FAX 704-943-0623

K-1-9  A copy of a Material Witness Order dated 07/10/98 for Marilyn Connor
K-1-10 A copy of the signature page of an unknown type document undated
See Appendix 2

The following was submitted as the known writing of Liz Noonan:

- K-2-1  A copy of a two (2) page Affidavit on Application for Certificate dated
  02/24/95
- K-2-2  A copy of a Brooklyn DA fax cover sheet dated 03/30/94 To: "Property
  Clerks..."
- K-2-3  A copy of a Kings Co. District Attorney Request in Lieu of Subpoena
  dated 03/30/94
- K-2-4  A copy of a Kings Co. District Attorney form letter dated 04/01/94
- K-2-5  A copy of handwritten notes dated 01/11/95
- K-2-6  A copy of a Kings Co. District Attorney Fax Cover Sheet dated 02/27/95
- K-2-7  A copy of a two (2) page Affirmation in Support of the People's Motion
  For a Material Witness Order dated 02/23/95
- K-2-8  A copy of a Kings Co. District Attorney Fax Cover Sheet dated 01/26/95
- K-2-9  A copy of a three (3) page Affirmation dated 01/26/95

K-2-10-Copies of eleven (11) pages of miscellaneous handwritten notes
K-2-20
K-2-21 A copy of an Order to Produce dated 03/08/94
K-2-22 A copy of two (2) pages of an Affirmation dated 05/25/95
K-2-23 A copy of an Order to Produce dated 06/29/95
K-2-24 A copy of an Order to Produce dated 10/25/95
K-2-25 A copy of an Order to Produce dated 03/27/96
K-2-26 A copy of a two (2) page Affirmation dated 05/16/96
K-2-27 A copy of a two (2) page Affirmation dated 03/27/96
K-2-28 A copy of a two (2) page Affirmation dated 06/19/96
K-2-29 A copy of a Material Witness Application dated 10/21/94

See Appendix 3

888-883-1352 • info@appliedforensics.com • www.appliedforensics.com

New York
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429
FAX 516-409-0285

Washington, D.C.
5268G Nicholson Ln
Suite 125
Kensington, MD 20895
202-657-5187
FAX 301-560-6597

Connecticut
222 Main Street
Farmington, CT 06032
860-331-8228
FAX 860-606-9583

Boston
75 Arlington St
Suite 500
Boston, MA 02216
617-523-2959
FAX 617-249-0419

North Carolina
8116 South Tryon St
Suite B3-220
Charlotte, NC 28273
704-557-0230
FAX 704-943-0623

## REPORT

The examination and comparison of the submitted material resulted in the following:

### **Examination and Comparison of the Q-1 Irvin signature to the Known Signatures of Irvin**

The range of variation exhibited in the Q-1 Irvin signature and in the known signatures of Irvin contains substantial significant differences. Range of variation is the accumulation of deviations among repetitions of respective handwriting characteristics that are demonstrated in the writing habits of an individual. A significant difference is a repeated identifying characteristic which is different between two or more handwritten items and which is outside the demonstrated range of variation of the writer and that cannot be explained.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

There are no significant similarities. A significant similarity is an individualizing characteristic in common between two or more handwritten items.

There are no limitations associated with absent characters, and quantity of writing present. An absent character is a character or character combination which is present in one body of writing but is not present (for example, does not have a corresponding character) in another body of writing.

*See Appendix 4*

888-883-1352 • info@appliedforensics.com • www.appliedforensics.com

New York
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429
FAX 516-409-0285

Washington, D.C.
5268G Nicholson Ln
Suite 125
Kensington, MD 20895
202-657-5187
FAX 301-560-6597

Connecticut
222 Main Street
Farmington, CT 06032
860-331-8228
FAX 860-606-9583

Boston
75 Arlington St
Suite 500
Boston, MA 02216
617-523-2959
FAX 617-249-0419

North Carolina
8116 South Tryon St
Suite B3-220
Charlotte, NC 28273
704-557-0230
FAX 704-943-0623

## Examination and Comparison of the Q-2 Irvin signature to the Known Signatures of Irvin

The range of variation exhibited in the Q-2 Irvin signature and in the known signatures of Irvin contains substantial significant differences.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

There are no significant similarities.

There are no limitations associated with absent characters, and quantity of writing present.

*See Appendix 4*

## Examination and Comparison of the Q-3 Irvin signature to the Known Signatures of Irvin

The range of variation exhibited in the Q-3 Irvin signature and in the known signatures of Irvin contains substantial significant differences.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

New York
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429
FAX 516-409-0285

Washington, D.C.
5268G Nicholson Ln
Suite 125
Kensington, MD 20895
202-657-5187
FAX 301-560-6597

Connecticut
222 Main Street
Farmington, CT 06032
860-331-8228
FAX 860-606-9583

Boston
75 Arlington St
Suite 500
Boston, MA 02216
617-523-2959
FAX 617-249-0419

North Carolina
8116 South Tryon St
Suite B3-220
Charlotte, NC 28273
704-557-0230
FAX 704-943-0623

There are no significant similarities.

There are no limitations associated with absent characters, and quantity of writing present.

*See Appendix 4*

## Examination and Comparison of the Q-4 Irvin signature to the Known Signatures of Irvin

The range of variation exhibited in the Q-4 Irvin signature and in the known signatures of Irvin contains substantial significant differences.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

There are no significant similarities.

There are no limitations associated with absent characters, and quantity of writing present.

*See Appendix 4*

## Examination and Comparison of the Q-5 Irvin signature to the Known Signatures of Irvin

The range of variation exhibited in the Q-5 Irvin signature and in the known signatures of Irvin contains substantial significant differences.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments;

New York
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429
FAX 516-409-0285

Washington, D.C.
5268G Nicholson Ln
Suite 125
Kensington, MD 20895
202-657-5187
FAX 301-560-6597

Connecticut
222 Main Street
Farmington, CT 06032
860-331-8228
FAX 860-606-9583

Boston
75 Arlington St
Suite 500
Boston, MA 02216
617-523-2959
FAX 617-249-0419

North Carolina
8116 South Tryon St
Suite B3-220
Charlotte, NC 28273
704-557-0230
FAX 704-943-0623

formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

There are no significant similarities.

There are no limitations associated with absent characters, and quantity of writing present.

*See Appendix 4*

## **Examination and Comparison of the Q-6 Irvin signature to the Known Signatures of Irvin**

The range of variation exhibited in the Q-6 Irvin signature and in the known signatures of Irvin contains substantial significant differences.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

There are no significant similarities.

There are no limitations associated with absent characters, and quantity of writing present.

*See Appendix 4*

888-883-1352 • info@appliedforensics.com • www.appliedforensics.com

New York
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429
FAX 516-409-0285

Washington, D.C.
5268G Nicholson Ln
Suite 125
Kensington, MD 20895
202-657-5187
FAX 301-560-6597

Connecticut
222 Main Street
Farmington, CT 06032
860-331-8228
FAX 860-606-9583

Boston
75 Arlington St
Suite 500
Boston, MA 02216
617-523-2959
FAX 617-249-0419

North Carolina
8116 South Tryon St
Suite B3-220
Charlotte, NC 28273
704-557-0230
FAX 704-943-0623

## Examination and Comparison of the Q-7 Irvin signature to the Known Signatures of Irvin

The range of variation exhibited in the Q-7 Irvin signature and in the known signatures of Irvin contains substantial significant differences.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

There are no significant similarities.

There are no limitations associated with absent characters, and quantity of writing present.

*See Appendix 4*

## Examination and Comparison of the Q-8 Irvin signature to the Known Signatures of Irvin

The range of variation exhibited in the Q-8 Irvin signature and in the known signatures of Irvin contains substantial significant differences.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

New York
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429
FAX 516-409-0285

Washington, D.C.
5268G Nicholson Ln
Suite 125
Kensington, MD 20895
202-657-5187
FAX 301-560-6597

Connecticut
222 Main Street
Farmington, CT 06032
860-331-8228
FAX 860-606-9583

Boston
75 Arlington St
Suite 500
Boston, MA 02216
617-523-2959
FAX 617-249-0419

North Carolina
8116 South Tryon St
Suite B3-220
Charlotte, NC 28273
704-557-0230
FAX 704-943-0623

There are no significant similarities.

There are no limitations associated with absent characters, and quantity of writing present.

*See Appendix 4*

## Examination and Comparison of the Questioned Irvin Signatures for Common Authorship

The range of variation in the Q-2, Q-3, Q-4, Q-6, Q-7 and Q-8 Irvin signatures contains substantial significant similarities. A significant similarity is an individualizing characteristic in common between two or more handwritten items.

Some of the individualizing characteristics considered in the writing are abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation. Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms are evaluated when present.

There are no significant differences.

There are no limitations associated with absent characters, and quantity of writing present.

*See Appendix 4*

## Examination and Comparison of the Questioned Irvin Signatures to the Known Writing of Noonan

The range of variation in the Q-2, Q-3, Q-4, Q-6, Q-7 and Q-8 Irvin signatures and the known writing of Liz Noonan contains a small number of significant similarities. A significant similarity is an individualizing characteristic in common between two or more handwritten items.

New York
1975 Hempstead Tpk
Suite 407
East Meadow, NY 11554
516-826-6429
FAX 516-409-0285

Washington, D.C.
5268G Nicholson Ln
Suite 125
Kensington, MD 20895
202-657-5187
FAX 301-560-6597

Connecticut
222 Main Street
Farmington, CT 06032
860-331-8228
FAX 860-606-9583

Boston
75 Arlington St
Suite 500
Boston, MA 02216
617-523-2959
FAX 617-249-0419

North Carolina
8116 South Tryon St
Suite B3-220
Charlotte, NC 28273
704-557-0230
FAX 704-943-0623

There are no significant differences.

There are limitations associated with the lack of directly comparable writing from Noonan.

### Findings

Stan Irvin did not sign his name to the Q-1 to Q-8 questioned documents.

The Q-2, Q-3, Q-4, Q-6, Q-7 and Q-8 Stan Irvin signatures are of common authorship.

There are indications or evidence to suggest that the Q-2, Q-3, Q-4, Q-6, Q-7 and Q-8 Stan Irvin signatures may have been written by Liz Noonan.

### Remarks

I certify this is the original of my report and contains the opinions and interpretations of the examination I performed on the above referenced case.

Dennis J. Ryan
Forensic Document Examiner

| New York | Washington, D.C. | Connecticut | Boston | North Carolina |
|---|---|---|---|---|
| 1975 Hempstead Tpk | 5268G Nicholson Ln | 222 Main Street | 75 Arlington St | 8116 South Tryon St |
| Suite 407 | Suite 125 | Farmington, CT 06032 | Suite 500 | Suite B3-220 |
| East Meadow, NY 11554 | Kensington, MD 20895 | 860-331-8228 | Boston, MA 02216 | Charlotte, NC 28273 |
| 516-826-6429 | 202-657-5187 | FAX 860-606-9583 | 617-523-2959 | 704-557-0230 |
| FAX 516-409-0285 | FAX 301-560-6597 | | FAX 617-249-0419 | FAX 704-943-0623 |

**APPENDIX TO HANDWRITING
EXPERT REPORT OMITTED**

# EXHIBIT K

# Excerpt Of State's Opposition To
# Spruill's CPL § 440.10 Motion

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 38

THE PEOPLE OF THE STATE OF NEW YORK

-against-

TASKER SPRUILL,

Defendant.

AFFIRMATION IN
OPPOSITION TO MOTION
TO VACATE JUDGMENT

Kings County
Indictment Number
13008/95

MORGAN J. DENNEHY, an attorney duly admitted to practice law in the State of New York, and an Assistant District Attorney in Kings County, affirms under the penalties of perjury that the following is true:

1. I submit this affirmation in opposition to defendant's motion, dated March 14, 2016, for an order vacating his judgment of conviction pursuant to C.P.L. § 440.10.

2. I affirm the following statements on information and belief, based upon my examination of the records and files of the Kings County District Attorney's Office.

3. On October 22, 1993, near McDonald and Hopkinson Avenues in Brooklyn, defendant shot and killed Tracey Thomas, a reputed drug dealer, with a bullet fired into his chest. At the time, Thomas was sitting in his parked car in front of a video game room and pool hall, which was a local hangout operated by defendant, who was also known as "Pike." Thomas drove his car around the corner and then collapsed at the wheel, crashing his

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 38

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Kings County
Indictment Number
13008/95

TASKER SPRUILL,

Defendant.

## MEMEORANDUM OF LAW

### POINT I

#### DEFENDANT'S BRADY CLAIM SHOULD BE REJECTED WITHOUT A HEARING BECAUSE HE HAS FAILED TO ESTABLISH THAT THE PROSECUTOR COMMITTED A BRADY VIOLATION.

As the first ground in support of his motion to vacate his judgment of conviction, defendant claims that the prosecutor, Stanley Irvin, violated the requirements of Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose to the defense the affirmations and the court orders that were used to facilitate the transfer of an eyewitness, Shawn Newton, from prison so that Irvin could speak with Newton in the months leading up to defendant's trial. Defendant also claims that the prosecutor committed a Brady violation by failing to disclose to the defense the material witness order that he had used to secure the attendance at trial of the second eyewitness, Marilyn Connor. Defendant claims that had these affirmations and orders been disclosed, they would have

establish that the orders and affirmations were favorable to the defense and that there is a reasonable probability that their disclosure would have changed the outcome of the trial. See People v. Lundy, 48 A.D.3d 1046, 1047 (4th Dep't 2008) ("The information at issue, i.e., the fact that a witness was testifying pursuant to a material witness order, does not constitute Brady material because it is not exculpatory").

Defendant claims, for several reasons, that the orders to produce Newton from prison and to compel Connor's presence at trial, and the affirmations used to obtain those orders, would have benefitted him and would have changed the outcome of the trial, but each of those reasons is based upon unsupported allegations which are contradicted by the record, and is in conflict with common sense. First, defendant argues that the affirmations and the orders showed that Newton had refused to meet with Irvin, and that Irvin had coerced Newton into testifying against defendant by wearing down Newton's will through an alleged tactic that defendant calls "bullpen therapy" (i.e., the repeated transporting of an inmate from prison to prison) (Dave affirmation at 2-3, 5, 31, 36, 40; Defendant's Memorandum of Law at 8-9, 11). Defendant's claim of coercion should be rejected without a hearing, because that claim rests on allegations that are unsupported, speculative, and belied by the record. See C.P.L. § 440.30(4)(b) (upon considering merits of

13

motion to vacate judgment, court may deny motion without a hearing if motion is based upon the existence of facts, and the moving papers do not contain sworn allegations substantiating the essential facts).

The affirmations to obtain the orders to produce and to obtain the _Damiani_ orders, and the orders themselves, are evidence of nothing more than Irvin causing Newton to be transported from prison to the District Attorney's Office so that Irvin could meet with Newton in the months leading up to defendant's trial. A fair reading of the record shows that, at those meetings, Newton expressed his reluctance to testify because he was afraid for his and his wife's safety, and he and Irvin discussed which benefits Irvin could extend to Newton to secure Newton's testimony. _See_ _supra_ at 8-11 (433-39); _see also_ Newton's extensive trial testimony about the benefits he had received from Irvin in exchange for his trial testimony (449-62, 645-52).

The fact that Newton negotiated a series of significant benefits from Irvin in exchange for his testimony -- including a reprieve from four months of solitary confinement, possible early work release and/or parole, a possible transfer to a non-maximum security facility, and a threat assessment for his wife which could have resulted in her moving to a different apartment -- supports the conclusion that Newton made a conscious and informed

14

decision to meet with Irvin and ultimately to testify against defendant, presumably because Newton decided that the benefits of Irvin's promises outweighed the danger associated with testifying.

Defendant's argument that the affirmations and orders show that Irvin coerced Newton into testifying should be rejected, because it is unsupported by any evidence (notably, defendant has not attached to his motion an affidavit from Newton), and because it is fatally undermined by the record. Newton's earlier assertions, as recounted by Irvin (438-39), that he did not want to testify undoubtedly reflected Newton's equivocation due to his fear, and/or his posturing to achieve the greatest benefit that he could from his testifying. It did not reflect his outright refusal to testify under any circumstance. Thus, Newton's reluctance to testify in no way establishes that Newton's trial testimony was coerced.[5]

Relying upon People v. Russ, 79 N.Y.2d 173 (1992), defendant argues that because the affirmations and orders would have established that Newton's testimony had been "legally coerced,"

_____

[5] Indeed, as argued above (see supra at 11-12), because Newton's reluctance to testify was disclosed by Irvin before Newton testified (438-39), defense counsel was free to use this reluctance to attempt to undermine Newton's credibility. The fact that counsel did not ask Newton about his reluctance to testify is hardly surprising, as it would have opened the door to testimony, damaging to the defense, about how the reluctance was caused by Newton's fear of defendant.

15

# EXHIBIT L

## DA Opposition To Spruill's Article
## 78 Petition

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS:  CIVIL TERM, IAS PART 52

In the matter of the application of
TASKER SPRUILL,

                              Petitioner,

For a Judgment Pursuant to Article 78
of the Civil Practice Law and Rules,

                    -against-

CHARLES J. HYNES, Kings County District
Attorney,

                              Respondent.

AFFIRMATION IN
OPPOSITION TO PETITION

Index No. 11036/2010

MORGAN J. DENNEHY, an attorney duly admitted to practice law
in the State of New York, and an Assistant District Attorney in
the office of Charles J. Hynes, District Attorney of Kings County
(hereinafter "respondent"), affirms under the penalties of perjury
that the following is true:

1.   I submit this affirmation in opposition to petitioner's
C.P.L.R. Article 78 petition, in which he challenges the
constructive denial of his Freedom of Information Law (hereinafter
"FOIL") request.

2.   I affirm the following statements on information and
belief, based upon my examination of the records and files
maintained by the Kings County District Attorney's Office.

3.   By letter dated August 1, 2006, petitioner requested,
pursuant to FOIL, all of the records in the respondent's
possession that related to petitioner's prosecution under Kings

County Indictment Number 13008/95 and to Linwood Spruill's prosecution under Kings County Indictment Number 1170/94.

4. The respondent acknowledged receipt of the FOIL request, and the request was partially answered on May 11, 2007. Petitioner appealed from the partial answer, and the respondent granted his appeal, and promised a more complete response within the next thirty days. After the thirty days elapsed without a supplemental response, petitioner inquired about the status of the supplemental response then filed a C.P.L.R. Article 78 petition challenging the constructive denial of his FOIL request. The Court dismissed the petition because petitioner had failed to serve the order to show cause and the petition upon the respondent (Saitta, J.).

5. Over the course of the following two years, petitioner and the respondent exchanged correspondence, but the supplemental FOIL response remained outstanding because the respondent had only located a small portion of the requested materials and had encountered significant difficulties in locating the complete files.

6. Petitioner has now filed the instant C.P.L.R. Article 78 petition, presumably challenging the constructive denial of his FOIL request.[1]

---

[1] The respondent presumes that this is the claim because while petitioner has served the respondent with the order to show cause, petitioner has not served the respondent with the C.P.L.R. Article 78 petition.

2

7. After receiving the order to show cause, the respondent re-doubled its efforts to locate the missing materials, and the complete files ultimately were located. On June 22, 2010, the respondent fully answered petitioner's FOIL request, and sent him a letter listing all of the documents that were available for purchase. See June 22, 2010 letter, attached hereto as Exhibit A. Thus, because the respondent has already answered the request, the relief that petitioner seeks is moot. Accordingly, the Article 78 petition should be dismissed.

Dated: Brooklyn, New York
June 23, 2010

Morgan J. Dennehy
Assistant District Attorney
(718) 250-2515

cc: Tasker Spruill
Inmate Number 98-A-5959
Clinton Correctional Facility
PO Box 2001
Dannemora, New York  12929

## EXHIBIT A



# OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY

RENAISSANCE PLAZA at 350 JAY STREET
BROOKLYN, N.Y. 11201-2908
(718) 250-2000

**CHARLES J. HYNES**
*District Attorney*

June 22, 2010

Tasker Spruill
Inmate Number 98-A-5959
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929

Re: FOIL Requests
People v. Tasker Spruill
Kings County Indictment
Number 13008/95
People v. Linwood Spruill
Kings County Indictment
Number 1170/94

Mr. Spruill:

In response to your requests for records pursuant to the Freedom of Information Law (FOIL) be advised that the file in question has been located, and I can provide you with copies of the following records:

| Documents | Pages |
|---|---|
| Index Sheets | 3 |
| UF-61 (Complaint Report) | 1 |
| DD5 (Complaint Follow Up) | 72 |
| On Line Booking System Worksheet | 1 |
| Activity Logs (Memo Book Entries) | 50 |
| Miscellaneous Notes | 4 |
| Sprint/911 Report | 5 |
| Arrest Report | 6 |
| Expenditure Breakdown/Receipts | 2 |
| Unusual Occurrence Reports | 3 |
| ESU Report | 1 |
| Investigative Plan | 2 |
| Interrogation Warnings | 1 |
| Lineup Report/Photos | 1 |
| Aided Report | 2 |
| Investigation Card | 1 |
| Crime Scene Unit Reports | 8 |
| Photographs | 20 |
| Ballistics Reports | 4 |
| Fingerprint Records | 4 |

| Documents | Pages |
|---|---|
| Property Clerk Invoices | 7 |
| Notices and Voluntary Disclosure Form | 11 |
| Mugshots | 4 |
| Indictment | 9 |
| Criminal Court Complaint | 1 |
| CJA Interview Report | 1 |
| Transcript of Statements | 49 |
| Wanted Posters | 2 |
| Newspaper Article | 1 |
| Birth Certificate | 1 |
| Potential Witness List | 1 |
| Miscellaneous Police Records | 14 |
| Correspondence | 1 |
| Motions, Court Records and Warrants | 56 |
| Investigation Card | 1 |
| Homicide Bureau Investigation Sheet | 6 |
| Early Case Assessment Bureau Data Sheet | 1 |
| **Total** | **357** |

**Tapes**
Audiotape of Morris Rogers' Statement
Tape Number A93-1576
Audiotape of P.O. Cole's Statement
Tape Number A93-1515
Audiotape of P.O. Harrison's Statement
Tape Number A93-1613
Audiotape of P.O. Cocco's Statement
Tape Number A93-1621
Audiotape of Marilyn Connor's Statement
Tape Number A93-1731
Audiotape of Derrick Wright's Statement
Tape Number A93-1688

A statutory photocopying fee of 25¢ per page will be assessed for each photocopied page sent to you. Furthermore, a reproduction fee of $5.00 per audiotape will be assessed for each tape sent to you. Accordingly, should you wish to receive copies of these records, remit your check or money order in the amount of $119.25, made payable to the Kings County District Attorney's Office, to my attention at your earliest convenience. Do NOT make your check payable to me. If you wish to limit your request to only certain records, indicate which records you wish to receive and make your check or money order payable in the appropriate amount.

Be advised that the copies offered to you will be retained by the Kings County District Attorney's Office for six months. If payment is not received within that period, the copies will be destroyed. Be further advised that we will not provide any records without payment of the statutory reproduction fees. The Freedom of Information Law does not provide for waiver of these fees. See Whitehead v. Morgenthau, 146 Misc. 2d 806 (Sup. Ct. New York County 1990).

Information of a personal nature regarding any witnesses and/or identifying information relating to informants who did not testify at trial have been deleted from the records to be provided to you pursuant to Public Officers Law §§ 87(2)(e)(iii), 89(2). The release of personal and/or identifying information would impede the law enforcement capabilities of this office and hamper future efforts to secure the cooperation of informants and witnesses. See Public Officers Law §§ 87(2)(e) and (f); see also De Oliveira v. Wagner, 274 A.D.2d 904 (3d Dep't 2000); Johnson v. New York City Police Dep't, 257 A.D.2d 343 (1st Dep't 1999); Moore v. Santucci, 151 A.D.2d 677 (2d Dep't 1989); Knight v. Gold, 53 A.D.2d 694 (2d Dep't 1976).

Autopsy records, which would include all medical examiner reports, etc., have been withheld because these are specifically exempt from disclosure pursuant to New York City Charter § 557(g), and thus are exempt from disclosure under the Freedom of Information Law. See Public Officers Law § 87(2)(a); New York City Charter § 557(g); see also Scott v. Borakove, 248 A.D.2d 175 (1st Dep't 1998); see also Daily Gazette v. Schenectady, 93 N.Y.2d 145 (1999); Prisoners' Legal Servs. v. New York State Dep't of Correctional Servs., 73 N.Y.2d 26 (1998); Capital Newspapers v. Burns, 67 N.Y.2d 562 (1986).

Records and/or references therein that represent the work product of an attorney have been withheld since these are exempt from disclosure under the Freedom of Information Law. See Public Officers Law § 87(2)(a); Civil Practice Law and Rules § 3101(c).

Records or references therein have been withheld where disclosure would endanger the life or safety of a person and/or result in an unwarranted invasion of the subject's privacy. See Public Officers Law §§ 87(2)(b)(f), 89(2); see also Stonza v. Hoke, 148 A.D.2d 900 (3d Dep't 1989); Nallo v. Sullivan, 125 A.D.2d 311 (2d Dep't 1986); De Oliveira v. Wagner, 274 A.D.2d 904 (3d Dep't 2000); Johnson v. New York City Police Dep't, 257 A.D.2d 343 (1st Dep't 1999); Allen v. Strojnowski, 129 A.D.2d 700 (2d Dep't 1987).

Records relating to Grand Jury proceedings have been withheld. Grand Jury proceedings and the materials and testimony related thereto are secret, and thus are not disclosable pursuant to a FOIL request. See Penal Law § 215.70; Criminal Procedure Law § 190.25(4)(a); Public Officers Law § 87(2)(a); see also Ex rel. Newton v. District Attorney, 186 A.D.2d 57 (1st Dep't 1992); Thompson v. Weinstein, 150 A.D.2d 782 (2d Dep't 1989); Allen v. Strojnowski, 129 A.D.2d 700 (2d Dep't 1987).

Furthermore, Grand Jury minutes are court records, not agency records, and thus are exempt from the ambit of FOIL disclosure for this additional reason. See Mullgrav v. Santucci, 195 A.D.2d 786 (3d Dep't 1993); Gibson v. Grady, 192 A.D.2d 657 (2d Dep't 1993).

Intra-agency records which are not (i) statistical or factual tabulations or data; (ii) instructions to staff that affect the public; (iii) final agency policy or determinations; or (iv) external audits, including but not limited to audits performed by the comptroller and federal government are exempt from disclosure under the Freedom of Information Law and have been withheld. See Public Officers Law § 87(2)(g).

New York Criminal History Reports (rapsheets) have been withheld. Such reports, which are generated by the Division of Criminal Justice Services, are exempt from disclosure under the Freedom of Information Law. See Public Officers Law §§ 87(2)(a) and (b), 89(2)(b); Executive Law § 837(8); 9 N.Y.C.R.R. § 6150.4(b)(6); see also Gerace v. Mandel, 267 A.D.2d 386 (2d Dep't 1999); Woods v. Kings County Dist. Attorney's Office, 234 A.D.2d 554 (2d Dep't 1996); Bennett v. Girgenti, 226 A.D.2d 792 (3d Dep't 1996); cf. United States Dep't of Justice v. Reporters Committee for Freedom of Press, 489 U.S. 749 (1989). Furthermore, this office's use agreement with the Division of Criminal Justice Services prohibits us from disseminating Criminal History Reports in response to Freedom of Information Law requests.

Court transcripts have been withheld. Transcripts of court proceedings are not agency records but judicial records and, thus, are exempt from disclosure under the Freedom of Information Law. See Public Officers Law §§ 86(3) and 87(2); see also Moore v. Santucci, 151 A.D.2d 677 (2d Dep't 1989). Court transcripts must be obtained from the Office of the Principal Court Reporter, 360 Adams Street, 6th Floor, Brooklyn, New York 11201.

Unless they were admitted at trial as an exhibit, medical records are exempt from disclosure under the Freedom of Information Law. First, medical records are specifically exempted from disclosure by Civil Practice Law and Rules § 4504, and thus are not discoverable under the Freedom of Information Law. See Public Officers Law § 87(2)(a). Second, disclosure of medical records would constitute an unwarranted invasion of personal privacy pursuant to Public Officers Law § 89(2)(b)(ii). Therefore, they are exempt from disclosure under the Freedom of Information Law pursuant to Public Officers Law § 87(2)(b). See also Hanig v. State Dep't of Motor Vehicles, 79 N.Y.2d 106 (1992).

Witness statements are exempt from disclosure under the Freedom of Information Law unless they have been disclosed in court. See Public Officers Law § 87(2)(c)(iii); see also Knight v. Gold, 53 A.D.2d 694 (2d Dep't 1976); see also Johnson v. Hynes, 264 A.D.2d 777 (2d Dep't 1999); Williams v. Erie County Dist. Attorney, 255 A.D.2d 863 (4th Dep't 1998); Spencer v. New York State Police, 187 A.D.2d 919 (3d Dep't 1992); Moore v. Santucci, 151 A.D.2d 677 (2d Dep't 1989); Melendez v. New York, 109 A.D.2d 13 (1st Dep't 1985). Accordingly, records and/or references therein containing the statements of witnesses who did not testify in court have been withheld.

You may appeal these determinations within thirty days of the date of this letter by contacting Morgan Dennehy, Esq., FOIL Appeals Officer, at the above address.

Very truly yours,

Douglas O'Connell
Paralegal Specialist
FOIL Records Access Officer



*WebCivil Supreme - Appearance Detail*

Court: **Kings Civil Supreme**
Index Number: **011036/2010**
Case Name: **SPRULL,TASKER vs. HYNES,CHARLES J.**
Case Type: **Special Proceedings**
Track: **Standard**

### Appearance Information:

| Appearance Date | Time | On For | Appearance Outcome | Justice / Part | Comments | Motion Seq |
|---|---|---|---|---|---|---|
| 07/23/2010 | | Motion | Dismissed | FRANCOIS A. RIVERA (PT. 52) MOTION TRIAL TERM 52 | PETITION DISMISSED | 001 |
| 06/25/2010 | | Motion | Adjourned | FRANCOIS A. RIVERA (PT. 52) MOTION TRIAL TERM 52 | | 001 |
| 05/13/2010 | | Motion | Adjourned | FRANCOIS A. RIVERA (PT. 52) ORDER TO SHOW CAUSE PART | | 001 |

Close

# EXHIBIT M

## Excerpt of July 13, 2016, Appearance Transcript On Spruill's CPL § 440.10 Motion

CRIMINAL COURT OF THE CITY OF NEW YORK

COUNTY OF KINGS                    PART 38

- - - - - - - - - - - - - - - - - - - - x
THE PEOPLE OF THE STATE OF NEW YORK,

                                                  Docket No.:

                -against-                         13008/95


TASKER SPRUILL,
                              Defendant.
- - - - - - - - - - - - - - - - - - - - x

                        120 Schermerhorn Street
                        Brooklyn, New York 11201
                        July 13, 2016

B E F O R E:

        THE HONORABLE MICHAEL GERSTEIN, Criminal Court Judge

A P P E A R A N C E S:

FOR THE PEOPLE:

                KENNETH P. THOMPSON, ESQ.
                District Attorney Kings County
                350 Jay Street
                Brooklyn, New York 11201
                BY: MORGAN J. DENNEHY, ESQ.


FOR THE DEFENDANT:

                RITA DAVE, ESQ.
                Attorney for the Defendant
                26 Court Street, Suite 1212
                Brooklyn, New York 11242
                BY: RITA DAVE, ESQ.

ALSO PRESENT:  JABBAR COLLINS


                        NANCY McENROE, RPR, NYACR
                        OFFICIAL COURT REPORTER

1    taken out 20 times and water boarded 20 times -- and that

2    didn't happen.  So whether you call it "Brady" or "fraud,"

3    that evidence would be precluded as being coerced.

4            She says -- she, Ms. Dave -- says he was coerced,

5    and she gives it the fancy became of "bullpen therapy."

6            MR. DENNEHY:  The difference is in Your Honor's

7    scenario, the evidence was developed through the coercion.

8    Here, the evidence existed before the alleged coercion.

9    All Newton was trying to do was massage this guy onto the

10   stand.  That's all he was trying to do.

11           This statement he gave two days after the murder,

12   right?  So he didn't create any evidence; he didn't offer

13   any evidence.  All he was trying to do was to get him to

14   testify and to promise him what he needed to do to get him

15   on the stand.  That's very different than water

16   boarding someone and getting evidence.

17           THE COURT:  Of course it is.  I just took it as a

18   hypothetical to say if the evidence is coerced, if the

19   testimony is coerced --

20           MR. DENNEHY:  I don't understand this coercion

21   claim.  What could Irvin have done to coerce him?

22           THE COURT:  She says bringing him back and forth

23   20 times is coercive.

24           MR. DENNEHY:  He is allowed to do that.

25           THE COURT:  Is he?

1    MR. DENNEHY: Yes. He is allowed to prepare his

2    case.

3    THE COURT: If I'm Upstate in jail, and I say, "I

4    don't want to meet with the DA. Go away. Leave me alone,"

5    you are allowed to bring me down 20 times to try to

6    browbeat me?

7    MR. DENNEHY: Yes. You are not allowed to bring

8    them from Rikers Island to your office, but as the DA, I

9    could bring you down to Rikers Island, and I could go talk

10   to you at Rikers. That is completely permissible.

11   THE COURT: And he walks away and says, "I don't

12   want to talk to you. Stop doing this."

13   MR. DENNEHY: He could. He could, but I don't

14   think that would preclude Mr. Irvin from trying to issue at

15   times -- to get the Court to sign orders to bring him down.

16   Now, taking him out of prison and bringing him to his

17   office, yes, you need consent for that.

18   THE COURT: Where were those 20 meetings? Nobody

19   developed that.

20   MR. DENNEHY: I have to say, and of course this is

21   not part of the record, but in my conversations with

22   Mr. Irvin, Mr. Newton way overstated the number of

23   meetings. It was nowhere near 20.

24   THE COURT: I don't know. That's what he is

25   saying under oath at trial.

PROCEEDINGS

1        MR. DENNEHY: That's fine. So let's assume it's

2    20. My point is that the CPL permits the prosecutor to

3    bring the defendant down from prison so that prosecutor can

4    prepare his or her case. That's allowed. The allegations

5    here is that he didn't follow the letter of the law by him

6    self-signing the affirmations to get the orders, that his

7    paralegal signed his name in his place, or that he wasn't

8    brought down on court dates even though there was no

9    requirement --

10       THE COURT: No. You misstate the allegations. I

11    understand the allegation. It's that he was coerced. Not

12    just that he didn't sign in the right place. If he

13    consented, who cares whether he signed it or he -- the

14    evidence is consent in some other fashion.

15       MR. DENNEHY: So, it's confined -- I think there

16    is one Damiani Order, maybe two, I'm not sure if I'm

17    remembering the record correctly, where there's a consent

18    line and there is no signature there, and that's evidence

19    that --

20       THE COURT: Do you have any that -- where there

21    were --

22       MR. DENNEHY: Those are the only orders in the

23    file.

24       THE COURT: We know if there were more than two

25    meetings, there were presumably more than two orders.

1    MR. DENNEHY:  That would suggest that --

2    THE COURT:  I don't know what it suggests.

3 Possibly.

4    MR. DENNEHY:  I understand.  Again, I would

5 contend that there is no evidence here of coercion,

6 that those Damiani Orders don't make out coercion.  It's

7 refuted by the record.  You know, Irvin is allowed to speak

8 to this witness, and I don't understand how coercion could

9 have occurred.  Either the witness testified or he doesn't.

10 And on the day of trial, Irvin didn't know if he was going

11 to testify, so how could you have been coerced?  He made up

12 his own mind.  He made an informed decision.  "I want the

13 benefits.  I'm going to roll the dice.  I might be in

14 danger, but I'm going to roll the dice because I want the

15 benefits."

16    That's what happened here.  It's not coercion.

17 It's free will.  It's evinced by the record.  And unless

18 Your Honor has any further questions, I rely on my papers.

19    THE COURT:  Okay.  All right.  This is what I'm

20 going to do here.  I am going to direct a hearing,

21 primarily on the issue of whether Shawn Newton consented to

22 all these meetings with the DA.  Or if he did not consent,

23 whether the DA had legal authority to have such meetings

24 without his consent.

25    There will be an order -- an interim decision and